IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, WHEELING DIVISION

| | | |
|---|---|---|
| PROGRESSIVE MINERALS LLC., | § | |
| | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | |
| MUHAMMAD HAROON RASHID, | § | CASE NO. 5:07-CV-108 |
| GERALD D. HENDRIX, DAVID M. | § | |
| BERNSTEIN, JOHN DOUGLAS | § | |
| REYNOLDS, JOHN C. CROSBIE, and | § | |
| JUDE O'NURKERA, | § | |
| | § | |
| Defendants. | | |



FILED
AUG 2 4 2007
U.S. DISTRICT COURT
WHEELING, WV 26003

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Progressive Minerals LLC, ("Progressive") files this Complaint, and for cause of action respectfully states:

### I. Parties

1. Plaintiff Progressive Minerals LLC is a limited liability company, with its principal place of business located in Moundsville, West Virginia.

2. Defendant Dr. Muhammad Haroon Rashid ("Rashid") is an individual residing in Houston, Texas. Rashid is CEO and President of Global Empire Investments and Holdings LLC. ("Global"). Rashid is amenable to the jurisdiction of this Court and to service of process under the West Virginia Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007). Rashid has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. This proceeding arises out of the business done in West Virginia by Rashid. Accordingly, the Secretary of State of West Virginia is an agent for service of process upon Rashid, and may be served pursuant to W.Va. Code § 56-3-33(c) (2007). The Secretary of State of West Virginia

may forward the Citation and this Complaint to Rashid at his home or home office address, 5821 Southwest Freeway, Suite 500, Houston, TX 77057.

3. Defendant Gerald D. Hendrix ("Hendrix") is an individual residing in Houston, Texas. Hendrix was Global's COO and CFO. Hendrix is amenable to the jurisdiction of this Court and to service of process under the Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007). Hendrix has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. This proceeding arises out of the business done in West Virginia by Hendrix. Accordingly, the Secretary of State of West Virginia is an agent for service of process upon Hendrix, and he may be served pursuant to W.Va. Code § 56-3-33(c) (2007). The Secretary of State of West Virginia may forward the Citation and this Complaint to Hendrix at his home or home office address, 15455 Ella Blvd., #48, Houston, TX 77090.

4. Defendant David M. Bernstein ("Bernstein") is an individual residing in Quebec, Canada. Bernstein was Global's Vice President of Finance and Legal. Bernstein has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Bernstein in accordance with The Hague Convention on Service. A copy of the summons and complaint will be served by personal service upon David M. Bernstein at 25 Raspberry Crescent, Beaconsfield, Quebec, Canada, H9W 6C9 or wherever he may be found.

5. Defendant John Reynolds ("Reynolds") is an individual residing in Canada. Reynolds was a member of Global's Board of Directors. Reynolds has committed torts in whole or in part in West Virginia as set out more fully in this Complaint. Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Reynolds in accordance with

The Hague Convention on Service. A copy of the summons and complaint will also be served by personal service upon John Reynolds at Lang Michener LLP, 1500 Royal Centre, 1055 West Georgian Street, Vancouver, British Columbia V6E 4N7 or wherever he may be found.

6. Defendant John C. Crosbie ("Crosbie") is an individual residing in Canada. Crosbie was the Chairman of Global's Board of Directors. Crosbie has committed torts in whole or in part in West Virginia as set out more fully in this Complaint. Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Crosbie in accordance with The Hague Convention on Service. A copy of the summons and complaint will also be served by personal service upon John C. Crosbie at Cox & Palmer, Scotia Centre, Suite 1000, 235 Water Street, St. John's, Newfoundland A1C 1B6 or wherever he may be found..

7. Defendant Jude O'Nurkera ("O'Nurkera") is an individual residing in Georgia. O'Nurkera introduced Progressive to Global Empire Investments and Holdings LLC. O'Nurkera is amenable to the jurisdiction of this Court and to service of process under the West Virginia Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007). O'Nurkera has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. Accordingly, the Secretary of State of West Virginia may forward the Citation and this Complaint to O'Nurkera at his home or office address, 6260 Indian River Drive, Norcross, Georgia 30092-1349.

