IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF WEST VIRGINIA
at Wheeling

**PROGRESSIVE MINERALS, LLC,**

      **Plaintiff,**

**v.**                                          **Case No. 5:07-CV-108**

**MUHAMMAD HAROON RASHID,
GERALD D. HENDRIX, DAVID M.
BERNSTEIN, JOHN DOUGLAS
REYNOLDS, JOHN C. CROSBIE and
JUDE O'NURKERA,**

      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS OF
## DEFENDANTS DAVID M. BERNSTEIN,
## JOHN DOUGLAS REYNOLDS AND JOHN C. CROSBIE

This memorandum of law is submitted in support of the Motion to Dismiss of Defendants David M. Bernstein, John Douglas Reynolds and John C. Crosbie.

In terms of factual background and in order to avoid repetition, the Court is respectfully referred to the Declaration of David M. Bernstein, dated November 19, 2007 ("Bernstein Declaration"); the Declaration of John C. Crosbie, dated November 15, 2007 ("Crosbie Declaration"); and the Declaration of John Douglas Reynolds, dated November 19, 2007 ("Reynolds Declaration").

The Court lacks personal jurisdiction over Moving Defendants. When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the Court, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence. *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d

56, 59-60 (4th Cir. 1993); *Carefast of Maryland, Inc. v. Carefast Pregnancy Centers, Inc.*, 334 F3d 390, 396 (4th Cir. 2003).

Accordingly, since Moving Defendants have not been shown to do or have done business in West Virginia, are not domiciled in West Virginia, were not physically present at the time of service and did not consent to service, jurisdiction is proper only if West Virginia's long-arm statute, W. Va. Code, §56-3-33, confers specific jurisdiction. Thus, for a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment.  Id.

In order for a court to validly exercise personal jurisdiction over a non-resident defendant: (1) a statute must authorize service of process on the non-resident defendant, and (2) the service of process must comport with the Due Process Clause. *See Mylan Lab., Inc.,* 2 F.3d at 60. Because the West Virginia long-arm statute is coextensive with the full reach of due process, *see Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 831 F.2d 522, 525 (4th Cir.1987), it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction, *see, e.g., Stover v. O'Connell Assocs., Inc.,* 84 F.3d 132, 135-36 (4th Cir.) (Maryland forum state), *cert. denied,* 519 U.S. 983, 117 S.Ct. 437, 136 L.Ed.2d 334 (1996); *Rossman v. State Farm Mut. Auto. Ins. Co.,* 832 F.2d 282, 286 n. 1 (4th Cir.1987) (Virginia forum state); *Columbia Briargate Co. v. First Nat'l Bank of Dallas,* 713 F.2d 1052, 1057 (4th Cir.1983) (South Carolina forum state). Rather, the statutory inquiry necessarily merges with the constitutional inquiry. Accordingly, our inquiry centers on whether exercising

2

personal jurisdiction over Moving Defendants is consistent with the Due Process Clause. *See Stover*, 84 F.3d at 136.

A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend its interests in the forum does not "offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Later cases have clarified that the minimum contacts must be "purposeful." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). This "purposeful" requirement rests on the basic premise that traditional notions of fair play and substantial justice are offended by requiring a non-resident to defend itself in a forum when the non-resident never purposefully availed itself of the privilege of conducting activities within the forum, thus never invoking the benefits and protections of its laws. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *Stover*, 84 F.3d at 136. Moreover, this "purposeful" requirement "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Plant Genetic Systems, N.V. v. Ciba Seeds*, 933 F.Supp. 519, 523 (M.D.N.C.1996) (citing *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2181 and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). *In Re Celotex Corp.*, 124 F3d 619, 627-628 (4th Cir 1997).

The Bernstein Declaration, the Crosbie Declaration and the Reynolds Declaration clearly show that Moving Defendants had no contacts with the State of West Virginia,

nor even the facts surrounding the alleged fraud.  In fact, it is quite evident that the inclusion of Moving Defendants in this action could only have been exercised in bad faith.  Accordingly, it is submitted that the Complaint contains no allegations that Moving Defendants purposefully availed themselves of the privilege or invoked the benefits of doing business in the State of West Virginia sufficient to confer personal jurisdiction.

Accordingly, it is respectfully submitted that the Court lacks personal jurisdiction over each of the Moving Defendants.

<u>Conclusion</u>

By reason of the foregoing, it is respectfully submitted that the motion of the Moving Defendants should be granted in its entirety and that the Court grant such or\ther and further relief as to it may seem just and proper.

By: _____
      Counsel for Moving Defendants

Patrick S. Casey (W. Va. Bar No. 668)
BURNS, WHITE & HICKTON, PLLC
32 20th Street
Maxwell Centre, Suite 200
Wheeling, WV 26003
(304) 233-9500
(304) 233-1363 (fax)

Edward C. Kramer, Esq. (pro hac admission pending)
EDWARD C. KRAMER, P.C.
488 Madison Avenue, Suite 1100
New York, NY 10022
(212) 490-1616
(212) 490-2888 (fax)

## CERTIFICATE OF SERVICE

Service of the foregoing MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS OF DEFENDANTS DAVID M. BERNSTEIN, JOHN
DOUGLAS REYNOLDS AND JOHN C. CROSBIE was had upon the parties, as
addressed below, this 1st day of November, 2007.

David W. Parham, Esq.
Elliot D. Schuler, Esq.
BAKER & McKENZIE, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201

Mark A. Carter, Esq. (W. Va. Bar No. 4316)
DINSMORE & SHOHL, LLP
900 Lee Street
Huntington Square, Suite 600
Charleston, WV 25301

Denise D. Klug, Esq., (W. Va. Bar. No. 6620)
DINSMORE & SHOHL, LLP
1115 Main Street
Wheeling, WV 26003
Counsel for Plaintiff Progressive Minerals, LLC

Muhammad Haroon Rashid
5821 Southwest Freeway, Suite 500
Houston, TX 77057

Jude O'Nurkera
6260 Indian River Drive
Norcross, GA 30092

Gerald Hendrix
15455 Ella Boulevard, #48
Houston, TX 77090


By: _____
Counsel for Moving Defendants

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
-----------------------------------------------------------------X
Progressive Minerals LLC,

                                Plaintiff,                    5:07-CV-108

               -against-                          Declaration

Muhammad Haroon Rashid, Gerald D. Hendrix, David
M. Bernstein, John Douglas Reynolds, John C. Crosbie
and Jude O'Nurkera,
                                Defendants.
-----------------------------------------------------------------X

      David M. Bernstein hereby declares the truth of the following under the penalties of

perjury.

      1.  I am a Defendant in the above-entitled action and am fully familiar with the facts

stated in this declaration and know them to be true to my personal knowledge.


      2.  This Declaration is submitted in support of Defendants', David M. Bernstein, John

Douglas Reynolds and John C. Crosbie, (hereinafter referred to as the "Moving Defendants")

application, as follows:

            (a) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure,
dismissing the action, as to Defendants, David M. Bernstein, John Douglas
Reynolds and John C. Crosbie, for lack of personal jurisdiction; and

            (b) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for
sanctions and costs and reasonable attorneys' fees against Plaintiff and its
counsel, David W. Parham, Esq. and Baker & McKenzie LLP.

