**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA,
WHEELING DIVISION**

| | | |
|---|---|---|
| **PROGRESSIVE MINERALS LLC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **V.** | § | |
| | § | |
| **MUHAMMAD HAROON RASHID,** | § | |
| **GERALD D. HENDRIX, DAVID M.** | § | **CASE NO. 5:07-CV-108** |
| **BERNSTEIN, JOHN DOUGLAS** | § | |
| **REYNOLDS, JOHN C. CROSBIE, and** | § | |
| **JUDE O'NURKERA,** | § | |
| | § | |
| **Defendants.** | § | |

## RESPONSE TO MOTION TO DISMISS OF DEFENDANTS DAVID M. BERNSTEIN, JOHN DOUGLAS REYNOLDS AND JOHN C. CROSBIE

Progressive Minerals LLC, respectfully files this Response to the Motion to Dismiss (the "Motion to Dismiss") of Defendants David M. Bernstein, John Douglas Reynolds and John C. Crosbie and states as follows:

## I.

## Preliminary Statement

Defendants Bernstein, Reynolds and Crosbie were involved in a conspiracy with the other Defendants to swindle a West Virginia company that was seeking to obtain financing to acquire a coal mine in Bishop, McDowell County, West Virginia. In reliance upon fraudulent misrepresentations that Global Empire Investments & Holdings, LLC was a financially solid business entity, comprised of highly reputable people, with numerous holdings throughout the world, and could easily provide the necessary $200,000,000.00 in financing to acquire the Mine, Plaintiff, Progressive Minerals, LLC entered into an agreement with Global.

In reality, Global was a façade.  According to its subsequent bankruptcy filing, Global had virtually no unencumbered assets, had never made a loan, had no real employees, and had virtually none of the many subsidiaries and holdings that had been represented to Progressive.  In essence, Global was an enterprise comprised of the Defendants who through various lies and misrepresentations created the illusion of a mythical business enterprise in order to defraud Progressive out of a $750,000.00 loan commitment fee.  In all, Progressive lost in excess of $1.25 million as a result of the Defendants fraudulent scheme.

Defendants Bernstein, Reynolds and Crosbie are primary participants in a wrongdoing intentionally directed at a West Virginia limited liability company. By committing an intentional tort on a West Virginia limited liability company, with the goal that damage would result in West Virginia, each of the Canadian Conspirators have made purposeful contact with this state and jurisdiction over them is therefore proper on that basis.

## II.

## Facts Relevant to the Current Motion

1)      In the Spring of 2005, Progressive Minerals LLC, ("Progressive"),  through its President, Arch A. Moore, Jr. "("Governor Moore") was negotiating with a subsidiary of James C. Justice, Companies, Inc. ("Justice") for the acquisition of a coal mine located near Bishop, West Virginia (the "West Virginia Mine"). Justice owned coal interests in Virginia, West Virginia, and Kentucky and he wanted to sell some of his interests, including all assets of Red Fox Surface Mine near Bishop, West Virginia. Mr. Justice and his family have been a major player in the coal industry in West Virginia for many years.[1]

2)      Progressive was looking for a potential source of funding for the acquisition and

---

[1] See, Exhibit 1: Affidavit of Governor Arch A. Moore, Jr. (the "Governor Moore Affidavit") at para. 3.

DALDMS/629838.8

contacted Fred Cooper ("Cooper") to help locate same.[2]

3)       Mr. Cooper  made several inquiries among parties he thought might have an interest including Defendant Jude O'Nurkera ("O'Nurkera") regarding the proposed transaction and potential sources of capital infusion for Progressive. Mr. O'Nurkera indicated he had previously served as a broker on a coal deal of decent size and he thought he might know some people that might be interested in pursuing the transaction.[3]

4)       In March or early April of 2005, Mr. O'Nurkera advised Mr. Cooper that he knew of a group based in Houston, Texas called Global Empire Investments & Holdings, LLC ("Global Empire") that was interested. Mr. O'Nurkera represented that the individuals comprising Global Empire were upstanding and honorable and that Global Empire was more than capable of making a deal of this size.[4]

5)       Progressive requested that Global Empire provide them with information on their business and operations and biographies of their key officers and directors.[5]

6)       On April 26, 2005, Progressive received three separate facsimiles from Global Empire regarding who they were and what they did. The first facsimile was a PowerPoint presentation of Global Empire (the "PowerPoint").[6]

7)       Global was portrayed within the PowerPoint as a global conglomeration of nine companies comprising the "Global Empire Group Companies."  The PowerPoint further conveyed that Global Empire was an asset based investment and holding corporation that engaged in diversified investment, financial and related operations throughout the world and that had the wherewithal to finance, or arrange financing for, the acquisition of the Mine.  Global's

---

[2] *Id* at para. 4; *see also* Exhibit 2: Affidavit of Fred Cooper (the "Cooper Affidavit") at para. 2.
[3] *See*, Cooper Affidavit at para. 4 and 5.
[4] *Id* at para. 5 and 6.
[5] *Id* at para. 6; see also Governor Moore Affidavit at para. 5.
[6] See, Cooper Affidavit at para. 7 and 8; see also, Governor Moore Affidavit at para. 6.

business interests allegedly encompassed a broad cross-section of industries, including all energy sectors, manufacturing companies, service industries, real estate companies as well as residential and commercial sectors.[7]

8)      The PowerPoint further emphasized that Global regularly participated in leveraged buyouts and acquisitions, business turnarounds, as well as investing in Chapter 11 debtors.  Global was represented as "specializing" in a variety of investments which included the following:[8]

a) residential and commercial land development and construction

b) oil and gas exploration, refining and transportation

c) marketing refined products on wholesale and retail basis

d) electric power regeneration

e) maintenance of oil services for refinery equipment

f) import and export of commodities

g) hospitality division of recreation and lodging

h) healthcare and pharmaceuticals

i) venture capital and debt restructuring

j) automotive industries

9)      Global was further represented within the PowerPoint as maintaining ownership and financial interests in a number of corporations.[9]  Based on additional information provided by Global Empire that same day these entities allegedly performed the following functions:[10]

---

[7] See, Cooper Affidavit at para. 8; see also, Governor Moore Affidavit at para. 7.
[8] See, Cooper Affidavit at para. 8; see also, Governor Moore Affidavit at para. 8.
[9] See, Cooper Affidavit at para. 8; see also, Governor Moore Affidavit at para. 9.
[10] See, Governor Moore Affidavit at para. 9.

DALDMS/629838.8

a)     Primergy International, LLC ("Primergy").  This corporation allegedly had several subsidiary corporations within the oil, gas and electrical energy sectors.  Primergy allegedly held all of Global's oil and gas related companies which supposedly included two refineries in Texas and Louisiana.

b)     Petroworld Services, LLC ("Petroworld").  Petroworld allegedly provided project management construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally.  Such services allegedly included offering complete turnkey projects from refurbishing to comprehensive installations.

c)     Prime Stops, LLC ("Prime Stops").  Prime Stops allegedly had formal Letters of Intent with several leading companies in the United States and Canada to purchase over 8,300 gas stations and truck stops throughout North America.

d)     Prime Development & Construction, LLC ("Prime Development").  Prime Development allegedly focused on real estate investment and the construction and development of commercial and residential properties for affordable/low income housing, multi-family housing, commercial office, retail and industrial build outs.  Prime Development allegedly had $60M under contract in affordable housing build-outs.

e)     World Times Communications, LLC ("World Times").  Global allegedly owned this telecommunication corporation that focused on prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP.  World Times allegedly was a pioneer in long distance and prepaid calling including establishing distribution channels within various communities in Southern California.

f)     First American Source Reality, LLC ("First Realty"). First Realty

allegedly had $75 million in properties under contract with expectations to expand operations in 2005 from Houston, Texas into Florida, New York and California.

g)      First American Source Mortgage, LLC ("First Mortgage"). First Mortgage allegedly originated residential and commercial loans for affordable housing, multi-family housing, commercial office, retail and industrial real estate. First Mortgage allegedly worked to coordinate loan origination through First Reality and Prime Development, both subsidiaries of Global Empire. It allegedly had over $60 million under contract.

h)      The remaining two companies were Crown NRG Refinery ("Crown") and Mohawk Refining and Marketing, LLC ("Mohawk").  While no information was presented as to Crown and Mohawk they were represented as owning oil refineries in Louisiana and Texas.