## II. Jurisdiction and Venue

8. The Court has original jurisdiction over this action since the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states pursuant to 28 U.S.C. 1332 (2007).

9. Venue is proper in this Court because all or a substantial part of the events or omissions occurred within this district.

### III. Summary

10. This case arises out of the deceit and trickery of numerous individuals who conspired to swindle a West Virginia company that was seeking to obtain financing to acquire a coal mine in Bishop, McDowell County, West Virginia (the "Project" or "Mine"). In reliance upon the fraudulent misrepresentations of O'Nurkera, Rashid, and Hendrix that Global was a financially solid business entity, with numerous holdings throughout the world, and could provide the necessary $200,000,000.00 in financing, and the reputation of Board of Director members Crosbie and Reynolds, Progressive entered into an agreement with Global pursuant to which Global was to fund Progressive's acquisition of the Mine. In reality, Global was a façade. According to its subsequent bankruptcy filing and Rashid's testimony therein, Global had virtually no unencumbered assets, had never made a loan, and had virtually none of the many subsidiaries and holdings that had been represented to Progressive. In essence, Global was Rashid, Hendrix and their gang of Canadian conspirators who through various lies and misrepresentations created the illusion of a mythical business enterprise in order to defraud Progressive out of a $750,000.00 loan commitment fee. In all, Progressive lost in excess of $1.25 million as a result of the Defendants fraudulent scheme.

### IV. Facts

**A.    Background of Global**

11. Global was created in 2003. Rashid was Global's sole shareholder. Upon information and belief, Rashid was the only "director" that had the right to vote, while both

Crosbie, the Chairman of the Board of Directors, and Reynolds, were non-voting members of Global's Board of Directors.

12.     Rashid also served as the Chief Executive Officer for Global.  Hendrix was Global's Chief Financial Officer, and David M. Bernstein served as Global's Vice President of Finance and Legal Affairs.

13.     Global was far from what the "Global Empire" name implied.  On December 6, 2005, after only two years as a business entity, Global filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.  As of the date of bankruptcy filing, its assets consisted of three bank accounts which collectively contained $3,369.24, and two office buildings in Houston, Texas (the "Office Park").  While the Office Park was valued on the Harris County Tax Rolls at approximately $5.4 million, there was approximately $12.8 million in secured debt against it.

**B.     The Fictitious Empire and the Duping of Progressive**

14.     Despite its limited holdings, O'Nurkera, Hendrix and ultimately Rashid, represented to Progressive on all occasions, and within numerous documents, that Global was, as its name suggests, a global conglomeration of multiple business entities, and in particular, that it was an "asset based investment and holding corporation" that provided "venture capital."  In fact, Global had never made a loan, had few assets of value, no net worth, and thus absolutely no ability to engage in a transaction of the size of the proposed financing.  Moreover, upon information and belief, the commitment fee received from Progressive was used almost, if not entirely, and nearly immediately, for purposes personal to the Defendants and unrelated to Progressive.  Under the circumstances, it is clear Global never intended to perform and instead

was a mere façade created for the purpose of defrauding Progressive, and others.

15. Progressive learned of Global in the Spring of 2005. Progressive was told about Global by Fred Cooper ("Cooper"). Cooper had learned from Progressive that Progressive was looking for financing. During a conversation between Cooper and O'Nurkera, unrelated to the Project, O'Nurkera told Cooper about Global. O'Nurkera forwarded Cooper a lengthy PowerPoint presentation about Global. The PowerPoint presentation, which upon information and belief was prepared by Rashid and Hendrix, and provided by them to O'Nurkera, explained in detail the alleged holdings of Global and the inner workings of their alleged affiliates and subsidiaries. The PowerPoint presentation further highlighted the various services purportedly offered by Global, the numerous industry sectors with which Global allegedly frequently conducted business, the services supposedly provided by Global, and contained detailed resumes and biographies of all the key members of Global—most notably Rashid, Hendrix, Bernstein, Reynolds and Crosbie.