      3.  This purports to be an action based in fraud concerning a 2005 transaction between

Plaintiff and an entity called Global Empire Investments and Holdings LLC (hereinafter referred

to as "Global").  Copies of the Summons and Complaint are annexed hereto as Exhibit A.

4.   I am a Canadian national and a citizen and resident of the Province of Quebec.  I also am a retired attorney and was formerly the Canadian affiliate of *Global, as* its Canadian and Quebec representative duly registered on November 18th, 2004.  A Canadian corporation was incorporated on November 22, 2005.  My role for the registered Canadian US Company and the Canadian Corporation was Canadian representative.  I had no previous connection with either Plaintiff or Global.

5.   I have never engaged in business in West Virginia.  I have never visited West Virginia.

6.   I have never been a shareholder of Global.  I have never been an officer of Global. I have never been a director of Global, either voting or non-voting.

7.   As alleged in the Complaint, the transaction upon which this lawsuit is based is a Commitment Letter, entered into by Plaintiff and Global on or about July 14, 2005, and a formal agreement entered into by the same parties on July 21, 2005 (Exhibit A, Complaint, para 21).  As conceded in the Complaint, all moneys paid by Plaintiff to Global were paid by July 26, 2005 ($200,000 on June 29, 2005, $50,000 on June 30, 2005 and $500,000 on July 26, 2005) (Exhibit A, Complaint, para. 22, footnote 1).

2

8. It was not until October 10, 2005, prior to a meeting with Plaintiff in Houston and consonant with my duties and obligations as counsel, I examined for the first time the documents produced by Plaintiff to Global. I then immediately drafted a letter to Plaintiff (copy annexed hereto as Exhibit B), casting doubt on the transaction and requesting reasonable proof of ownership of the mine, worth of the mine, among other items. If these due diligence items were not provided by Plaintiff, I could only recommend that Global not pursue the transaction and certainly to refrain from introducing this deal to potential investors or sources of capital. Plaintiff never provided to me such proof as requested, when Plaintiff met with me in Houston. Since Global was going to approach Canadian entities to arrange the funding for Plaintiff, my function was to assist with due diligence.   It was my understanding that if Global could not raise the funds for Plaintiff, Global would return to Plaintiff the entire commitment fee, less expenses.

9.  After I met with Plaintiff, I became quite concerned with the entire deal.  It appeared to me that Plaintiff was requesting that Global raise $200,000,000 for a mine, which Plaintiff claimed it owned, when, in fact, it did not own and had no rights to such mine.  I later came to understand that Plaintiff, which claimed that the mine was worth $200,000,000, was actually intended to be purchased by Plaintiff for only $18,000,000.  I sensed that a major fraud was about to be perpetrated by Plaintiff, and I immediately left the meeting and had no further discussions with Plaintiff.  I certainly believed that if these due diligence items were not provided by Plaintiff, I could only recommend that Global not pursue the transaction and certainly to refrain from introducing this deal to potential investors or sources of capital. Plaintiff never provided to me such proof as requested.  Thereafter, I had nothing further to do

3

with Plaintiff. Whether or not money was returned to Plaintiff was not within my knowledge or responsibility. In fact, I had no further involvement with Global. I later found out that Global was involved in insolvency proceedings; however, I lack any direct knowledge of the same or what happened to Global or the return of any money to Plaintiff. What I can say is that Plaintiff appeared to have attempted to defraud Global and its investors and funding sources, a fraud which I am proud to say that I helped stop.

10. More importantly, the actions, which Plaintiff alleges as constituting the fraud in the inducement, are claimed to have occurred in June and July of 2005. I only became involved in October 2005, and my involvement was solely limited to due diligence.

11. Therefore, it is respectfully submitted that I have not had contact with West Virginia, or any other involvement sufficient to confer personal jurisdiction over me by this court.

12. By the same token, it is respectfully submitted that this court lacks personal jurisdiction over Defendants Reynolds and Crosbie. I introduced both Mr. Reynolds and Mr. Crosbie to Mr. Rashid in Houston in October 2004. Nothing ever came from that one meeting. I personally know that neither Mr. Reynolds nor Mr. Crosbie had any connection with Global other than that one meeting with Mr. Rashid in Houston. Further, during my brief association with Global's Canadian affiliate, or at any other time (until seeing this Complaint), I never saw any document or heard any representation linking either Mr. Reynolds or Mr. Crosbie to Plaintiff.

4

13.  I respectfully submit that this action has been brought against each of the Moving Defendants for frivolous or improper purposes.  Not only is there no link between Mr. Reynolds and Mr. Crosbie with Plaintiff; there is no link between Mr. Reynolds and Mr. Crosbie with Global.  Accordingly, I am advised that sanctions, reasonable attorneys' fees and costs against both Plaintiff and Mr. Parham, pursuant to Rule 11 of the Federal Rules of Civil Procedure, are appropriate and warranted.  I am not seeking sanctions against local counsel for Plaintiff, as I have no personal knowledge of bad faith on the part of local counsel.

WHEREFORE, Your declarant respectfully submits that the Court should grant Defendant, John C. Crosbie's motion, in its entirely, as follows:

(a) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, dismissing the action, as to Defendants, David M. Bernstein, John Douglas Reynolds and John C. Crosbie, for lack of personal jurisdiction;

(b) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions and reasonable costs and attorneys fees against Plaintiff and its counsel, David W. Parham, Esq. and Baker & McKenzie LLP; and

(c) for such other and further relief as to this Court may seem just and proper.

Dated: Quebec, Quebec

November 19, 2007

David M. Bernstein

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

-------------------------------------------------------------------------- X

Progressive Minerals LLC,

                                Plaintiff,                                    5 :07-CV-l08

                -against-                                   Declaration


Muhammad Haroon Rashid, Gerald D. Hendrix, David
M. Bernstein, John Douglas Reynolds, John C. Crosbie
and Jude O'Nurkera,


                                      Defendants.

-------------------------------------------------------------------------X


        John C. Crosbie, hereby declares the truth of the following under the penalties of perjury.


        1.  I am the Defendant in the above-entitled action and am fully familiar with the facts stated in this declaration and know them to be true to my personal knowledge.


        2.  This Declaration is submitted in support of the Defendant's application, as follows:

               (a)  pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, dismissing the action, as to the Defendants, David M. Bernstein, John Douglas Reynolds and John C. Crosbie,, for lack of personal jurisdiction; and

               (b)  pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions and reasonable costs and attorneys fees against the Plaintiff and its counsel, David W. Parham, Esq. and Baker & McKenzie LLP.



3.  This purports to be an action based in fraud concerning a 2005 transaction between the Plaintiff and an entity called Global Empire Investments and Holdings LLC (hereinafter referred to as "Global"). Copies of the Summons and Complaint are annexed hereto as Exhibit A.