10)      The PowerPoint likewise highlighted that Global Empire was comprised of "knowledgeable and experienced people" with "broad experience and in-depth industry knowledge."[11] Eliminating any doubt as to the identity of the individuals comprising the Global Empire team and containing the "knowledge and experience" described above, Global Empire included within the PowerPoint a chart of their Organizational Structure.[12]  Defendants John Douglas Reynolds ("Reynolds") and John C. Crosbie ("Crosbie") were both listed as members of the Board of Directors and Defendant David Bernstein ("Bernstein") was noted as an officer of the company.[13]

11)      Progressive was further provided that same day, April 26, 2005,  with two additional facsimiles containing detailed resumes and biographies of all the key members of Global—most notably Defendants Rashid, Hendrix, Bernstein, Reynolds and Crosbie.[14]

---

[11] See, Cooper Affidavit at para. 8; see also, Governor Moore Affidavit at para. 10.
[12] See, Cooper Affidavit at para. 9 and 10; see also, Governor Moore Affidavit at para. 10.
[13] See, Cooper Affidavit at para. 9; see also, Governor Moore Affidavit at para. 10.
[14] See, Cooper Affidavit at para. 10; see also, Governor Moore Affidavit at para. 11.

12)      Governor Moore was extremely impressed with the Curriculum Vitae of Mr. Reynolds which detailed his various accomplishments.[15]   In addition to his lengthy political career which spanned several decades, and of which he was previously aware, Mr. Reynolds portrayed himself as a leader in the business community that was actively involved in many pursuits. Most notably, Reynolds was represented as having substantial experience in venture capital development and consumer products marketing. On the last page of his Curriculum Vitae, Reynolds devoted an entire paragraph to his position on the Board of Directors of Global Empire and his role as Senior Vice President of Global Empire's Oil & Gas Division.[16]

13)      Governor Moore was equally as impressed with the Curriculum Vitae of Mr. Crosbie, whom he likewise knew was a prominent politician.[17]   Mr. Crosbie highlighted his involvement with Global Empire under the "Professional Experience" tab of his Curriculum Vitae by expressly noting his election as Chairman of the Board of Directors in 2004.[18]

14)      On that same date Global Empire also provided Progressive with additional information as to Defendants Crosbie and Reynolds. [19]   This information, along with inquiries made to the offices of each gentleman,[20] further confirmed the Curriculum Vitae (that they were most definitely high-ranking officials in Canadian government).[21]

15)      In reliance upon the information provided concerning Global Empire, its alleged affiliates and subsidiaries, and the impressive resumes of the individuals comprising Global Empire, Progressive was induced into entering into a Term Sheet with Global in order to allow

---

[15] See, Governor Moore Affidavit at para. 12.
[16] See, Cooper Affidavit at para. 11; see also, Governor Moore Affidavit at para. 12.
[17] See, Governor Moore Affidavit at para. 13.
[18] See, Cooper Affidavit at para. 12; see also, Governor Moore Affidavit at para. 13.
[19] See, Cooper Affidavit at para. 14; see also, Governor Moore Affidavit at para. 14.
[20] See, Cooper Affidavit at para. 14.
[21] Id.; see also, Governor Moore Affidavit at para. 14.

DALDMS/629838.8

Progressive to acquire the West Virginia Mine.[22]  The Term Sheet was executed by Progressive in West Virginia. [23]

16)      The Term Sheet detailed a $200,000,000.00 Loan (the "Loan") which contained a 5.5% interest rate payable on a quarterly basis and granted Global Empire a first lien on all assets, in particular the West Virginia Mine.[24]  Global Empire was also to receive a 45% ownership interest in the West Virginia Mine.[25]

17)      Pursuant to Paragraph 8 of the Term Sheet, Progressive was required to pay a Commitment Fee of $750,000.00 (the "Commitment Fee").[26]  The Commitment Fee was payable in parts: $250,000 upon execution of the Term Sheet: and $500,000 upon issuance of the Commitment Letter.[27]  Global likewise signed a Corporate Guaranty whereby they agreed to return the Commitment Fee if the loan didn't close within 120 days of receipt of Funds (the "Corporate Guaranty").[28]

18)      Progressive promptly forwarded the initial portion of the Commitment Fee to Global via two separate wire transfers.[29]  The first Wire Transfer, in the amount of $200,000.00 was sent on June 29, 2005.[30]  The following day Progressive made the second wire transfer of $50,000.00.[31]  Each of these wire transfers were initiated from Progressive's bank accounts in Moundsville, West Virginia. [32]

19)      Sometime that summer, following the execution of the Agreement, but prior to the

---

[22] See, Governor Moore Affidavit at para. 15.
[23] Id.
[24] Id. at para. 16.
[25] Id.
[26] Id. at para. 17.
[27] Id.
[28] Id.
[29] Id. at para. 18.
[30] Id.
[31] Id.
[32] Id.

issuance of the Commitment Letter or payment of the remaining $500,000, O'Nurkera and Defendant Hendrix, Global's CFO, visited the Mine on behalf of Global (the " Visit"), ostensibly to do due diligence. Cooper was there when they arrived at Justice's offices in Beckley, West Virginia.[33]

20)    A representative of Justice then flew both Hendrix and O'Nurkera in a helicopter out to visit the Mine. They spent the rest of the day reviewing the Mine and then were flown back to Justice's offices. In conjunction with the Visit, Progressive was requested to provide numerous items to assist Global with their independent due diligence. Progressive complied with every request it received.[34]

21)    Following, the O'Nurkera-Hendrix Visit, on July 21, 2005, Progressive and Global executed a Commitment Letter reiterating the terms in the Term Sheet, including the return of the Commitment Fee, and setting a closing date of August 15, 2005 (the "Commitment Letter").[35] Progressive then sent the final wire transfer, in the amount of $500,000.00 on July 26, 2005.[36] This wire transfer, like the two prior transfers, was likewise sent from bank accounts in Moundsville, West Virginia.[37]

22)    All of the documents executed by Progressive were executed in West Virginia, the wires were initiated in West Virginia, the collateral for the loan was in West Virginia and Plaintiff was based in West Virginia.

23)    In reliance upon the Term Sheet, Corporate Guaranty and Commitment Letter with Global Empire, Progressive expended an additional $516,219.18, to secure Progressive's right to purchase Justice's Red Fox Division from Justice Energy, LLC ("Justice Mine")—an

---

[33] See, Cooper Affidavit at para. 16.
[34] See, Cooper Affidavit at para. 17; see also, Governor Moore Affidavit at para. 19.
[35] See, Governor Moore Affidavit at para. 20.
[36] Id. at para. 21.
[37] Id.

acquisition the success of which was dependent upon the acquisition of the West Virginia Mine.[38]

24)      Despite making all required payments, and responding to all inquiries from Global Empire and promptly and completely complying with all due diligence requests, Global Empire did not move forward with closing as scheduled on August 15, 2005.[39]

25)      On September 6, 2005, Governor Moore sent a letter to Global Empire referencing the lack of closing and Progressive's displeasure that no one from Global Empire advised them of same.[40]  Within that letter Progressive specifically referenced the $750,000.00 commitment fee held by Global and the $516,219.18 paid by Progressive to Justice with regard to the Justice Mine.[41] Progressive further requested that Global comply with the agreements and acknowledged that settlement possibilities were available if Global decided it no longer wished to proceed.[42]  Governor Moore further expressed therein his desire to complete the transaction and reiterated the tremendous respect he then had for Global Empire.[43]

26)      Due to the lack of closure on this issue Progressive coordinated a meeting with representatives of Global Empire which Progressive understood was for the purpose of closing the deal.[44]  On or about October 10, 2005, Governor Moore and James C. Justice, II, the owner of Justice, his son, James Justice, III, Tom Lusk, Justice's Chief Operating Officer and another Justice representative flew down to Global's offices in Houston, Texas and met personally with Global's President and CEO, Dr. Rashid, and its Vice President of Finance and Legal Affairs,

---

[38] Id. at para. 22.
[39] Id. at para. 23.
[40] Id. at para. 24.
[41] Id.
[42] Id.
[43] Id.
[44] Id. at para. 25.