16. Global was portrayed to Progressive, both orally and within the PowerPoint presentation as an asset based investment and holding corporation that engaged in diversified investment, financial and related operations throughout the world and that had the wherewithal to finance, or arrange financing for, the Project. Global's business interests allegedly encompassed a broad cross-section of industries, including all energy sectors, manufacturing companies, service industries, real estate companies as well as residential and commercial sectors.

17. The PowerPoint presentation further emphasized that Global regularly participated in leveraged buyouts and acquisitions, business turnarounds, as well as investing in Chapter 11 debtors. Global was represented as "specializing" in a variety of investments which

included the following:

    a) residential and commercial land development and construction

    b) oil and gas exploration, refining and transportation

    c) marketing refined products on wholesale and retail basis

    d) electric power regeneration

    e) maintenance of oil services for refinery equipment

    f) import and export of commodities

    g) hospitality division of recreation and lodging

    h) healthcare and pharmaceuticals

    i) venture capital and debt restructuring

    j) automotive industries

18.    Global was further represented both verbally and within the PowerPoint presentation as maintaining ownership and financial interests in a number of corporations including, but not limited to the following:

    a)    Primergy International, LLC ("Primergy"). This corporation allegedly had several subsidiary corporations within the oil, gas and electrical energy sectors. Primergy allegedly held all of Global's oil and gas related companies which supposedly included two refineries in Texas and Louisiana.

    b)    Petroworld Services, LLC ("Petroworld"). Petroworld allegedly provided project management construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally. Such services allegedly included offering complete turnkey projects from refurbishing to comprehensive installations.

      c)      Prime Stops, LLC ("Prime Stops"). Prime Stops allegedly had formal Letters of Intent with several leading companies in the United States and Canada to purchase over 8,300 gas stations and truck stops throughout North America.

      d)      Prime Development & Construction, LLC ("Prime Development"). Prime Development allegedly focused on real estate investment and the construction and development of commercial and residential properties for affordable/low income housing, multi-family housing, commercial office, retail and industrial build outs. Prime Development allegedly had $60M under contract in affordable housing build-outs.

      e)      Galleria Corridor, LLC ("Galleria"). Galleria was represented as being a full service management and leasing company that had 166,000 square feet of office space under management in Houston, Texas, and was in the process of securing management services contracts for ten other buildings. While Galleria does manage the Office Park it does not, and upon information and belief never has, or has sought to, manage any other properties.

      f)      Transworld Power Partners, LLC ("Transworld"). Transworld allegedly had several electrical generating plants with existing supply contracts in place and was positioned to become an established and operating utility company in the United States. Transworld's management team was represented as being well known in the electrical energy market.

      g)      Worldwide Resources USA, LLC, Worldwide Resources Honduran, Inc., and Worldwide Resources Asia (collectively "Worldwide Resources"). Global allegedly established these three independent international commodity trading companies which allegedly focused on timber, sugar, skim milk powder, oil and cotton. These corporations were allegedly

operating in Dubai with ten employees and Hong Kong with three employees.

    h)  World Times Communications, LLC ("World Times"). Global allegedly owned this telecommunication corporation that focused on prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP. World Times allegedly was a pioneer in long distance and prepaid calling including establishing distribution channels within various communities in Southern California.

  19.  In addition, O'Nurkera forwarded references on Global to Cooper. O'Nurkera knew Cooper was doing due diligence on behalf of Progressive and intended the PowerPoint, the references, and the impression that Global was a legitimate enterprise as described above to be relayed to, and relied upon by, Progressive.

  20.  In reliance upon O'Nurkera's, Rashid's and Hendrix's countless misrepresentations of the financial wherewithal of Global, and its fictitious affiliates and subsidiaries, Progressive was induced into entering into a contractual relationship with Global for a $200,000,000.00 Loan (the "Loan") from Global to Progressive in order to acquire the Project.