4.  Firstly, I have no direct knowledge as to the business of the Plaintiff, since I have never had anything to do with the Plaintiff or its principals or had any communication with the Plaintiff or representatives of the Plaintiff except with respect to the Plaintiff threatening me with the institution of the within action.

5.  I am a Canadian national and a citizen and resident of the Province of Newfoundland and Labrador.  I am formerly a member of the House of Commons of Canada and have held senior federal cabinet posts, including Minister of Finance, Minister of Justice and Attorney General, Minister of Transport and Minister of International Trade and Minister of Fisheries and Oceans. I am the Chancellor of Memorial University of Newfoundland and a counsel to the law firm of Cox & Palmer.

6.  At various times in my political life, I have found myself a target of the loyal opposition and am no stranger to political controversy.  However, this is the first time my name has been linked to a nefarious business transaction.  Considering that I have had no connection with either the Plaintiff or with Global, I find this lawsuit distasteful and frivolous.

7.  I have never engaged in business in West Virginia. I have never set foot in West Virginia, which is not to say that it is a state I would not look forward to visiting in the future.

8.  I have never had communications with Plaintiff.

9.  I have never been a shareholder of Global.  I have never been an officer of Global.  I have never been a director of Global, either voting or non-voting.  I have never been an



employee of, agent of, advisor to or consultant to Global. I have never had a connection with Global, either directly or indirectly. I have never given consent, either explicitly or implicitly, either directly or indirectly, to Global to represent any of the foregoing. My only contact with Global was a short introduction I had with Defendant, Dr. Muhammad Maroon Rashid, which took place in Houston, Texas, several years ago. Nothing ever came of it and I have had no business connection with Dr. Rashid since.

10. By letter dated October 27, 2006 I replied to a letter received dated October 10, 2006, sent to me by David W. Parham of the firm of Baker & MacKenzie LLP, enclosing a draft complaint and attachments in which letter I advised David W. Parham Esq. of Baker & McKenzie LLP, Plaintiff's counsel in this action, of the foregoing (copy annexed hereto as Exhibit C). Accordingly, with a scintilla of due diligence and good faith, Mr. Parham could have easily confirmed the same. Rather he has chosen to attempt to glorify his action by naming a prominent Canadian public servant in an attempt to, in effect, "extort" a settlement. This, I can assure, will not happen. Accordingly, I am advised that sanctions, reasonable attorneys' fees and costs against both Plaintiff and Mr. Parham, pursuant to Rule 11 of the Federal Rules of Civil Procedure, are appropriate and warranted. I am not seeking sanctions against local counsel for the Plaintiff, as I have no personal knowledge of bad faith on the part of local counsel.

11. Accordingly, I am advised by counsel that this esteemed court lacks personal jurisdiction over me.

WHEREFORE, Your declarant respectfully submits that the Court should grant the Defendant, John C. Crosbie's motion, in its entirely, as follows:

> (a) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, dismissing the action, as to Defendants, David M. Bernstein, John Douglas Reynolds and John C. Crosbie, for lack of personal jurisdiction;

> (b) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions and reasonable costs and attorneys fees against Plaintiff



and its counsel, David W. Parham, Esq. and Baker & McKenzie LLP; and

(c) for such other and further relief as to this Court may seem just and proper.

**SWORN TO** before me at St. John's in the Province of Newfoundland and Labrador this 15th day of November, 2007.

_John C. Crosbie_

_S M Kavanagh_

SHAWN KAVANAGH
BARRISTER (NL - CANADA)
NOTARY PUBLIC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
------------------------------------------------------------------X
Progressive Minerals LLC,

                              Plaintiff,              5:07-CV-108

            -against-                                 Declaration

Muhammad Haroon Rashid, Gerald D. Hendrix, David
M. Bernstein, John Douglas Reynolds, John C. Crosbie
and Jude O'Nurkera,

                              Defendants.
------------------------------------------------------------------X

      John Douglas Reynolds, hereby declares the truth of the following under the penalties of

perjury.

      1. I am a Defendant in the above-entitled action and am fully familiar with the facts

stated in this declaration and know them to be true to my personal knowledge.

      2. This Declaration is submitted in support of Defendant's application, as follows:

        (a) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure,
dismissing the action, as to Defendants, David M. Bernstein, John Douglas
Reynolds and John C. Crosbie, for lack of personal jurisdiction; and

        (b) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for
sanctions and reasonable costs and attorneys fees against Plaintiff and its counsel,
David W. Parham, Esq. and Baker & McKenzie LLP.

      3. This purports to be an action based in fraud concerning a 2005 transaction between

Plaintiff and an entity called Global Empire Investments and Holdings LLC (hereinafter referred

to as "Global").  Copies of the Summons and Complaint are annexed hereto as Exhibit A.

4. Firstly, I have no direct knowledge as to the business of Plaintiff, since I have never had anything to do with Plaintiff or its principals or had any communication with Plaintiff or representatives of Plaintiff, except with respect to Plaintiff threatening me with the institution of the within action.

5. I am a Canadian national and a citizen and resident of the Province of British Columbia. I am formerly a Member of Parliament of Canada and have served as Chief Opposition Whip, Leader of the Loyal Opposition, House Leader and a Minister. I am currently a member of the Canadian Privy Counsel.

6. I have had an active life in public service and am no stranger to political controversy. Never, though, has my name been associated with a purported fraud. The fact that I am a defendant in the instant action is certainly outrageous.

7. I have never engaged in business in West Virginia. I have never been in West Virginia.

8. I have never had communications with Plaintiff.

9. I have never been a shareholder of Global. I have never been an officer of Global. I have never been a director of Global, either voting or non-voting. I have never been an employee of , agent of, advisor to or consultant to Global. I have never had a connection with

Global, either directly or indirectly. I have never given consent, either explicitly or implicitly, either directly or indirectly, to Global to represent any of the foregoing. My only contact with Global was a short introduction I had with Defendant, Dr. Muhammad Haroon Rashid, which took place in Houston, Texas, several years ago. Nothing ever came of it and I have had no business connection with Dr. Rashid since.

10. By letter dated October 27, 2006, my friend, Defendant John C. Crosbie, advised David W. Parham, Esq. of Baker & McKenzie LLP, Plaintiff's counsel in this action, of the foregoing (copy annexed hereto as Exhibit C). Accordingly, with a scintilla of due diligence and good faith, Mr. Parham could have easily confirmed the same. Rather he has chosen to attempt to glorify his action by naming a prominent Canadian public servant in attempt to, in effect, "extort" a settlement. This, I can assure, will not happen. Accordingly, I am advised that sanctions, reasonable attorneys' fees and costs against both Plaintiff and Mr. Parham, pursuant to Rule 11 of the Federal Rules of Civil Procedure, are appropriate and warranted. I am not seeking sanctions against local counsel for Plaintiff, as I have no personal knowledge of bad faith on the part of local counsel.