David Bernstein.[45]

27)      At that meeting both Dr. Rashid and Mr. Bernstein represented that Global was financially capable of financing the acquisition of the West Virginia Mine and was still interested in doing so.[46]  At no time did Mr. Bernstein state that he was not an officer of Global Empire.[47]

28)      Instead of closing the financing and acquisition, however, Mr. Bernstein, in the presence of all the individuals from Justice, presented Progressive that day with a letter written on Global Empire letterhead from him as V.P. Finance and Legal Affairs, NOT as outside counsel (the "October Letter").[48]  The October Letter contained a long list of due diligence items that he requested be delivered by November 15, 2005 and further advising that they would "be employing and sending our own due diligence experts in regards to quality and production of the coal mines and our auditing firm to examine the books and records of Progressive Mineral and Justice Energy."[49]

29)      Within the October Letter Mr. Bernstein referenced that Global's "credit committee" would be meeting on November 17, 2005 to review this matter and to determine the viability of the loan application.[50]  He further stated that "in the event our credit committee regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000, the amount of your advance."[51]

30)      The October Letter surprised Governor Moore because Global Empire had previously requested, and been provided answers to each and every one of these inquiries on multiple occasions over the preceding six months and the purpose of the meeting was to close the

---

[45] Id.
[46] Id. at para. 26.
[47] Id.
[48] Id. at para. 27.
[49] Id.
[50] Id. at para. 28.
[51] Id.

purchase.[52]  Mr. Bernstein never said that Global was not provided this information previously.[53]

31)      Despite Bernstein's present assertion to the contrary, there was never any question as to who owned the mine.[54] Bernstein's version of what transpired is a complete fabrication.[55] Justice had owned the mine for a considerable number of years prior to this point and his family is well-known in West Virginia in the mining of West Virginia coal.[56]  Any alleged concerns of ownership could have easily been addressed that day since four members of Justice were present at Global's offices in Houston at that exact moment.[57]  Furthermore, Justice still owns that mine today.[58]

32)      Bernstein likewise spent a good portion of the meeting discussing Canadian politics and the role that Global's directors Crosbie and Reynolds served in same.[59]  Bernstein harped on their presence in Canadian government because he knew of Governor Moore's involvement in politics, in addition to that of his daughter, United States Congresswoman Shelley Moore Capito.[60]  Bernstein even commented how he had just recently read an article about leading women in politics and how Ms. Capito was prominently mentioned.[61]

33)      While Governor Moore already knew that Crosbie and Reynolds were politicians and board members, Bernstein further advised him that one of them was running for President of Parliament.[62]  This information solidified his belief that Global Empire was legitimate and

---

[52] Id. at para. 29.
[53] Id.
[54] Id. at para. 30.
[55] Id.
[56] Id.
[57] Id.
[58] Id.
[59] Id. at para. 31.
[60] Id.
[61] Id.
[62] Id. at para. 32.

credible.[63]

34)      Although the deal did not close that day, Governor Moore's meeting with both Dr. Rashid and Mr. Bernstein ended on a pleasant note and he was left with the impression he had made two new friends in addition to business partners.[64] Mr. Bernstein's characterization of the meeting as confrontational where he helped "avert a fraud" is totally inaccurate.[65]  Governor Moore left Houston that day thinking that this matter would be resolved shortly and that Progressive would either receive the loan funding or a return of the Commitment Fee.[66]

35)      Despite Mr. Bernstein's representations to the contrary, he did contact Progressive again after the meeting in Houston.[67]  Specifically, Mr. Bernstein called Governor Moore in West Virginia on at least two occasions.[68]  Initially he gave Governor Moore every assurance that the matter would be concluded either with a funding of the loan or a refund of the Commitment Fee.[69]  Bernstein further advised on the last call that he was preparing to send and return the Commitment Fee.[70]

36)      Despite Mr. Bernstein's statements to Governor Moore on the telephone, and contained within the October Letter, Progressive did not hear from Mr. Bernstein, one way or the other, on November 18, 2005 as promised. [71]  Mr. Bernstein never advised Progressive of the alleged credit committee's determination as to whether Global Empire wanted to continue with the financing.[72] Global Empire likewise did not refund the $750,000.00 on November 18, 2005

---

[63] Id.
[64] Id. at para. 33.
[65] Id.
[66] Id.
[67] Id. at para. 34.
[68] Id.
[69] Id.
[70] Id.
[71] Id. at para. 35.
[72] Id.

DALDMS/629838.8

as promised by Mr. Bernstein.[73]

37)    On January 4, 2006, Governor Moore sent another letter to Global Empire referencing the agreement and Mr. Bernstein's direct promises with regard to the return of the $750,000.00 commitment fee. Governor Moore further advised them that they did not understand the delay in refunding the money and notified them that Progressive had been forced to retain counsel.[74]

38)    On January 13, 2006, contrary to the statements made in Mr. Bernstein's Affidavit about having "no further involvement," Progressive received a facsimile from Mr. Bernstein again written on Global Letterhead from him as V.P. Finance and Legal Affairs <u>NOT</u> as outside counsel (the "<u>January 2006 Letter</u>").[75]   Mr. Bernstein apologized for the delay and referenced that it was due to the fact that he was intensely involved in the Canadian elections with Defendant Crosbie. Bernstein did advise that he would be in touch by the end of the following week "to settle this matter."[76]

39)    Progressive later found out that Global Empire had filed a petition for relief under Chapter 11 of the Bankruptcy Code on December 6, 2005, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.[77]   Despite the fact that the bankruptcy filing pre-dated Mr. Bernstein's January 2006 Letter, Mr. Bernstein did not say a word about the bankruptcy filing nor did Progressive ever hear from him again as promised.[78]   Progressive likewise never received any portion of the Commitment Fee back.[79]

40)    Bernstein's bold statement that he "had no further involvement with Global" after

---

[73] Id.
[74] Id. at para. 36.
[75] Id. at para. 37.
[76] Id.
[77] Id. at para. 38.
[78] Id.
[79] Id.

October 2005, and that he "later found out that Global was involved in insolvency proceedings"[80] was clearly false. Bernstein made two telephone calls to Progressive in the fall of 2005, sent further correspondence to Progressive in January 2006, and was a crucial player in attempting to help Global obtain financing in February 2006 in their bankruptcy case.[81]

41)     In addition to the foregoing, Bernstein's representations as to Global's intentions with regard to repayment of the Commitment Fee, were obviously fraudulent because as of the date of bankruptcy filing, Global's three bank accounts collectively contained $3,369.24.[82] **$3,369.24!** In addition to having virtually zero funds, Global's "biggest assets" were two office buildings in Houston, Texas (the "Office Park"), which, though collectively valued on the Harris County Tax Rolls at approximately $5.4 million, had approximately $12.8 million in secured debt against it.[83]

42)     While it is unclear where all of the money went, it is clear it didn't stay long, if at all, in the bank accounts of Global Empire. On the contrary, it is pretty clear that the commitment fee was used almost, if not entirely, and nearly immediately, for purposes personal to the Defendants,[84] including no less than $200,000.00 went to Bernstein himself.[85]

43)     Furthermore, the Schedules in Global's bankruptcy case and the sworn testimony from the 341 Creditors Meeting clearly show that Global did not have the capability of undertaking any of the services the PowerPoint indicated it regularly offered. In addition, virtually none of the entities described above either were subsidiaries of Global Empire at all nor

---

[80] See, Affidavit of David M. Bernstein attached to the Motion to Dismiss (the "Bernstein Affidavit") at para. 9.
[81] See, Exhibit 3: "Transcript of 341 Meeting of Creditors" in *In re Global Empire Investments and Holdings, LLC,* ("Transcript")at pp. 14-16.
[82] See, Exhibit 4: Schedules from Bankruptcy Case ("Schedules") at Schedule B: Personal Property.
[83] See, Schedules, at Schedule A.
[84] See, Transcript at pp. 17-21.
[85] Id. at pp 18-19 (testimony that $200,00 went to "Jerome (unintelligible) and Associates." According to Bernstein's Curriculum Vitae, Bernstein's firm was Choquette, Beaupre Rheaume with Jerome Choquette as name partner.

did they have any business operations, or employees, let alone the worldwide presence that Global Empire pretended they had.