  21.  Specifically, on or about July 14, 2005, Global and Progressive entered into a Commitment Letter for the establishment of a $200,000,000.00 Credit Facility which would be used to finance the acquisition. In furtherance of the Commitment Letter, Progressive and Global entered into a formal agreement on July 21, 2005 (the "Agreement").

  22.  Pursuant to the Agreement, Progressive was required to pay Global $750,000.00 upfront as a commitment fee in order to process the Loan (the "Commitment Fee"). The Commitment Fee was payable in two parts: (a) $250,000.00 upon execution of the Agreement

9

and (b) $500,000.00 once the commitment letter was issued. Both of these prerequisites were ultimately satisfied and Progressive promptly forwarded the Commitment Fee to Global.[1]

23. Following the execution of the Agreement, but prior to the issuance of the Commitment Letter or payment of the $500,000.00, O'Nurkera and Hendrix visited the Mine, ostensibly to do due diligence, but in hindsight simply to further the façade and insure payment of the final installment.

24. As a component of the Agreement, Rashid, on behalf of Global, also executed a Corporate Guaranty (the "Corporate Guaranty") providing that if the Loan was not completed within 120 days after receipt of the Commitment Fee, Global would refund the Commitment Fee, without deductions. Despite Global's failure to process the Loan at the conclusion of the 120 day period, Global failed to refund the Commitment Fee, and upon information and belief, had no wherewithal to do so, having already distributed its ill gotten gain to and among the Defendants herein.

25. Furthermore, in reliance upon the representations made by O'Nurkera, Rashid and Hendrix, Progressive expended $516,219.18 to secure Progressive's right to purchase Justice's Red Fox Coal Mine from Justice Energy, LLC ("Justice Mine")—an acquisition the success of which was dependent upon the acquisition of the coal mine that comprised the Project.

26. Rashid and Bernstein, Global's Vice President of Finance and Legal Affairs, continued the conspiracy even further into the Fall of 2005. On or about October 10, 2005, Rashid and Bernstein met with Progressive and the owners of the Mine. During that meeting, Rashid and Bernstein represented that Global was financially capable of financing the Project

---

[1] The Commitment Fee was wired to the accounts of Global in three separate wire transfers. The first Wire Transfer, in the amount of $200,000.00 was sent on June 29, 2005. The following day Progressive made the second wire

and was still interested, subject to due diligence, in doing so. In fact, upon information and belief, Global had neither the wherewithal or intent at that time to finance the Project and, to the contrary, had dissipated the Commitment Fee to the Defendants' personal uses.

27.     Further, Bernstein delivered a writing to Progressive that day, which represented to Progressive that, despite failing to facilitate the Loan, Global was still interested in advancing the $200,000,000.00 contemplated by the Project in conformity with the Commitment Letter. Bernstein further represented, in that writing, that in the event Global decided to not move forward with the Project, the Commitment Fee would be refunded without deductions to Progressive no later than November 18, 2005. This never happened. Moreover, in hindsight it is clear that Bernstein's October 10, 2005 letter was intended to delay Progressive from pursuing Global and to further the fraudulent conspiracy. The Bernstein letter referenced a fictitious "credit committee" and requested documents (which had previously been provided during the O'Nurkera-Hendrix trip to West Virginia) for due diligence. Since Global was a mere façade and not a lender or financial institution, did not have a "credit committee," had virtually no money at the time the Bernstein letter was sent having previously distributed same to at least some of the Defendants, and, upon information and belief, never conducted due diligence, the Bernstein letter could not have been intended to serve any purpose other than to delay Progressive from discovering the truth about Global and thus to further the fraudulent conspiracy.

---

transfer of $50,000.00. The final wire transfer, in the amount of $500,000.00 was sent on July 26, 2005.

C.     Defendants' "Spanish Prisoner" Scam[2]

28.     It appears the Defendants were engaged in a variation of the age old "Spanish Prisoner" scam. O'Nurkera, Hendrix, Rashid and Bernstein grossly misrepresented Global, which, contrary to the company that was portrayed, had little cash, no "venture capital" experience, only two debt laden properties and only one small subsidiary with assets (Mohawk Refining & Marketing, LLC). Mohawk's sole asset was a small refinery or topping plant, which it had purchased for $175,000.00. Mohawk's assets, however, were foreclosed upon in October 2005.