11. Accordingly, I am advised by counsel that this esteemed court lacks personal jurisdiction over me.

WHEREFORE, Your declarant respectfully submits that the Court should grant Defendants', David M. Bernstein, John Douglas Reynolds and John C. Crosbie, motion, in its

entirely, as follows:

      (a) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, dismissing the action, as to Defendants, David M. Bernstein, John Douglas Reynolds and John C. Crosbie, for lack of personal jurisdiction;

      (b) pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions and reasonable costs and attorneys fees against Plaintiff and its counsel, David W. Parham, Esq. and Baker & McKenzie LLP; and

      (c) for such other and further relief as to this Court may seem just and proper.

Dated: St. Johns, Newfoundland

    November 19, 2007

 

_____
John Douglas Reynolds



AO 440 (Rev. 8/01) WVND (02/07) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

### AT WHEELING

Progressive Minerals LLC,

                    Plaintiff,

    v.

Muhammad Haroon Rashid, Gerald D.
Hendrix, David M. Bernstein, John Douglas
Reynolds, John C. Crosbie, and Jude
O'Nurkera,

                    Defendants.

**SUMMONS IN A CIVIL CASE**
CIVIL ACTION NO.
    5:07-CV-108

**TO** [Name and address of defendant]:
    John C. Crosbie
    Cox & Palmer
    Scotia Centre, Suite 1000
    235 Water Street
    St. John's, Newfoundland
    A1C 1B6

**YOU ARE HEREBY SUMMONED** and required to serve on [Name and address of Attorney(s) for Plaintiff(s)]:
    Mark A. Carter, Esq.
    Dinsmore & Shohl, LLP
    900 Lee Street
    Huntington Square, #600
    Charleston, WV 25301

an answer to the complaint which is served on you with this summons, within 20 days of      service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

Wally Edgell, Ph.D., CLERK OF COURT

BY: _____

DEPUTY CLERK

DATE: ___8/24/07___

EXHIBIT
A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, WHEELING DIVISION

**FILED**

| | |
|---|---|
| PROGRESSIVE MINERALS LLC., § | |
| § | AUG 2 4 2007 |
| Plaintiff, § | |
| V. § | U.S. DISTRICT COURT |
| § | WHEELING, WV 26003 |
| MUHAMMAD HAROON RASHID, § | |
| GERALD D. HENDRIX, DAVID M. § | CASE NO. 5:07-CV-108 |
| BERNSTEIN, JOHN DOUGLAS § | |
| REYNOLDS, JOHN C. CROSBIE, and § | |
| JUDE O'NURKERA, § | |
| § | |
| Defendants. | |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Progressive Minerals LLC, ("Progressive") files this Complaint, and for cause of action

respectfully states:

### I. Parties

1.     Plaintiff Progressive Minerals LLC is a limited liability company, with its

principal place of business located in Moundsville, West Virginia.

2.     Defendant Dr. Muhammad Haroon Rashid ("Rashid") is an individual residing in

Houston, Texas.  Rashid is CEO and President of Global Empire Investments and Holdings LLC.

("Global").  Rashid is amenable to the jurisdiction of this Court and to service of process under

the West Virginia Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007).  Rashid has

committed torts in whole or in part in West Virginia, as set out more fully in this Complaint.

This proceeding arises out of the business done in West Virginia by Rashid.  Accordingly, the

Secretary of State of West Virginia is an agent for service of process upon Rashid, and may be

served pursuant to W.Va. Code § 56-3-33(c) (2007).  The Secretary of State of West Virginia

may forward the Citation and this Complaint to Rashid at his home or home office address, 5821 Southwest Freeway, Suite 500, Houston, TX 77057.

3.      Defendant Gerald D. Hendrix ("Hendrix") is an individual residing in Houston, Texas. Hendrix was Global's COO and CFO. Hendrix is amenable to the jurisdiction of this Court and to service of process under the Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007). Hendrix has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. This proceeding arises out of the business done in West Virginia by Hendrix. Accordingly, the Secretary of State of West Virginia is an agent for service of process upon Hendrix, and he may be served pursuant to W.Va. Code § 56-3-33(c) (2007). The Secretary of State of West Virginia may forward the Citation and this Complaint to Hendrix at his home or home office address, 15455 Ella Blvd., #48, Houston, TX 77090.

4.      Defendant David M. Bernstein ("Bernstein") is an individual residing in Quebec, Canada. Bernstein was Global's Vice President of Finance and Legal. Bernstein has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint. Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Bernstein in accordance with The Hague Convention on Service. A copy of the summons and complaint will be served by personal service upon David M. Bernstein at 25 Raspberry Crescent, Beaconsfield, Quebec, Canada, H9W 6C9 or wherever he may be found.

5.      Defendant John Reynolds ("Reynolds") is an individual residing in Canada. Reynolds was a member of Global's Board of Directors. Reynolds has committed torts in whole or in part in West Virginia as set out more fully in this Complaint. Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Reynolds in accordance with

The Hague Convention on Service.  A copy of the summons and complaint will also be served by personal service upon John Reynolds at Lang Michener LLP, 1500 Royal Centre, 1055 West Georgian Street, Vancouver, British Columbia V6E 4N7 or wherever he may be found.

6.   Defendant John C. Crosbie ("Crosbie") is an individual residing in Canada. Crosbie was the Chairman of Global's Board of Directors.  Crosbie has committed torts in whole or in part in West Virginia as set out more fully in this Complaint.  Pursuant to Federal Rule of Civil Procedure 4(f)(1), service of the summons may be made upon Crosbie in accordance with The Hague Convention on Service.  A copy of the summons and complaint will also be served by personal service upon John C. Crosbie at Cox & Palmer, Scotia Centre, Suite 1000, 235 Water Street, St. John's, Newfoundland A1C 1B6 or wherever he may be found..

7.   Defendant Jude O'Nurkera ("O'Nurkera") is an individual residing in Georgia. O'Nurkera introduced Progressive to Global Empire Investments and Holdings LLC.  O'Nurkera is amenable to the jurisdiction of this Court and to service of process under the West Virginia Long-Arm Statute, W.Va. Code § 56-3-33(a)(1)-(5) (2007).  O'Nurkera has committed torts in whole or in part in West Virginia, as set out more fully in this Complaint.  Accordingly, the Secretary of State of West Virginia may forward the Citation and this Complaint to O'Nurkera at his home or office address , 6260 Indian River Drive, Norcross, Georgia 30092-1349.

## II. Jurisdiction and Venue

8.   The Court has original jurisdiction over this action since the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states pursuant to 28 U.S.C. 1332 (2007).

9.      Venue is proper in this Court because all or a substantial part of the events or omissions occurred within this district.