44)      Specifically, the only affiliates that Global Empire had were Mohawk and Galleria Corridor, LLC ("Galleria").[86]  Mohawk had no remaining assets at the time of the bankruptcy filing[87] and Galleria's sole function was to manage the Office Park.[88]  While Galleria did manage the Office Park, it did not, never had, or sought to, manage any other properties.[89]

45)      Despite the PowerPoint's depiction of a worldwide network of affiliated entities, Global had no other subsidiaries at the time of the bankruptcy filing and it never had any other subsidiaries.[90]  "It was only a simple holding company. Investment Company. That's all."[91]

46)      In addition to having no part of the alleged subsidiaries and affiliates, Global never owned a percentage of any other business.[92]  Never in its history had Global made loans to any entity.[93]  While it did have officers and non-voting directors,[94] like Bernstein, Reynolds and Crosbie respectively,[95] Global never had any employees.[96]

47)      Thus, Primergy was not a subsidiary of Global Empire.[97]  It was an independent company. In other words, Primergy was misrepresented as being part of the Global Empire Group of Companies. It was likewise misrepresented that Primergy, and its alleged subsidiary corporations, "held all of Global's oil and gas related companies" (read: none).[98]

---

[86] Id. at pp. 3-4, 8-9, and 16-17.
[87] Id. at p.16.
[88] Id. at pp. 16-17.
[89] Id.
[90] Id. at p.17.
[91] Id. at p.51.
[92] Id. at p.17.
[93] Id. at p.20.
[94] Id. at p. 23.
[95] See, PowerPoint attached to Governor Moore Affidavit.
[96] Id.
[97] Id. at pp.47-50 (erroneously typed name as "Prime Energy").
[98] See para. 9 above.

48)      Petroworld was not a subsidiary of Global Empire either.[99] In fact, Petroworld was barely a company at the time of the bankruptcy filing as it had no employees.[100] Thus, Petroworld did not do project management, construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally as misrepresented by Progressive.[101]

49)      Prime Stops, another alleged affiliate, was not part of Global Empire. At the time of the bankruptcy filing it was allegedly hoping to acquire some gas stations but hadn't acquired any yet.[102]

50)      Global Empire likewise did not have any interest in World Times. Despite misrepresentations to the contrary, it was not "a pioneer"[103] in long distance and prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP, rather it allegedly only provided prepaid telephone services out of the Office Park in Houston.[104]

51)      Lastly, Crown, Prime Development, First Realty and First Mortgage were likewise additional companies that Global Empire did not have any interest in. In keeping with the theme established by several of the other "Global Empire companies", none of these alleged affiliates had any employees either.[105] Thus, it was misrepresented that Global Empire had any involvement in real estate investment, the construction and development of commercial and residential properties, or the origination of residential and commercial loans.[106] Global Empire likewise did not have any properties under contract (let alone millions of dollars worth of

---

[99] See, Transcript at p.51 (erroneously typed name as "Petro Oil").
[100] Id.
[101] See para. 9 above.
[102] See, Transcript at p.51.
[103] See para. 9 above.
[104] See, Transcript at p.52.
[105] Id. at pp.51-52.
[106] See para. 9 above.

properties) and could not possibly expand its operations[107] since it did not have any!

## III.

## Arguments and Authorities

**A.      The Affidavits of Bernstein, Crosbie and Reynolds should be afforded little weight**

52)      The Motion to Dismiss demonstrates a concerted effort by Defendants Bernstein, Reynolds and Crosbie (collectively, the "Canadian Conspirators") to play "fast and loose" with this litigation and this Court.  These games are reflected in three self-serving affidavits (the "Affidavits") which do not deny knowledge of Global Empire or the other Defendants. Instead, the Canadian Conspirators each allege that none of them were officers or directors of Global Empire and that none of them had any role in Global Empire's scheme to defraud Progressive.

53)      The Affidavits, however, are cluttered with pages upon pages of contradictions, half-truths, and misrepresentations so contrary to the weight of the evidence,  that is hard to decipher whether any of the statements contained therein are accurate. In fact, it is clear from the Affidavits that misleading and scamming Progressive was not enough for the Canadian Conspirators, as they are now committed to carrying this deception into this Court.  As a result, each of the Affidavits must be viewed as nothing more than the Canadian Conspirators' futile attempts to pretend that they were innocent bystanders with plausible deniability in an intentional concerted conspiracy with which they were willing participants. The following outline lists the most glaring misrepresentations and deficiencies contained within the Affidavits.

| Affiant | False or Misleading Statement | Contrary Evidence |
|---|---|---|
| Bernstein | "I have never been an officer of Global." | See, PowerPoint attached to Governor Moore Affidavit where Bernstein listed as VP of Finance |

---

[107] See para. 9 above.

| | | |
|---|---|---|
| | | and Legal Affairs under "Organizasional Structure" and Bernstein's former firm, Choquette Beaupre Rheaume, listed as counsel to Global Empire.<br><br>See also, the October Letter from Bernstein to Governor Moore on Global Empire letterhead with Bernstein title of VP of Finance and Legal Affairs and referring to Global Empire throughout as "our company."<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting.<br><br>See also, the January 2006 Letter from Bernstein to Governor Moore on Global Empire letterhead with Bernstein title of VP of Finance and Legal Affairs. |
| Bernstein | "It was my understanding that if Global could not raise the funds for Plaintiff, Global would return to Plaintiff the entire commitment fee, less expenses." | See, the October Letter where Bernstein personally states that "in the event our credit committee, regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000 the amount of your advance." This was not a mere "understanding" of what Global might do, but an express promise of what Bernstein as an officer of Global would make sure was done.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting, including in two telephone conversations where he explicitly promised to return the money.<br><br>See also, the January 2006 Letter to |

| | | |
|---|---|---|
| | | Governor Moore where Bernstein personally promises to "settle this matter with you."<br><br>Lastly, Bernstein himself received a portion of the money from Progressive even though Global Empire had virtually no money in its bank accounts. See, Transcript at pp. 18-19; Schedules at Schedule B: Personal Property. |
| Bernstein | "It appeared to me that Plaintiff was requesting that Global raise $200,000,000 for a mine, which Plaintiff claimed it owned, when in fact, it did not own and had no rights to such mine" | This statement is wholly inaccurate and drastically distorts the truth.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting.<br><br>Furthermore, all documents between the parties, including the October Letter, clearly showed that Plaintiff was looking to purchase this mine from Justice (referenced throughout the October Letter). |
| Bernstein | "I sensed that a major fraud was about to be perpetrated by Plaintiff, and I immediately left the meeting and had no further discussions with Plaintiff". | See, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein during telephone conversations after the Houston meeting.<br><br>Furthermore, approximately three months after Bernstein allegedly "had no further discussions with Plaintiff, " Bernstein wrote the January 2006 Letter to Governor Moore, promising to "be in touch with you by the end of next week to settle this matter with you." The tone of the January 2006 Letter likewise thoroughly contradicts Bernstein characterization of his dealings with Plaintiff. |
| Bernstein | "Whether or not money was | Again, it can not be stressed enough |