29.     This façade was created, however, to induce Progressive to pay the Commitment Fee in hopes of completing the acquisition of the Project. Once Progressive took the bait and paid the initial fee, Global issued the "Commitment Letter" to obtain the remainder of the "Commitment Fee."

30.     Only after Global failed and/or refused to fulfill its obligations under the Agreement by, among other things, failing to either arrange the financing or refund the Commitment Fee, did Progressive realize that it had unwittingly become a victim of the age-old Spanish Prisoner confidence scam.

D.     The Canadian Conspirators

31.     While they never dealt directly with Progressive, Reynolds and Crosbie were also

---

[2] The Spanish Prisoner is a confidence game dating back to 1588. In its original form, the confidence artist tells his victim (the mark) that he is in correspondence with a wealthy person of high estate who has been imprisoned in Spain, and is relying on the confidence artist to raise money to secure his release. The confidence artist offers to let the mark supply some of the money, with a promise that he will be rewarded generously when the prisoner returns both financially and by being married to the prisoner's beautiful daughter. However, once the mark has turned over his money, he learns that further difficulties have arisen, requiring more money, until the mark is cleaned out and the game ends. http://en.wikipedia.org/wiki/Spanish_Prisoner

part of the plot to defraud Progressive. Progressive was duped into believing the representations made by O'Nurkera, Rashid and Hendrix, as to the financial wherewithal of Global and its capabilities largely because the individuals comprising Global, in particular, Crosbie and Reynolds, were present or former high ranking officials in the Canadian government and therefore reputable, and presumed to be knowledgeable and experienced, and possessed substantial financial expertise. The credibility of Crosbie and Reynolds was thus a significant factor in inducing Progressive to do business with Global.

32.  Specifically, Reynolds, who sat on Global's Board of Directors and was Senior Vice-President of Global's Oil & Gas division, was the Opposition House Leader in the Canadian House of Commons. In addition to his political resume, Reynolds was represented in the PowerPoint presentation as having substantial experience in venture capital development and consumer products marketing. Reynolds knew, or should have known, that Global was a façade seeking innocent victims and that Progressive or others similarly situated would rely upon his presence as a director of Global as an indication that Reynolds was well-informed of all actions taken by Global and, most importantly, that Global was a legitimate organization.

33.  In addition, Crosbie (together with Reynolds and Bernstein, the "Canadian Conspirators"), who served as Chairman of the Board to Global, was a retired Canadian politician who was actively involved in various levels of government in Newfoundland and Canada focusing primarily on environmental conservation. Like Reynolds, Crosbie knew, or should have known, that Global was a façade and that Progressive, or others similarly situated would rely upon his presence as a director of Global as an indication that Crosbie was well-informed of all actions taken by Global and, most importantly, that Global was a legitimate

organization.

34.     The Canadian Conspirators apparent role in the conspiracy was to offer no less than their names, and stature as political leaders, to Global and therefore served to falsely legitimize a sham enterprise. Progressive relied, to its detriment, on the association of the Canadian Conspirators in determining to do business with Global.

35.     The Defendants' conspiracy demonstrates a concerted effort to perpetuate a fraudulent scheme designed to financially cripple Progressive. With the lure of greater riches later, Progressive was duped into providing the Commitment Fee and expending significant additional sums on related ventures. Due to the fact that its alleged financier was comprised of a group of foreign government officials and supposedly reputable business persons, Progressive could not have known that Global was in fact a façade.

36.     Progressive seeks the return of the $750,000.00 Commitment Fee as well as the additional $516,219.18 that Progressive expended on the Project in the belief that Global and the individuals comprising same, would perform their end of the bargain.