### III. Summary

10.     This case arises out of the deceit and trickery of numerous individuals who conspired to swindle a West Virginia company that was seeking to obtain financing to acquire a coal mine in Bishop, McDowell County, West Virginia (the "Project" or "Mine").  In reliance upon the fraudulent misrepresentations of O'Nurkera, Rashid, and Hendrix that Global was a financially solid business entity, with numerous holdings throughout the world, and could provide the necessary $200,000,000.00 in financing, and the reputation of Board of Director members Crosbie and Reynolds, Progressive entered into an agreement with Global pursuant to which Global was to fund Progressive's acquisition of the Mine.  In reality, Global was a façade.  According to its subsequent bankruptcy filing and Rashid's testimony therein, Global had virtually no unencumbered assets, had never made a loan, and had virtually none of the many subsidiaries and holdings that had been represented to Progressive.  In essence, Global was Rashid, Hendrix and their gang of Canadian conspirators who through various lies and misrepresentations created the illusion of a mythical business enterprise in order to defraud Progressive out of a $750,000.00 loan commitment fee.  In all, Progressive lost in excess of $1.25 million as a result of the Defendants fraudulent scheme.

### IV. Facts

**A.    Background of Global**

11.     Global was created in 2003.  Rashid was Global's sole shareholder.  Upon information and belief, Rashid was the only "director" that had the right to vote, while both

Crosbie, the Chairman of the Board of Directors, and Reynolds, were non-voting members of Global's Board of Directors.

12.      Rashid also served as the Chief Executive Officer for Global. Hendrix was Global's Chief Financial Officer, and David M. Bernstein served as Global's Vice President of Finance and Legal Affairs.

13.      Global was far from what the "Global Empire" name implied. On December 6, 2005, after only two years as a business entity, Global filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. As of the date of bankruptcy filing, its assets consisted of three bank accounts which collectively contained $3,369.24, and two office buildings in Houston, Texas (the "Office Park"). While the Office Park was valued on the Harris County Tax Rolls at approximately $5.4 million, there was approximately $12.8 million in secured debt against it.

**B.     The Fictitious Empire and the Duping of Progressive**

14.      Despite its limited holdings, O'Nurkera, Hendrix and ultimately Rashid, represented to Progressive on all occasions, and within numerous documents, that Global was, as its name suggests, a global conglomeration of multiple business entities, and in particular, that it was an "asset based investment and holding corporation" that provided "venture capital." In fact, Global had never made a loan, had few assets of value, no net worth, and thus absolutely no ability to engage in a transaction of the size of the proposed financing. Moreover, upon information and belief, the commitment fee received from Progressive was used almost, if not entirely, and nearly immediately, for purposes personal to the Defendants and unrelated to Progressive. Under the circumstances, it is clear Global never intended to perform and instead

was a mere façade created for the purpose of defrauding Progressive, and others.

15.    Progressive learned of Global in the Spring of 2005.  Progressive was told about Global by Fred Cooper ("Cooper").  Cooper had learned from Progressive that Progressive was looking for financing.  During a conversation between Cooper and O'Nurkera, unrelated to the Project, O'Nurkera told Cooper about Global.  O'Nurkera forwarded Cooper a lengthy PowerPoint presentation about Global.  The PowerPoint presentation, which upon information and belief was prepared by Rashid and Hendrix, and provided by them to O'Nurkera, explained in detail the alleged holdings of Global and the inner workings of their alleged affiliates and subsidiaries.  The PowerPoint presentation further highlighted the various services purportedly offered by Global, the numerous industry sectors with which Global allegedly frequently conducted business, the services supposedly provided by Global, and contained detailed resumes and biographies of all the key members of Global—most notably Rashid, Hendrix, Bernstein, Reynolds and Crosbie.

16.    Global was portrayed to Progressive, both orally and within the PowerPoint presentation as an asset based investment and holding corporation that engaged in diversified investment, financial and related operations throughout the world and that had the wherewithal to finance, or arrange financing for, the Project.  Global's business interests allegedly encompassed a broad cross-section of industries, including all energy sectors, manufacturing companies, service industries, real estate companies as well as residential and commercial sectors.

17.    The PowerPoint presentation further emphasized that Global regularly participated in leveraged buyouts and acquisitions, business turnarounds, as well as investing in Chapter 11 debtors.  Global was represented as "specializing" in a variety of investments which

included the following:

      a) residential and commercial land development and construction

      b) oil and gas exploration, refining and transportation

      c) marketing refined products on wholesale and retail basis

      d) electric power regeneration

      e) maintenance of oil services for refinery equipment

      f) import and export of commodities

      g) hospitality division of recreation and lodging

      h) healthcare and pharmaceuticals

      i) venture capital and debt restructuring

      j) automotive industries

18.     Global was further represented both verbally and within the PowerPoint presentation as maintaining ownership and financial interests in a number of corporations including, but not limited to the following:

      a)    Primergy International, LLC ("Primergy"). This corporation allegedly had several subsidiary corporations within the oil, gas and electrical energy sectors. Primergy allegedly held all of Global's oil and gas related companies which supposedly included two refineries in Texas and Louisiana.

      b)    Petroworld Services, LLC ("Petroworld"). Petroworld allegedly provided project management construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally. Such services allegedly included offering complete turnkey projects from refurbishing to comprehensive installations.

c)   Prime Stops, LLC ("Prime Stops").  Prime Stops allegedly had formal Letters of Intent with several leading companies in the United States and Canada to purchase over 8,300 gas stations and truck stops throughout North America.

d)   Prime Development & Construction, LLC ("Prime Development").  Prime Development allegedly focused on real estate investment and the construction and development of commercial and residential properties for affordable/low income housing, multi-family housing, commercial office, retail and industrial build outs.  Prime Development allegedly had $60M under contract in affordable housing build-outs.

e)   Galleria Corridor, LLC ("Galleria").  Galleria was represented as being a full service management and leasing company that had 166,000 square feet of office space under management in Houston, Texas, and was in the process of securing management services contracts for ten other buildings.  While Galleria does manage the Office Park it does not, upon information and belief never has, or has sought to, manage any other properties.

f)   Transworld Power Partners, LLC ("Transworld").  Transworld allegedly had several electrical generating plants with existing supply contracts in place and was positioned to become an established and operating utility company in the United States.  Transworld's management team was represented as being well known in the electrical energy market.

g)   Worldwide Resources USA, LLC, Worldwide Resources Honduran, Inc., and Worldwide Resources Asia (collectively "Worldwide Resources").   Global allegedly established these three independent international commodity trading companies which allegedly focused on timber, sugar, skim milk powder, oil and cotton.  These corporations were allegedly

operating in Dubai with ten employees and Hong Kong with three employees.

      h)    World Times Communications, LLC ("World Times"). Global allegedly owned this telecommunication corporation that focused on prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP. World Times allegedly was a pioneer in long distance and prepaid calling including establishing distribution channels within various communities in Southern California.

19.     In addition, O'Nurkera forwarded references on Global to Cooper. O'Nurkera knew Cooper was doing due diligence on behalf of Progressive and intended the PowerPoint, the references, and the impression that Global was a legitimate enterprise as described above to be relayed to, and relied upon by, Progressive.

20.     In reliance upon O'Nurkera's, Rashid's and Hendrix's countless misrepresentations of the financial wherewithal of Global, and its fictitious affiliates and subsidiaries, Progressive was induced into entering into a contractual relationship with Global for a $200,000,000.00 Loan (the "Loan") from Global to Progressive in order to acquire the Project.