| | | |
|---|---|---|
| | returned to Plaintiff was not within my knowledge or responsibility." | that Bernstein was the Vice President of Finance. This was clearly within his knowledge and responsibility.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting including in two telephone conversations where he explicitly promised to return the money.<br><br>Further, the October Letter where Bernstein, the VP of Finance and Legal Affairs, personally states that "in the event our credit committee, regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000 the amount of your advance."<br><br>See, also the January 2006 Letter from Bernstein to Governor Moore dated 1/13/06, promising to "be in touch with you by the end of next week to settle this matter with you."<br><br>Lastly, Bernstein himself received a portion of the money from Progressive even though Global Empire had virtually no money in its bank accounts. See, Transcript at pp. 18-19;  Schedules at Schedule B: Personal Property. |
| Bernstein | "In fact I had no further involvement with Global". | See, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting.<br><br>Bernstein also sent the January 2006 letter on Global letterhead from himself as VP of Finance and Legal Affairs.<br><br>See also, the 341 Transcript at pp. |

| | | |
|---|---|---|
| | | 12, 15-16 (Bernstein cited as assisting Global with transfer of funds in the coming days to facilitate Global's reorganization)<br><br>See, Summary of Schedules from Global Empire bankruptcy case at Schedule F where Global references owing $100,000.00 to Bernstein's company Emiq, Inc.[108] and $10,000.00 to Bernstein's legal partner Jerome Choquette. |
| Bernstein | "More importantly, the actions which Plaintiff alleges as constituting the fraud in the inducement, are claimed to have occurred in June and July of 2005. I only became involved in October 2005, and my involvement was solely limited to due diligence." | The Complaint alleges a continuing fraud that commenced no later than April 2005 and continued into January 2006 with Bernstein's continued representations that the Commitment Fee would be returned even though Global Empire, as Progressive late learned, lacked the wherewithal to do so, in large part because Defendants herein had taken the Commitment Fee for their own devices.<br><br>The CV's and PowerPoint were delivered on April 26, 2005. Bernstein is referenced in each of those. Furthermore, Bernstein helped prepare the PowerPoint. See, Affidavit of Wayne Kitchens.<br><br>It is further contended that the fraud continued beyond June and July of 2005 into 2006. The representations made by Bernstein to Governor Moore at the meeting in Houston and within Bernstein's October Letter and January 2006 Letter delayed Progressive in their attempts to collect. This delay allowed Global to escape repayment by filing for Chapter 11 bankruptcy. |

---

[108] See, Curriculum Vitae of Bernstein attached to Governor Moore Affidavit.

| | | The contention that Bernstein "only became involved in October 2005" is further contradicted directly by Bernstein himself in para. 4 of his sham Affidavit. See, Bernstein Affidavit. |
|---|---|---|
| Bernstein | "I introduced both Mr. Reynolds and Mr. Crosbie to Mr. Rashid in Houston in October 2004. Nothing ever came from that one meeting. I personally know that neither Mr. Reynolds nor Mr. Crosbie had any connection with Global other than one meeting with Mr. Rashid in Houston…..I never saw any document or heard any representation linking either Mr. Reynolds or Mr. Crosbie to Plaintiff". | There is an improper predicate for this statement.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting.<br><br>Bernstein's affidavit is inconsistent. First, Bernstein states he had no knowledge of anything Global did prior to, or after, October 2005. See, para. 8-10 of Bernstein's Affidavit. If Bernstein allegedly had no knowledge of anything Global did prior to, or after, October 2005, how could he possibly "personally know" what Reynolds or Crosbie did after the Houston meeting?<br><br>In addition, Crosbie's CV states that he was elected as Chairman of the Board in 2004 (presumably at this same October 2004 meeting or shortly thereafter. See, Crosbie CV under "Professional Experience"). |
| Bernstein | "Not only is there no link between Mr. Reynolds and Mr. Crosbie with Plaintiff; there is no link between Mr. Reynolds and Mr. Crosbie with Global." | There is an improper predicate for this statement as well for the same reasons outlined above.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein specifically about Crosbie and Reynolds at the Houston meeting.<br><br>See, PowerPoint where Crosbie and Reynolds are listed as Directors and Crosbie's law firm, Patterson |

Page 23

| | | |
|---|---|---|
| | | Palmer, listed as counsel to Global Empire.<br><br>See, CV of Crosbie provided by Global Empire to Plaintiff on 4/26/05. Under "Professional Experience" it clearly states "In 2004  Mr. Crosbie was elected as <u>Chairman of the Board</u> to Global Empire Investments & Holdings, LLC, a US based corporation with holdings in a number of subsidiary companies within the energy, real estate investment, construction & development and  telecommunications  sectors."<br><br>See, CV of Reynolds provided by Global Empire to Plaintiff on 4/26/05. On page 3 of the CV and page 10 of the fax it clearly states that "Mr. Reynolds sits on the Board of Directors of Global Empire Investments & Holding LLC and holds the position of Senior Vice-President of Global Empire's Oil & Gas  division  for the US. Global Empire is a US holding  corporation  based  in Houston, Texas with interests in Energy, Real Estate Investment, Construction & Development and Telecommunications." |
| Crosbie | "I have never been a director of Global, either voting or non-voting. I have never been an employee of, agent of, advisor to or consultant to Global. I have never had a connection with Global,  either  directly  or indirectly……" | See, PowerPoint where Crosbie is listed as a Director and his law firm, Patterson Palmer, listed as counsel to Global Empire.<br><br>See, CV of Crosbie provided by Global Empire to Plaintiff on 4/26/05. Under "Professional Experience" it clearly states "In 2004  Mr. Crosbie was elected as <u>Chairman of the Board</u> to Global Empire Investments & Holdings, |

DALDMS/629838.8

| | | |
|---|---|---|
| | | LLC, a US based corporation with holdings in a number of subsidiary companies within the energy, real estate investment, construction & development and telecommunications sectors." <br><br> See, further information on Crosbie provided by Global Empire on 4/26/05 from www.asf.ca (website of the Atlantic Salmon Federation). <br><br> See, also the January 2006 Letter from Bernstein to Governor Moore dated 1/13/06, advising that Bernstein was intensely involved in Canadian election with Crosbie. <br><br> See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at the Houston meeting concerning Crosbie's involvement. |
| Crosbie | "My only contact with Global was a short introduction I had with Defendant, Dr. Muhammad Haroon Rashid, which took place in Houston, Texas several years ago. Nothing ever came of it and I have had no business connection with Dr. Rashid since." | See, PowerPoint where Crosbie listed as a Director and his firm, Patterson Palmer, listed as counsel to Global Empire. <br><br> See, CV of Crosbie provided by Global Empire to Plaintiff on 4/26/05 and printed off the Patterson Palmer website. Under "Professional Experience" it clearly states " In 2004 Mr. Crosbie was elected as Chairman of the Board to Global Empire Investments & Holdings, LLC, a US based corporation with holdings in a number of subsidiary companies within the energy, real estate investment, construction & development and telecommunications sectors." <br><br> See, also the January 2006 Letter |

DALDMS/629838.8

| | | |
|---|---|---|
| | | from Bernstein to Governor Moore dated 1/13/06, advising that Bernstein was intensely involved in Canadian election with Crosbie.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at the Houston meeting. |
| Reynolds | "I have never been an officer of Global. I have never been a director of Global, either voting or non-voting. I have never been an employee of, agent of, advisor to or consultant to Global. I have never had a connection with Global, either directly or indirectly……" | See, PowerPoint where Reynolds listed as a Director.<br><br>See, CV of Reynolds provided by Global Empire to Plaintiff on 4/26/05. On page 3 of the CV and page 10 of the fax it clearly states that "Mr. Reynolds sits on the Board of Directors of Global Empire Investments & Holding LLC and holds the position of Senior Vice-President of Global Empire's Oil & Gas division for the US. Global Empire is a US holding corporation based in Houston, Texas with interests in Energy, Real Estate Investment, Construction & Development and Telecommunications."<br><br>See, further information on John Douglas Reynolds provided by Global Empire on 4/26/05 from www.johnreynolds.ca.<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at the Houston meeting concerning the involvement of Reynolds. |
| Reynolds | "My only contact with Global was a short introduction I had with Defendant, Dr. Muhammad Haroon Rashid, which took place in Houston, Texas several | See, PowerPoint where Reynolds listed as a Director.<br><br>See, CV of Reynolds provided by Global Empire to Plaintiff on |

| | | |
|---|---|---|
| | years ago. Nothing ever came of it and I have had no business connection with Dr. Rashid since." | 4/26/05. On page 3 of the CV and page 10 of the fax it clearly states that "Mr. Reynolds sits on the Board of Directors of Global Empire Investments & Holding LLC and holds the position of Senior Vice-President of Global Empire's Oil & Gas division for the US. Global Empire is a US holding corporation based in Houston, Texas with interests in Energy, Real Estate Investment, Construction & Development and Telecommunications."<br><br>See also, Affidavit of Governor Moore at para. 26-37 regarding representations made by Bernstein at, and after, the Houston meeting. |

54)     In light of the foregoing, the credibility of these self-serving Affidavits is lacking and should be afforded little weight.