### V.  Claims

**A.     First Claim for Relief:  Fraud against O'Nurkera, Rashid, Hendrix and Bernstein**

37.     Progressive incorporates and realleges paragraphs 1-36 above as if fully set forth herein.

38.     Rashid and Hendrix knowingly made false representations to Progressive through Cooper as described above, and Rashid and Bernstein made false representations in the Houston meeting, and the October 10, 2005 letter as also described above. O'Nurkera's false representations as set forth above were either knowingly or made with reckless disregard for

their truth of falsity. Bernstein likewise knowingly, or with reckless disregard for the truth of falsity of such, made misrepresentations in the Houston meeting as described above, and in his October 10, 2005 letter.

39. Each and every one of O'Nurkera's, Rashid's, Hendrix's and Bernstein's representations were intended to induce Progressive to enter into the Agreement for the $200,000,000.00 acquisition of the Project, to induce Progressive to pay the Commitment Fee and/or to delay Progressive from timely pursuing reimbursement of the Commitment Fee.

40. Further, O'Nurkera, Hendrix, Rashid and Bernstein intended Progressive to rely upon, and Progressive did reasonably rely upon such misrepresentations to its detriment.

41. Progressive now sues for its actual and consequential damages in the amount of $1,216,219.18, suffered as a result of the fraud committed by O'Nurkera, Rashid, Hendrix and Bernstein.

42. Progressive also alleges that because O'Nurkera, Rashid, Hendrix and Bernstein knew that the representations were false at the time they were made, the representations were fraudulent and malicious and constitute conduct for which the law allows the imposition of punitive or exemplary damages. Accordingly, Progressive requests that exemplary damages be awarded against O'Nurkera, Rashid, Hendrix and Bernstein in an amount to be determined by the trier of fact to be sufficient to punish O'Nurkera, Rashid, Hendrix and Bernstein and deter similar conduct, for which it hereby sues.

**B.    Second Claim for Relief.  Negligent Misrepresentations against O'Nurkera.**

43. Progressive incorporates and realleges paragraphs 1-42 above as if fully set forth herein.

44. In the alternative as to O'Nurkera, and only in the event O'Nurkera can show he did not know the falsity of his representations and that he did not pass information to Cooper with a reckless disregard for its truth, Progressive would show that O'Nurkera was negligent in making the representations set forth above to Cooper, and therefore Progressive, and that such representations were relied upon by Progressive as intended by O'Nurkera and to the detriment of Progressive.

45. Progressive would show that as a result of such negligent representations by O'Nurkera, Progressive has been damaged in the amount of $1,216,219.18, for which amount it now sues.

### C. Third Claim for Relief: Conspiracy to Defraud against all Defendants.

46. Progressive incorporates and realleges paragraphs 1-45 above as if fully set forth herein.

47. Progressive advanced the Commitment Fee and expended additional sums totaling $516,219.18 with the anticipation that the Loan would be processed to facilitate the Project. From the inception, O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie knew of, agreed to, and intended to conspire against third parties, such as Progressive, in order to induce those parties to enter into contracts which the conspirators knew Global would never perform. Progressive was one such company, and was specifically targeted by O'Nurkera, Rashid, Hendrix, and Bernstein. Progressive was thus duped into entering into a contractual relationship with Global and to pay the Commitment Fee.

48. O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie knew of, agreed to, and intended to defraud Progressive by perpetuating a scheme designed to create the façade of

a company which, as set forth above, was involved in a variety of industries including venture capital, had prominent well known politicians on its Board of Directors, and that had the wherewithal to finance or arrange financing for the Project, and projects of similar size and complexity, and therefore enticed Progressive to advance the Commitment Fee. Nothing existed behind the façade however, and the Defendants had no intent to perform. It was Defendants' intent all along to simply dupe Progressive out of the Commitment Fee.

49.   Defendants' collaboration has caused Progressive to suffer damages, for which Progressive seeks recovery. Progressive seeks a judgment against O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie jointly and severally for damages in the amount of $1,216,219.18 suffered by Progressive due to the collective fraud perpetuated upon Progressive.