21.     Specifically, on or about July 14, 2005, Global and Progressive entered into a Commitment Letter for the establishment of a $200,000,000.00 Credit Facility which would be used to finance the acquisition. In furtherance of the Commitment Letter, Progressive and Global entered into a formal agreement on July 21, 2005 (the "Agreement").

22.     Pursuant to the Agreement, Progressive was required to pay Global $750,000.00 upfront as a commitment fee in order to process the Loan (the "Commitment Fee"). The Commitment Fee was payable in two parts: (a) $250,000.00 upon execution of the Agreement

and (b) $500,000.00 once the commitment letter was issued. Both of these prerequisites were ultimately satisfied and Progressive promptly forwarded the Commitment Fee to Global.[1]

23.     Following the execution of the Agreement, but prior to the issuance of the Commitment Letter or payment of the $500,000.00, O'Nurkera and Hendrix visited the Mine, ostensibly to do due diligence, but in hindsight simply to further the façade and insure payment of the final installment.

24.     As a component of the Agreement, Rashid, on behalf of Global, also executed a Corporate Guaranty (the "Corporate Guaranty") providing that if the Loan was not completed within 120 days after receipt of the Commitment Fee, Global would refund the Commitment Fee, without deductions. Despite Global's failure to process the Loan at the conclusion of the 120 day period, Global failed to refund the Commitment Fee, and upon information and belief, had no wherewithal to do so, having already distributed its ill gotten gain to and among the Defendants herein.

25.     Furthermore, in reliance upon the representations made by O'Nurkera, Rashid and Hendrix, Progressive expended $516,219.18 to secure Progressive's right to purchase Justice's Red Fox Coal Mine from Justice Energy, LLC ("Justice Mine")—an acquisition the success of which was dependent upon the acquisition of the coal mine that comprised the Project.

26.     Rashid and Bernstein, Global's Vice President of Finance and Legal Affairs, continued the conspiracy even further into the Fall of 2005. On or about October 10, 2005, Rashid and Bernstein met with Progressive and the owners of the Mine. During that meeting, Rashid and Bernstein represented that Global was financially capable of financing the Project

---

[1] The Commitment Fee was wired to the accounts of Global in three separate wire transfers. The first Wire Transfer, in the amount of $200,000.00 was sent on June 29, 2005. The following day Progressive made the second wire

and was still interested, subject to due diligence, in doing so.  In fact, upon information and belief, Global had neither the wherewithal or intent at that time to finance the Project and, to the contrary, had dissipated the Commitment Fee to the Defendants' personal uses.

27.  Further, Bernstein delivered a writing to Progressive that day, which represented to Progressive that, despite failing to facilitate the Loan, Global was still interested in advancing the $200,000,000.00 contemplated by the Project in conformity with the Commitment Letter. Bernstein further represented, in that writing, that in the event Global decided to not move forward with the Project, the Commitment Fee would be refunded without deductions to Progressive no later than November 18, 2005. This never happened.  Moreover, in hindsight it is clear that Bernstein's October 10, 2005 letter was intended to delay Progressive from pursuing Global and to further the fraudulent conspiracy.  The Bernstein letter referenced a fictitious "credit committee" and requested documents (which had previously been provided during the O'Nurkera-Hendrix trip to West Virginia) for due diligence.  Since Global was a mere façade and not a lender or financial institution, did not have a "credit committee," had virtually no money at the time the Bernstein letter was sent having previously distributed same to at least some of the Defendants, and, upon information and belief, never conducted due diligence, the Bernstein letter could not have been intended to serve any purpose other than to delay Progressive from discovering the truth about Global and thus to further the fraudulent conspiracy.

transfer of $50,000.00. The final wire transfer, in the amount of $500,000.00 was sent on July 26, 2005.

## C.    Defendants' "Spanish Prisoner" Scam[2]

28.      It appears the Defendants were engaged in a variation of the age old "Spanish Prisoner" scam.  O'Nurkera, Hendrix, Rashid and Bernstein grossly misrepresented Global, which, contrary to the company that was portrayed, had little cash, no "venture capital" experience, only two debt laden properties and only one small subsidiary with assets (Mohawk Refining & Marketing, LLC).  Mohawk's sole asset was a small refinery or topping plant, which it had purchased for $175,000.00.  Mohawk's assets, however, were foreclosed upon in October 2005.

29.      This façade was created, however, to induce Progressive to pay the Commitment Fee in hopes of completing the acquisition of the Project.  Once Progressive took the bait and paid the initial fee, Global issued the "Commitment Letter" to obtain the remainder of the "Commitment Fee."

30.      Only after Global failed and/or refused to fulfill its obligations under the Agreement by, among other things, failing to either arrange the financing or refund the Commitment Fee, did Progressive realize that it had unwittingly become a victim of the age-old Spanish Prisoner confidence scam.

## D.    The Canadian Conspirators

31.      While they never dealt directly with Progressive, Reynolds and Crosbie were also

---

[2] The Spanish Prisoner is a confidence game dating back to 1588.  In its original form, the confidence artist tells his victim (the mark) that he is in correspondence with a wealthy person of high estate who has been imprisoned in Spain, and is relying on the confidence artist to raise money to secure his release.  The confidence artist offers to let the mark supply some of the money; with a promise that he will be rewarded generously when the prisoner returns both financially and by being married to the prisoner's beautiful daughter.  However, once the mark has turned over his money, he learns that further difficulties have arisen, requiring more money, until the mark is cleaned out and the game ends. http://en.wikipedia.org/wiki/Spanish_Prisoner

part of the plot to defraud Progressive. Progressive was duped into believing the representations made by O'Nurkera, Rashid and Hendrix, as to the financial wherewithal of Global and its capabilities largely because the individuals comprising Global, in particular, Crosbie and Reynolds, were present or former high ranking officials in the Canadian government and therefore reputable, and presumed to be knowledgeable and experienced, and possessed substantial financial expertise. The credibility of Crosbie and Reynolds was thus a significant factor in inducing Progressive to do business with Global.

32.     Specifically, Reynolds, who sat on Global's Board of Directors and was Senior Vice-President of Global's Oil & Gas division, was the Opposition House Leader in the Canadian House of Commons. In addition to his political resume, Reynolds was represented in the PowerPoint presentation as having substantial experience in venture capital development and consumer products marketing. Reynolds knew, or should have known, that Global was a façade seeking innocent victims and that Progressive or others similarly situated would rely upon his presence as a director of Global as an indication that Reynolds was well-informed of all actions taken by Global and, most importantly, that Global was a legitimate organization.

33.     In addition, Crosbie (together with Reynolds and Bernstein, the "Canadian Conspirators"), who served as Chairman of the Board to Global, was a retired Canadian politician who was actively involved in various levels of government in Newfoundland and Canada focusing primarily on environmental conservation. Like Reynolds, Crosbie knew, or should have known, that Global was a façade and that Progressive, or others similarly situated would rely upon his presence as a director of Global as an indication that Crosbie was well-informed of all actions taken by Global and, most importantly, that Global was a legitimate

organization.