**B.     West Virginia has Personal Jurisdiction over Defendants Bernstein,    Reynolds and Crosbie.**

55)     Assuming *arguendo* that Defendants Bernstein, Reynolds and Crosbie have even produced competent evidence in support of their Motion to Dismiss, Progressive maintains that each of the Defendants are nonetheless subject to jurisdiction in West Virginia. While Defendants allege no physical ties to West Virginia they engaged in conduct that they knew or should have known would cause damage here. Defendants Bernstein, Reynolds and Crosbie are primary participants in an alleged wrongdoing intentionally directed at a West Virginia limited liability company. The effect of their intentionally tortious conduct happened in West Virginia and jurisdiction over them is proper on that basis.

1.     Defendants Purposefully Established "Minimum Contacts" In West
       Virginia.

56)     The Due Process Clause of the Fourteenth Amendment to the United States

Constitution[109] permits personal jurisdiction over a defendant in any State with which the

defendant has "certain minimum contacts . . . such that the maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'" *See Calder v. Jones*, 465 U.S.

783, 788 (1984) (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940); *Int'l Shoe Co. v.

Washington*, 326 U.S. 310, 316 (1945)).

57)     "The constitutional touchstone remains whether the defendant purposefully

established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 474 (U.S. 1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "This

'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction

solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* at 475 (citing *Keeton v.

Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *World-Wide Volkswagen Corp. v. Woodson*,

444 U.S. 286, 299 (1980)). "'The foreseeability that is critical to due process analysis . . . is that

the defendant's conduct and connection with the forum State are such that he should reasonably

anticipate being haled into court there.'" *Id.* at 474 (citing *World-Wide Volkswagen*, 444 U.S. at

297).

58)     Furthermore, despite the Defendants' assertion to the contrary, "jurisdiction may

not be avoided merely because the defendant did not *physically* enter the forum State." *Burger

King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985) (emphasis added). "Although territorial

presence frequently will enhance a potential defendant's affiliation with a State and reinforce the

---

[109] Defendants acknowledge in their Memorandum that the West Virginia long-arm statute is coextensive with the
full reach of due process and it is unnecessary in this case to go through the normal two-step formula for
determining the existence of personal jurisdiction. *See* Memorandum at p.2 (citing, among other authorities,
*Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525 (4th Cir. 1987).

reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 476. "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, the Supreme Court has consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-775 (1984); *see also Calder v. Jones*, 465 U.S. 783, 788-790 (1984); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222-223 (1957); *cf. Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 317 (1943); *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525 (4th Cir. 1987).

59)      The United States Supreme Court case of *Calder v. Jones*, 465 U.S. 783 (1984), likewise resolved "any uncertainty about minimum contacts on a tort theory." *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 528 n. 8 (4th Cir. 1987).

60)      Specifically, courts may exercise "specific personal jurisdiction" over nonresidents when such has "intentionally directed his tortious conduct toward the forum state, knowing that such conduct would cause harm to a forum resident." *Jarmuth v. Waters*, 2005 U.S. Dist. LEXIS 45570, 7-8 (D. W. Va. 2005)(citing *Calder v. Jones*, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984).

61)      "This "effects test" of specific jurisdiction is typically construed to require that the plaintiff establish that: (1) the defendant committed an intentional tort; (2) the plaintiff  felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Jarmuth v. Waters*, 2005 U.S. Dist. LEXIS

45570, 7-8 (D. W. Va. 2005)(citing *Carefirst of Maryland v. Carefirst Pregnancy Ctrs.,* 334 F.3d 390, 398 (4th Cir. 2003)).

62)       In *Calder*, the focal point of the act and the harm suffered was California. *Calder*, 465 U.S. at 784.  The California Court of Appeal concluded, and the Supreme Court agreed, that a valid basis for jurisdiction existed on the theory that petitioners intended to, and did, cause tortious injury to respondent in California. *Id.* at 789-790.  The Court held that the fact that the actions causing the effects in California were performed outside the State did not prevent California from asserting jurisdiction based on the "effects" of petitioners knowingly causing the injury in California. *Id.* at 788-791; *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-298 (1980); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 37 (1971).

63)       The *Calder v. Jones* court further noted that the intentional, and allegedly tortious, actions were expressly aimed at California. *Calder*, 465 U.S. at 789. Petitioners took actions "that they knew would have a potentially devastating impact upon respondent, and they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works." *Id.* at 789-790.  Under the circumstances, petitioners must "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Kulko v. Cal. Super. Ct.*, 436 U.S. 84, 97-98 (1978); *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977).

64)       Each of the Canadian Conspirators deliberately reached out beyond their home provinces and purposefully established 'minimum contacts' with West Virginia. Their actions or inactions allowed Global Empire to induce Progressive to enter into contracts which the conspirators knew Global would never perform. The conspiratorial acts of Bernstein, Reynolds, and Crosbie played a significant role in allowing Global to perpetuate a scheme designed to

Page 30

create the façade of a global conglomerate which, as set forth above, was involved in a variety of industries including venture capital, and that had the wherewithal to finance or arrange financing for the acquisition of the West Virginia Mine, and projects of similar size and complexity.

65)      In fact, Global was a complete sham. While its marketing materials and board composition presented the picture of a veritable conglomerate spanning across the globe nothing contained in these materials had even the slightest bit of truth behind them. These materials were provided to Progressive to induce Progressive to pay the Commitment Fee. Each of the Canadian Conspirators knew that nothing existed behind the façade however, and that the Defendants had no intent to perform.

66)      The evidence shows that each of the Canadian Conspirators were either directors or officers of Global Empire, or even worse, pretended to be. Crosbie and Reynolds joined Global's Board of Directors and/or permitted Global to use their names as a means to enhance Global's reputation and to legitimize Global. Due to the fact that Global Empire was as a financial company, Crosbie and Reynolds were undoubtedly aware that Progressive would be influenced by their presence on the Board and do business with Global in reliance on same, and thus fail to discover Global's true financial state and true nature of Global's business. Progressive did in fact rely to its detriment on their presence and thus failed to discover Global's true financial state (insolvent) and true nature of Global's business (nothing).

67)      Crosbie and Reynolds now conveniently assert that they not only knew nothing of the scam of Progressive but they had no connection with Global Empire.[110]  However, they admit to flying down to Houston, Texas (Global's headquarters) in October 2004 to meet with the other Defendants (for reasons unknown).  Sometime subsequent that meeting, but prior to April 26,

---

[110] See, Affidavit of John Douglas Reynolds attached to the Motion to Dismiss (the "Reynolds Affidavit") at para. 9; see also Affidavit of John C. Crosbie attached to the Motion to Dismiss (the "Crosbie Affidavit") at para. 9;

2005, they each revised their Curriculum Vitae to explicitly detail their elections to Global's Board of Directors, in Crosbie's case as Chairman. Their names are further prominently displayed in Global's marketing materials where both Crosbie and Reynolds are listed as Directors and noted Crosbie's firm, Patterson Palmer, as counsel to Global Empire.[111]  They then allowed Global Empire to utilize their Curriculum Vitae, with their contact information, in the marketing materials sent to Progressive.