50.   Moreover, Defendants' conspiracy to harm Progressive was done with malice and constitutes conduct for which the law allows the imposition of punitive or exemplary damages. Accordingly, Progressive requests that exemplary damages be awarded against Defendants in an amount to be determined by the trier of fact to be sufficient to punish Defendants and deter similar conduct, for which Progressive hereby sues.

**D.   Fourth Claim for Relief:  Negligence against Crosbie and Reynolds**

51.   Progressive incorporates and realleges paragraphs 1-50 above as if fully set forth herein.

52.   Crosbie and Reynolds knew, or should have known, Global's true financial state and business. Crosbie and Reynolds joined Global's Board of Directors and permitted Global to use their names as a means to enhance Global's reputation and to legitimize Global. It was foreseeable that third parties such as Progressive would be influenced by their presence on the

Board and do business with Global in reliance on same, and thus fail to discover Global's true financial state and true nature of Global's business.

53. Progressive was one such entity that did in fact rely to its detriment on their presence and thus failed to discover Global's true financial state nor the true nature of Global's business.

54. Charged with knowledge as to what Global in fact was, Crosbie and Reynolds owed a duty to foreseeable third parties who might do business with Global not to mislead such parties into a false belief or understanding of Global and to prevent Global from misrepresenting itself.

55. Crosbie and Reynolds were thus negligent in:

    a) failing to prevent Global from misrepresenting itself to third parties;

    b) permitting their names to be used in connection with Global's "marketing" and "business development" efforts—which were in fact merely efforts to locate potential victims for fraudulent schemes; and

    c) permitting Global to go forward with its fraudulent schemes including the scheme to defraud Progressive.

56. Progressive would show that as a result of such negligent representations by Crosbie and Reynolds, Progressive has been damaged in the amount of $1,216,219.18, for which amount it now sues.

**E.     Fifth Claim for Relief: Attorneys' fees against all Defendants.**

57.     Progressive incorporates and realleges paragraphs 1-56 above as if fully set forth herein.

58.     Defendants' actions were in bad faith, vexatious, wanton, or for oppressive reasons. As a result, Progressive is entitled to recover its reasonable attorneys' fees incurred in presenting and prosecuting the claims asserted pursuant to West Virginia law. In the event of an appeal, Progressive will be entitled to its reasonable attorneys' fees incurred in taking or defending such an appeal to both the Fourth Circuit Court of Appeals and the United States Supreme Court for which amounts it now sues.

## VI. Prayer

WHEREFORE, Progressive prays that the Defendants be cited to appear and answer, and that upon final hearing Progressive have judgment against the Defendants as follows:

(1)     judgment against the Defendants for actual damages totaling $1,216,219.18;

(2)     punitive or exemplary damages in an amount to be determined by the trier of fact;

(3)     its reasonable and necessary attorneys' fees through trial and any appeal;

(4)     pre-judgment interest on all compensatory damages awarded herein, and post-judgment interest on all sums awarded herein, all at the rate provided by law;

(5)     costs of court; and

(6)     for such other and further relief, at law or in equity, to which Progressive may show itself justly entitled.

Date: August 24, 2007
Dallas, Texas

Respectfully submitted,

By: Counsel for Progressive Mining

**BAKER & McKENZIE LLP**

David W. Parham
State Bar No. 15459500
Elliot D. Schuler
State Bar No. 24033046
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099
elliot.e.schuller@bakernet.com
david.w.parham@bakernet.com

and

**DINSMORE & SHOHL LLP**

Mark A. Carter
State Bar No. of West Virginia 4316
900 Lee Street
Huntington Square, Suite #600
Charleston, West Virginia 25301
Telephone: (304) 357-0900
Facsimile: (304) 357-0919
mark.carter@dinslaw.com

Denise D. Klug
State Bar No. of West Virginia 6620
1115 Main Street
Wheeling, West Virginia 26003
Telephone: (304) 214-5114
Facsimile: (304) 214-5119
denise.klug@dinslaw.com

**ATTORNEYS FOR
PROGRESSIVE MINING LLC.**