34.    The Canadian Conspirators apparent role in the conspiracy was to offer no less than their names, and stature as political leaders, to Global and therefore served to falsely legitimize a sham enterprise.  Progressive relied, to its detriment, on the association of the Canadian Conspirators in determining to do business with Global.

35.    The Defendants' conspiracy demonstrates a concerted effort to perpetuate a fraudulent scheme designed to financially cripple Progressive.  With the lure of greater riches later, Progressive was duped into providing the Commitment Fee and expending significant additional sums on related ventures.  Due to the fact that its alleged financier was comprised of a group of foreign government officials and supposedly reputable business persons, Progressive could not have known that Global was in fact a façade.

36.    Progressive seeks the return of the $750,000.00 Commitment Fee as well as the additional $516,219.18 that Progressive expended on the Project in the belief that Global and the individuals comprising same, would perform their end of the bargain.

## V. Claims

**A.    First Claim for Relief:  Fraud against O'Nurkera, Rashid, Hendrix and Bernstein**

37.    Progressive incorporates and realleges paragraphs 1-36 above as if fully set forth herein.

38.    Rashid and Hendrix knowingly made false representations to Progressive through Cooper as described above, and Rashid and Bernstein made false representations in the Houston meeting, and the October 10, 2005 letter as also described above.   O'Nurkera's false representations as set forth above were either knowingly or made with reckless disregard for

their truth of falsity. Bernstein likewise knowingly, or with reckless disregard for the truth of falsity of such, made misrepresentations in the Houston meeting as described above, and in his October 10, 2005 letter.

39.    Each and every one of O'Nurkera's, Rashid's, Hendrix's and Bernstein's representations were intended to induce Progressive to enter into the Agreement for the $200,000,000.00 acquisition of the Project, to induce Progressive to pay the Commitment Fee and/or to delay Progressive from timely pursuing reimbursement of the Commitment Fee.

40.    Further, O'Nurkera, Hendrix, Rashid and Bernstein intended Progressive to rely upon, and Progressive did reasonably rely upon such misrepresentations to its detriment.

41.    Progressive now sues for its actual and consequential damages in the amount of $1,216,219.18, suffered as a result of the fraud committed by O'Nurkera, Rashid, Hendrix and Bernstein.

42.    Progressive also alleges that because O'Nurkera, Rashid, Hendrix and Bernstein knew that the representations were false at the time they were made, the representations were fraudulent and malicious and constitute conduct for which the law allows the imposition of punitive or exemplary damages. Accordingly, Progressive requests that exemplary damages be awarded against O'Nurkera, Rashid, Hendrix and Bernstein in an amount to be determined by the trier of fact to be sufficient to punish O'Nurkera, Rashid, Hendrix and Bernstein and deter similar conduct, for which it hereby sues.

**B.    Second Claim for Relief. Negligent Misrepresentations against O'Nurkera.**

43.    Progressive incorporates and realleges paragraphs 1-42 above as if fully set forth herein.

44.     In the alternative as to O'Nurkera, and only in the event O'Nurkera can show he did not know the falsity of his representations and that he did not pass information to Cooper with a reckless disregard for its truth, Progressive would show that O'Nurkera was negligent in making the representations set forth above to Cooper, and therefore Progressive, and that such representations were relied upon by Progressive as intended by O'Nurkera and to the detriment of Progressive.

45.     Progressive would show that as a result of such negligent representations by O'Nurkera, Progressive has been damaged in the amount of $1,216,219.18, for which amount it now sues.

## C.     Third Claim for Relief: Conspiracy to Defraud against all Defendants.

46.     Progressive incorporates and realleges paragraphs 1-45 above as if fully set forth herein.

47.     Progressive advanced the Commitment Fee and expended additional sums totaling $516,219.18 with the anticipation that the Loan would be processed to facilitate the Project. From the inception, O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie knew of, agreed to, and intended to conspire against third parties, such as Progressive, in order to induce those parties to enter into contracts which the conspirators knew Global would never perform. Progressive was one such company, and was specifically targeted by O'Nurkera, Rashid, Hendrix, and Bernstein. Progressive was thus duped into entering into a contractual relationship with Global and to pay the Commitment Fee.

48.     O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie knew of, agreed to, and intended to defraud Progressive by perpetuating a scheme designed to create the façade of

a company which, as set forth above, was involved in a variety of industries including venture capital, had prominent well known politicians on its Board of Directors, and that had the wherewithal to finance or arrange financing for the Project, and projects of similar size and complexity, and therefore enticed Progressive to advance the Commitment Fee. Nothing existed behind the façade however, and the Defendants had no intent to perform. It was Defendants' intent all along to simply dupe Progressive out of the Commitment Fee.

49.    Defendants' collaboration has caused Progressive to suffer damages, for which Progressive seeks recovery. Progressive seeks a judgment against O'Nurkera, Rashid, Hendrix, Bernstein, Reynolds, and Crosbie jointly and severally for damages in the amount of $1,216,219.18 suffered by Progressive due to the collective fraud perpetuated upon Progressive.

50.    Moreover, Defendants' conspiracy to harm Progressive was done with malice and constitutes conduct for which the law allows the imposition of punitive or exemplary damages. Accordingly, Progressive requests that exemplary damages be awarded against Defendants in an amount to be determined by the trier of fact to be sufficient to punish Defendants and deter similar conduct, for which Progressive hereby sues.

**D.    Fourth Claim for Relief: Negligence against Crosbie and Reynolds**

51.    Progressive incorporates and realleges paragraphs 1-50 above as if fully set forth herein.

52.    Crosbie and Reynolds knew, or should have known, Global's true financial state and business. Crosbie and Reynolds joined Global's Board of Directors and permitted Global to use their names as a means to enhance Global's reputation and to legitimize Global. It was foreseeable that third parties such as Progressive would be influenced by their presence on the

Board and do business with Global in reliance on same, and thus fail to discover Global's true financial state and true nature of Global's business.

53.    Progressive was one such entity that did in fact rely to its detriment on their presence and thus failed to discover Global's true financial state nor the true nature of Global's business.

54.    Charged with knowledge as to what Global in fact was, Crosbie and Reynolds owed a duty to foreseeable third parties who might do business with Global not to mislead such parties into a false belief or understanding of Global and to prevent Global from misrepresenting itself.

55.    Crosbie and Reynolds were thus negligent in:

    a)    failing to prevent Global from misrepresenting itself to third parties;

    b)    permitting their names to be used in connection with Global's "marketing" and "business development" efforts—which were in fact merely efforts to locate potential victims for fraudulent schemes; and

    c)    permitting Global to go forward with its fraudulent schemes including the scheme to defraud Progressive.

56.    Progressive would show that as a result of such negligent representations by Crosbie and Reynolds, Progressive has been damaged in the amount of $1,216,219.18, for which amount it now sues.