68)      Despite now contending that he never had a role with Global Empire, as of April 26, 2005  Mr. Crosbie was advertising that he was Chairman of the Board of Directors of Global Empire. Specifically, the very first item listed by Mr. Crosbie under the "Professional Experience" tab of his Curriculum Vitae, is his election as Chairman of the Board of Directors in 2004.[112]

69)      Much like his "friend" Mr. Crosbie,[113] the Curriculum Vitae of Defendant Reynolds refutes his entire Affidavit. Despite not listing his position at Global Empire as his most important achievement, like Mr. Crosbie did, Defendant Reynolds did devote an entire paragraph of his Curriculum Vitae to his positions at Global Empire. In addition to serving on the Board of Directors, as reflected in the PowerPoint, Mr. Reynolds also noted that, as of April 26, 2005, he served as Senior Vice President of Global Empire's Oil & Gas Division.[114]  Global had no legitimate subsidiaries, no employees, and no Oil & Gas Division.[115]

70)      While Reynolds and Crosbie are now denying any relationship with their Defendant brethren, the evidence disproves that claim. Whether they were Directors, which the information provided by Global, their personal Curriculum Vitae, and the representations made

---

[111] See, PowerPoint attached to Governor Moore Affidavit.
[112] See, Curriculum Vitae of Crosbie attached to Governor Moore Affidavit.
[113] See, Reynolds Affidavit at para. 10.
[114] See, Curriculum Vitae of Reynolds attached to Governor Moore Affidavit.
[115] See, discussion supra.

by Bernstein seem to most definitely indicate, or pretended to be, which is infinitely worse, Crosbie and Reynolds lent their names and stature to this sham. As opposed to directors of legitimate corporations that may sometimes claim lack of awareness or involvement of all dealings, Crosbie and Reynolds can't defend themselves in any way because Global Empire was in no way legitimate. Global Empire had no legitimate affiliates or purpose. Global Empire sold no products. Global Empire offered no services. Global Empire had no employees. Global Empire had no money.[116]

71)      In sum, Reynolds and Crosbie served as directors of a company with NO legitimate business to speak of, nor any intention of doing likewise. It was nothing less than a fake corporate con artist.   Purely an operation to scam unwitting investors. Reynolds, and Crosbie knew, or should have known, that Global was a façade and that Progressive, would rely upon their presence as directors as an indication that they were well-informed of all actions taken by Global and, most importantly, that Global was a legitimate organization.

72)      These gentleman intentionally acted to perpetuate this scam, or acted with such reckless abandonment that they couldn't care less if their actions allowed others to cause harm to Progressive.   Either way it appears that both Crosbie and Reynolds were key players in the Global Empire enterprise. By sitting back and idly watching Global Empire and Bernstein go forward with countless misrepresentations, including implicit ones from Crosbie and Reynolds, they were more than disinterested parties. Their role in the conspiracy was clear and their actions, or inactions, were intentionally taken with the intent of causing damage to misinformed entities that chose to do business with Global Empire. The effect of that damage would unquestionably be felt by the deceived entity in their home state. Progressive was one such entity and the effect of Crosbie and Reynolds conduct was severe damage in West Virginia.

---

[116] See, Schedules at Schedule B: Personal Property.

Jurisdiction is undoubtedly proper over these individuals.

73)     The assertion by Mr. Bernstein that there is no jurisdiction over him in West Virginia is without any basis whatsoever. Bernstein played a far more visible role in the conspiracy and knowingly, or with reckless disregard for the truth or falsity of such, made false representations <u>directly to Progressive</u> on no less than four occasions.[117]  Moreover, he received a significant amount of the Commitment Fee.[118]

74)     Bernstein, however, denies repeatedly that he was an officer of Global Empire and goes to great lengths to dissuade this Court from believing that he had much knowledge of the facts comprising this lawsuit or that he was actively involved in Global Empire's dealings or the scheme to defraud Progressive.[119] Unfortunately, virtually everything stated by Mr. Bernstein in his Affidavit, signed under penalty of perjury, is contradicted by documentary evidence, including his own writings, and testimony of competing witnesses.

75)     First, the PowerPoint clearly listed Bernstein as Global's Vice President of Finance and Legal Affairs and noted his former law firm, Choquette Beaupre Rheaume, as counsel to Global Empire.[120]  Furthermore, Bernstein himself played a pivotal role in creating the PowerPoint prior to its dissemination to Progressive in April 2005.[121]

76)     Second, on or about October 10, 2005, Bernstein and Defendant Rashid met personally with both Governor Moore and James C. Justice, II, the owner of Justice, his son, James Justice, III, Tom Lusk, Justice's Chief Operating Officer and another Justice representative in Houston, Texas.[122]  At that meeting Bernstein represented that Global was

---

[117] See, Governor Moore Affidavit at para. 26-37.
[118] See, Transcript at pp. 18-19.
[119] See, Bernstein Affidavit at para. 6-10.
[120] See, PowerPoint attached to Governor Moore Affidavit.
[121] See, <u>Exhibit 5</u>: Affidavit of Wayne Kitchens ("Kitchens Affidavit") at para. 5-7.
[122] See, Governor Moore Affidavit at para. 25-37.

financially capable of financing the acquisition of the West Virginia Mine, had solid leadership with Reynolds and Crosbie, and was still interested in doing the deal.[123]   At no time did Mr. Bernstein state that he was not an officer of Global Empire.[124]

77)      Third, at the meeting in Houston, Bernstein presented Governor Moore with a letter written on Global Empire letterhead from him as V.P. Finance and Legal Affairs <u>NOT</u> as outside counsel.[125]   This letter contained a long list of due diligence items that Bernstein requested be delivered by November 15, 2005 and further advising that Global would "be employing and sending <u>our</u> own due diligence experts in regards to quality and production of the coal mines and <u>our</u> auditing firm to examine the books and records of Progressive Mineral and Justice Energy."[126] Within the letter Bernstein referenced that Global's "credit committee" would be meeting on November 17, 2005 to review this matter and to determine the viability of the loan application.[127] Bernstein further stated that "in the event <u>our</u> credit committee regretfully declines <u>we</u> shall remit to you by cashier's check on November 18, 2005, $750,000, the amount of your advance."[128]

78)      Fourth, despite Mr. Bernstein's representations to the contrary, he called Governor Moore in West Virginia on at least two occasions and gave Governor Moore every assurance that the matter would be concluded either with a funding of the loan or a refund of the Commitment Fee.[129]

79)      Fifth, despite his representations made in the October Letter, and on the telephone after the meeting in Houston, Bernstein did not contact Governor Moore or anyone from

---

[123] Id. at para. 26.
[124] Id.
[125] Id. at para. 27.
[126] Id.
[127] Id. at para. 28.
[128] Id.
[129] Id. at para. 34.

Progressive as promised on November 18, 2005.[130]  Mr. Bernstein never advised Governor Moore of the alleged credit committee's determination as to whether Global Empire wanted to continue with the financing.[131]  Global Empire likewise did not refund the $750,000.00 on November 18, 2005 as promised by Mr. Bernstein.[132]

80)      Sixth, on January 13, 2006, contrary to the statements made in Bernstein's Affidavit, Bernstein sent yet another facsimile to Governor Moore in West Virginia again written on Global Letterhead from him as V.P. Finance and Legal Affairs <u>NOT</u> as outside counsel.[133] Bernstein apologized for the delay due to the fact that he was intensely involved in the Canadian elections with Defendant Crosbie and would be in touch by the end of the following week "to settle this matter."[134]  That never happened.[135]

81)      Seventh, while all of this was going on Bernstein was working with Global Empire in their bankruptcy case to allegedly arrange for funding—presumably through another scam.

82)      Thus, in addition to the PowerPoint which he co-authored, Bernstein represented to Progressive in person, on the telephone and in his own letters that he was an officer of Global Empire, that Progressive was entitled to a refund of the Commitment Fee, and that Global would refund the Commitment Fee by a specific date, if his company decided not to pursue the deal further.

83)      It must be emphasized as well that subsequent to the October Letter there was no further mention of the "credit committee." In light of the foregoing, there is no other conclusion

---

[130] Id. at para. 35.
[131] Id.
[132] Id.
[133] Id. at para. 37.
[134] Id.
[135] Id. at para. 38.