**E.**   **Fifth Claim for Relief:  Attorneys' fees against all Defendants.**

57.      Progressive incorporates and realleges paragraphs 1-56 above as if fully set forth herein.

58.      Defendants' actions were in bad faith, vexatious, wanton, or for oppressive reasons.  As a result, Progressive is entitled to recover its reasonable attorneys' fees incurred in presenting and prosecuting the claims asserted pursuant to West Virginia law.  In the event of an appeal, Progressive will be entitled to its reasonable attorneys' fees incurred in taking or defending such an appeal to both the Fourth Circuit Court of Appeals and the United States Supreme Court for which amounts it now sues.

## VI. Prayer

WHEREFORE, Progressive prays that the Defendants be cited to appear and answer, and that upon final hearing Progressive have judgment against the Defendants as follows:

(1)      judgment against the Defendants for actual damages totaling $1,216,219.18;

(2)      punitive or exemplary damages in an amount to be determined by the trier of fact;

(3)      its reasonable and necessary attorneys' fees through trial and any appeal;

(4)      pre-judgment interest on all compensatory damages awarded herein, and post-judgment interest on all sums awarded herein, all at the rate provided by law;

(5)      costs of court; and

(6)      for such other and further relief, at law or in equity, to which Progressive may show itself justly entitled.

Date:  August 24, 2007
       Dallas, Texas

Respectfully submitted,

By:  Counsel for Progressive Mining

**BAKER & McKENZIE LLP**

David W. Parham
State Bar No. 15459500
Elliot D. Schuler
State Bar No. 24033046
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone:  (214) 978-3000
Facsimile:  (214) 978-3099
elliot.e.schuller@bakernet.com
david.w.parham@bakernet.com

and

**DINSMORE & SHOHL LLP**

Mark A. Carter
State Bar No. of West Virginia 4316
900 Lee Street
Huntington Square, Suite #600
Charleston, West Virginia 25301
Telephone:  (304) 357-0900
Facsimile:  (304) 357-0919
mark.carter@dinslaw.com

Denise D. Klug
State Bar No. of West Virginia 6620
1115 Main Street
Wheeling, West Virginia 26003
Telephone:  (304) 214-5114
Facsimile:  (304) 214-5119
denise.klug@dinslaw.com

**ATTORNEYS FOR
PROGRESSIVE MINING LLC.**

# Global Empire
## Investment & Holdings LLC

---

**CANADIAN OFFICE**

**DAVID M. BERNSTEIN, Q.C.**
V.P. Finance and Legal Affairs
25 Raspberry Crescent
Beaconsfield, Quebec, Canada
H9W 6C9

Tel: (514) 831-2918
e-mail: emiq@sympatico.ca

October 10, 2005

Mr. Arch A. Moore, Jr.
President
Progressive Minerals, LLC
Hubb's Building, Suite 400
511 Seventh Street
Moundsville, WV 26041

Re: Applicant Progressive Minerals, LLC and Justice Energy, LLC

Dear Sir,

This file has been handed over to me for advice and reply.

First of all let me point out that our company is still very interested in advancing funds as a loan to Progressive Minerals in conformity with the terms sheet dated July 14, 2005.

Please note that Global has the absolute right as stipulated in the term sheet dated July, 14, 2005 to refuse to advance any loan in conformity with paragraph 14 thereof.

In order for us to proceed in this matter we shall require the following documentation:

    A.  Audited financial statements of Progressive Mineral, LLC and Justice Energy, LLC for the last three years or at least an accountant's review by a CPA;

---

**5821 Southwest Freeway, #500
Houston, Texas 77057**

Tel: (713) 669-9900

Cell: (949) 307-6378
e-mail: geinvest91@yahoo.com

Fax: (713) 839-8985


EXHIBIT
B

Page 2 of 3

B. The list of major shareholders of Progressive Mineral and their personal financial statements. (We shall also require a written consent to obtain credit information on all shareholders);

C. A list and a full description of all assets that shall be used and/or hypothecated to secure the loan contemplated herein.

D. The source and use of the funds.

E. Full disclosure and Production of all leases and without limiting the generality of the foregoing, leases of all mineral rights described by said lease or leases, and how the parties and leases are connected with this project.

F. A full description of the debt service as provided in the terms sheet dated July 14, 2005 by the borrower from an Acceptable CPA. (The figures as produced to date are extremely unclear and impossible to determine the viability of this enterprise.)

G. A copy of the contract between Justice Energy and Rowland Land Co. LLC.

H. A copy of all supply and sales contracts for the production of Red Fox Coal Mines and possibility Bluestone Corporation.

I. The description of the relationship between the following Parties; Justice Energy and all subsidiaries direct and indirect. Red Fox Coal Mine, Bluestone Coal Corp., and Consolidated Coal and any other related Party.

J. A concise 3 or 4 page executive summery of this project as we find it very difficult to comprehend and intracacies of the project.

K. There is a contradiction between our term sheet dated July 14, 2005 and the asset purchase agreement received on August 26, 2005. Please explain in writing.

L. There is a discrepancy between the production of coal as per the business plan and revenues derived therefrom and the alleged production and revenue to service the 200 Million Dollar debt. Please explain.

M. We will require a list and aging of all Accounts Receivable and Accounts Payable.

N. List and description of all liabilities to be assumed by Progressive Minerals.

O. All financial statements and all other financial documentation must be duly certified, under at least an Accountants review engagement by an acceptable CPA.

We shall require all documentation requested herein on or before November 15, 2005.

Our credit committee shall be meeting on November 17, 2005 to determine the viable of your loan application.

Page 3 of 3

In the event that we determine that we wish to make the loan.  We will be employing and sending our own due diligence experts in regards to the quality and production of the coal mines and our auditing firm to examine the books and records of Progressive Mineral and Justice Energy.

In the event our credit committee regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000 the amount of your advance.

Yours Truly,


David M. Bernstein

# <u>FILE COPY</u>

27 October 2006

The Honourable John C. Crosbie, P.C., O.C., Q.C.
Direct Line: 709-570-5501
Direct Fax:  709-570-5757
E-mail: jcrosbie@pattersonpalmer.ca

David W. Parham,
Baker and McKenzie, LLP,
2300 Trammell Crow Center,
2001 Ross Avenue,
Dallas, Texas 75201

Dear Mr. Parham:

**RE:    Global Empire Investments and Holdings, LLC**

I received your letter of 10 October 2006 stating you represent a company I have never heard of before described as Progressive Minerals, LLC which purports to have claims against former officers and directors of Global Empire Investments and Holdings, LLC.  This is the first correspondence I have received from you on this matter and the first time I have ever heard of the complaint of Progressive Minerals.

With respect to the draft complaint which you say you intend to file, I write to advise you that I have never been a director of the Global Empire Investments and Holdings, LLC Board of Directors nor have I any connection with any of the events or facts you allege in your document.  If you do take any action that involves myself, I will certainly be defending it as the allegations it contains are completely false and without any substance in fact or otherwise.

Yours truly,

PATTERSON PALMER

The Honourable John C. Crosbie, P.C., O.C., Q.C.