Page 36

to be drawn but that the "credit committee" referenced in Bernstein's letter was fictitious and made up by Bernstein.  Since Global was a mere façade and not a lender or financial institution, had no employees and virtually no money at the time the Bernstein letter was sent, the Bernstein letter could not have been intended to serve any purpose other than to delay Progressive from discovering the truth about Global and thus to further the fraudulent conspiracy.

84)     It is readily apparent that Bernstein intended to delay Progressive from timely pursuing reimbursement of the Commitment Fee and that Progressive did reasonably rely upon such misrepresentations to its detriment. That he and the other Defendants helped themselves to the Commitment Fee, and then made continuing promises to reimburse Progressive in order to delay Progressive from pursuing legal remedies to recover the money, further illustrates the malicious nature of this situation.

85)     Like the defendants in *Calder v. Jones,*[136] the actions taken by Bernstein, Reynolds and Crosbie are sufficient to satisfy specific jurisdiction over them in West Virginia.

86)     The "focal point" of this transaction was the acquisition of the mine in the state of West Virginia. Pursuant to the Agreement, Global Empire was not just lending the money for Progressive to acquire the West Virginia Mine, they also were to receive a 45% ownership interest in the West Virginia Mine.  To facilitate the Loan, Progressive was required to pay a Commitment Fee of $750,000.00 which they did by way of three separate wire transfers all made out of bank accounts located in Moundsville, West Virginia. All communications sent by Global Empire, including the two letters sent by Bernstein, and the two telephone calls made by Bernstein, were addressed or transmitted  to Progressive in Moundsville, West Virginia. All of these efforts were 'purposefully directed' at  the state of West Virginia. Under the circumstances, the Canadian Conspirators' contacts are not "random, fortuitous or attenuated" rather they must

---

[136] *Calder v. Jones*, 465 U.S. 783, 788-790 (1984).

all reasonably anticipate being haled into this court in West Virginia. Each of the Canadian Conspirators likewise knew that the brunt of the injury would be suffered by Progressive in West Virginia.

>   2.   <u>It would not offend traditional notions of fair play and substantial justice to require Defendants Bernstein, Reynolds or Crosbie to defend in West Virginia.</u>

87)     While each of the Canadian Conspirators has purposefully established minimum contacts with West Virginia, the assertion of personal jurisdiction must still comport with "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (U.S. 1985)(citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). However, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, <u>he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.</u>" *Id* (emphasis added).

88)     The Supreme Court has noted three reasons why states like West Virginia "should be able to assert jurisdiction over non-residents who purposefully direct their activities toward that State." *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525-526 (4th Cir. 1987). "First, a State has an obvious interest in providing a forum for its resident to redress injuries inflicted by non-residents." *Id.* As the Supreme Court has explained, "this is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tort-feasor shall be liable for damages which are the proximate result of his tort.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (U.S. 1984) (citing *Leeper v. Leeper*, 114 319 A. 2d 626, 629 (N.H. 1974) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 36 cmt *c* (1971))).

89)     Second, it would be unfair not to allow jurisdiction where the defendant has

derived benefits from the activities directed toward the forum State. *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525-526 (4th Cir. 1987). Finally, modern methods of transportation and communication make it much less onerous now for a person to defend himself in a remote forum. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985)).

90)     As detailed at length above and in the accompanying exhibits, Defendants Bernstein, Reynolds and Crosbie are primary participants in a wrongdoing intentionally directed at a West Virginia limited liability company. The effect of their intentionally tortious conduct happened in West Virginia. The activities of these non-residents inflicted serious injury on Progressive: a West Virginia entity. As a result of their intentional actions, the Canadian Conspirators and the other Defendants derived a substantial monetary benefit at the expense of Progressive. Such conduct clearly supports the maintenance of jurisdiction over them. It would therefore not "offend traditional notions of fair play and substantial justice" to require them to defend this action in West Virginia.

## C.     Sanctions are not warranted against Plaintiff or Plaintiff's counsel

91)     The Affidavits and documentary evidence attached to this Response establish that this suit is meritorious and the exercise of jurisdiction is warranted. As detailed at length above, Progressive was the victim of a fraud perpetrated by the Defendants.

92)     In support of their alleged demand for sanctions, Defendants state, without any support, that Plaintiff has brought this lawsuit against high-profile individuals merely to extort a settlement.[137]   However, Progressive sought to resolve this matter without resorting to the filing of a lawsuit.

93)     On or about March 14, 2006, counsel for Progressive sent a letter to all of the Defendants named herein advising them that counsel had been retained to represent Progressive

---

[137] *See,* Reynolds Affidavit at para. 10 and Crosbie Affidavit at para. 10.

Page 39

in connection with the claims comprising this lawsuit, and demanding repayment of the Commitment Fee and the additional amounts expended by Progressive.[138]

94)     Defendants Bernstein, Reynolds and Crosbie failed to respond to that letter.[139]

95)     On October 10, 2006, counsel for Progressive sent another letter to all of the Defendants named herein advising them that Progressive still planned to pursue the claims if this matter could not be resolved. [140]

96)     Defendant Crosbie, did send a very short letter in response shortly thereafter.[141]

97)     Nowhere in the letter did Crosbie say he never heard of Global Empire. Nowhere in the letter did Crosbie say that he knew all of the other Defendants well and had personal meetings with them around this point in time. Crosbie merely denied knowledge of Progressive. His letter was very cryptic and evidenced he had significantly more information on this matter which he was concealing.  Moreover, the letter did not invite further dialogue or threaten sanctions but rather was in the nature of a "go away" response.

98)     Reynolds and Bernstein, by contrast, have <u>never</u> replied to any correspondence from Plaintiff's counsel.[142]

## **Prayer**

For the foregoing reasons, Progressive Minerals LLC, respectfully requests that this Court deny Defendants Motion to Dismiss, deny their unfounded request for sanctions, and grant such other and further relief, whether general or special, at law or in equity, to which Progressive may show itself justly entitled and that the Court deems appropriate.

---

[138] See, <u>Exhibit 6</u>: Affidavit of David W. Parham ("Parham Affidavit") at para. 3.
[139] *Id*. at para. 4.
[140] *Id.* at para. 5.
[141] *Id.* at para. 6.
[142] *Id.* at para. 7.

Page 40

Date:   February 1, 2008

Respectfully submitted,

**BAKER & McKENZIE LLP**

David W. Parham
Texas State Bar No. 15459500
(Admitted pro hac vice)
Elliot D. Schuler
Texas State Bar No. 24033046
(Admitted pro hac vice)
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone:   (214) 978-3000
Facsimile:   (214) 978-3099

and

**DINSMORE & SHOHL LLP**


_____/s/ Denise D. Klug_____
Denise D. Klug
State Bar No. of West Virginia 6620
Jacob A. Manning
State Bar No. of West Virginia 9694
1115 Main Street
Wheeling, West Virginia 26003
Telephone:   (304) 214-5114
Facsimile:   (304) 214-5119

Mark A. Carter
State Bar No. of West Virginia 4316
900 Lee Street
Huntington Square, Suite #600
Charleston, West Virginia 25301
Telephone:   (304) 357-0900
Facsimile:   (304) 357-0919

**ATTORNEYS FOR
PROGRESSIVE MINERALS LLC.**

DALDMS/629838.8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing ***Response to Motion to Dismiss of Defendants David M. Bernstein, John Douglas Reynolds, and John C. Crosbie*** has been served upon the following via electronic mail on this the __1st__ day of February, 2008:

Edward C. Kramer
Law Offices of Edward C. Kramer, PC
488 Madison Ave.
New York, NY 10022
eck@lawkram.com

Patrick S. Casey
Burns, White & Hickton, LLC
32 - 20th Street
Wheeling, WV 26003
pscasey@bwhllc.com

The following has been served via first-class mail, postage prepaid on this the __1st__ day of February, 2008:

Jude O'Nurkera
6260 Indian River Dr.
Norcross, GA 30092

_____ /s/ Denise D. Klug _____

DALDMS/629838.8