# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, WHEELING DIVISION

| | | |
|---|---|---|
| **PROGRESSIVE MINERALS LLC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **V.** | § | |
| | § | |
| **MUHAMMAD HAROON RASHID,** | § | |
| **GERALD D. HENDRIX, DAVID M.** | § | **CASE NO. 5:07-CV-108** |
| **BERNSTEIN, JOHN DOUGLAS** | § | |
| **REYNOLDS, JOHN C. CROSBIE, and** | § | |
| **JUDE O'NURKERA,** | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT OF GOVERNOR ARCH A. MOORE, JR.

STATE OF WEST VIRGINIA     )
                           )
COUNTY OF _____   )

BEFORE ME, the undersigned Notary Public, did appear Arch A. Moore, Jr., who is also personally known to me and who did state and testify as follows:

1)     My name is Arch A. Moore, Jr. I am over the age of 18 and of sound mind. I have personal knowledge of the facts set forth herein and, if called upon, would testify as follows:

2)     I am the former three term Governor of the great state of West Virginia. I am also the President of Progressive Minerals, LLC, a West Virginia limited liability company with its office and principal place of business in West Virginia, and Plaintiff in this action.

3)     In the Spring of 2005, Progressive was negotiating with a subsidiary of James C. Justice, Companies, Inc. for the acquisition of coal mine. The seller owned coal interests in Virginia, West Virginia, and Kentucky and he wanted to sell some of his

interests, including all assets of Red Fox Surface Mine near Bishop, West Virginia. Mr. Justice and his family have been a major player in the coal industry in West Virginia for many years.

4)      I was looking for a potential source of funding for the acquisition and inquired into my friend Fred Cooper to help locate same. On my direction, Mr. Cooper made several inquiries among parties he thought might have an interest.

5)      In late March or early April of 2005, Mr. Cooper advised me that he found a group based in Houston, Texas called Global Empire that was interested. I requested that Global Empire provide us with information on their business and operations so that I could ascertain whether they were capable of funding an operation of this size and were honorable.

6)      On April 26, 2005, I received three separate facsimiles from Global Empire regarding who they were and what they did. The first facsimile was a PowerPoint presentation of Global Empire. A copy of the PowerPoint Presentation is attached hereto as Exhibit "A."

7)      Global was portrayed within the PowerPoint presentation as a global conglomeration of nine companies comprising the "Global Empire Group Companies." The PowerPoint presentation further conveyed that Global Empire was an asset based investment and holding corporation that engaged in diversified investment, financial and related operations throughout the world and that had the wherewithal to finance, or arrange financing for, the acquisition of the Mine. Global's business interests allegedly encompassed a broad cross-section of industries, including all energy sectors, manufacturing companies, service industries, real estate companies as well as residential

DALDMS/631792.3

and commercial sectors.

8)      The PowerPoint presentation further emphasized that Global regularly participated in leveraged buyouts and acquisitions, business turnarounds, as well as investing in Chapter 11 debtors. Global was represented as "specializing" in a variety of investments which included the following:

a) residential and commercial land development and construction

b) oil and gas exploration, refining and transportation

c) marketing refined products on wholesale and retail basis

d) electric power regeneration

e) maintenance of oil services for refinery equipment

f) import and export of commodities

g) hospitality division of recreation and lodging

h) healthcare and pharmaceuticals

i) venture capital and debt restructuring

j) automotive industries

9)      Global was further represented within the PowerPoint presentation as maintaining ownership and financial interests in a number of corporations. Based on additional information provided by Global Empire that same day these entities allegedly performed the following functions:

a)      Primergy International, LLC ("Primergy"). This corporation allegedly had several subsidiary corporations within the oil, gas and electrical energy sectors. Primergy allegedly held all of Global's oil and gas related companies which supposedly included two refineries in Texas and Louisiana.

     b)     Petroworld Services, LLC ("Petroworld"). Petroworld allegedly provided project management construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally. Such services allegedly included offering complete turnkey projects from refurbishing to comprehensive installations.

     c)     Prime Stops, LLC ("Prime Stops"). Prime Stops allegedly had formal Letters of Intent with several leading companies in the United States and Canada to purchase over 8,300 gas stations and truck stops throughout North America.

     d)     Prime Development & Construction, LLC ("Prime Development"). Prime Development allegedly focused on real estate investment and the construction and development of commercial and residential properties for affordable/low income housing, multi-family housing, commercial office, retail and industrial build outs. Prime Development allegedly had $60M under contract in affordable housing build-outs.

     e)     World Times Communications, LLC ("World Times"). Global allegedly owned this telecommunication corporation that focused on prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP. World Times allegedly was a pioneer in long distance and prepaid calling including establishing distribution channels within various communities in Southern California.

     f)     First American Source Reality, LLC ("First Realty"). First Realty allegedly had $75 million in properties under contract with expectations to expand operations in 2005 from Houston, Texas into Florida, New York and California.

     g)     First American Source Mortgage, LLC ("First Mortgage"). First Mortgage allegedly originated residential and commercial loans for affordable housing,

DALDMS/631792.3

multi-family housing, commercial office, retail and industrial real estate. First Mortgage allegedly worked to coordinate loan origination through First Reality and Prime Development, both subsidiaries of Global Empire. It allegedly had over $60 million under contract.

> h)    The remaining two companies were Crown NRG Refinery ("Crown") and Mohawk Refining and Marketing, LLC ("Mohawk"). While no information was presented as to Crown and Mohawk they were represented as owning oil refineries in Louisiana and Texas.

10)    The PowerPoint presentation likewise highlighted that Global Empire was comprised of "knowledgeable and experienced people" with "broad experience and in-depth industry knowledge." Eliminating any doubt as to the identity of the individuals comprising the Global Empire team and containing the knowledge and experience described above, Global Empire included within the PowerPoint presentation a chart of their Organizational Structure. Defendants Reynolds and Crosbie were both listed as members of the Board of Directors and Defendant Bernstein was noted as an officer of the company.

11)    Progressive was further provided that same day, April 26, 2005, with two additional facsimiles containing detailed resumes and biographies of all the key members of Global—most notably Defendants Rashid, Hendrix, Bernstein, Reynolds and Crosbie. Copies of these facsimiles are attached hereto as Exhibits "B" and "C."

12)    The Curriculum Vitae of Mr. Reynolds was extremely impressive detailing his various accomplishments. In addition to his lengthy political career which spanned several decades, and of which I was previously aware, Mr. Reynolds portrayed

himself as a leader in the business community that was actively involved in many pursuits. Most notably, Reynolds was represented as having substantial experience in venture capital development and consumer products marketing. On the last page there was an entire paragraph devoted to Mr. Reynolds position on the Board of Directors of Global Empire and his role as Senior Vice President of Global Empire's Oil & Gas Division.

13)      The Curriculum Vitae of Mr. Crosbie was equally as impressive. I was likewise aware of Mr. Crosbie as a prominent Canadian politician. Mr. Crosbie highlighted his involvement with Global Empire under the "Professional Experience" tab of his Curriculum Vitae by expressly noting his election as Chairman of the Board of Directors in 2004.

14)      On that same date Global Empire also provided Progressive with additional information as to Defendants Crosbie and Reynolds. This information further confirmed the Curriculum Vitae, and my prior knowledge,   (that they were most definitely high-ranking officials in Canadian government).  These printouts are attached as Exhibits "D" and "E."

15)      In reliance upon the information provided concerning Global Empire, its affiliates and subsidiaries, and the impressive resumes of the individuals comprising Global Empire, Progressive was induced into entering into a Term Sheet with Global in order to allow Progressive to acquire the West Virginia Mine.  The Term Sheet was executed by me, on behalf of Progressive, in West Virginia. A copy of the Term Sheet is attached as Exhibit "F."

16)      The Term Sheet detailed a for a $200,000,000.00 Loan (the "Loan") which

contained a 5.5% interest rate payable on a quarterly basis and granted Global Empire a first lien on all assets, in particular the West Virginia Mine. Global Empire was also to receive a 45% ownership interest in the West Virginia Mine.

17)        Pursuant to Paragraph 8 of the Term Sheet, Progressive was required to pay a Commitment Fee of $750,000.00 (the "Commitment Fee"). The Commitment Fee was payable in parts: $250,000 upon execution of the Term Sheet; and $500,000 upon issuance of the Commitment Letter. Global likewise signed a Corporate Guaranty whereby they agreed to return the Commitment Fee if the loan didn't close within 120 days of receipt of Funds (the "Corporate Guaranty"). A copy of the Corporate Guaranty is attached as Exhibit "G."

18)        Progressive promptly forwarded the initial portion of the Commitment Fee to Global via two separate wire transfers. The first Wire Transfer, in the amount of $200,000.00 was sent on June 29, 2005. The following day Progressive made the second wire transfer of $50,000.00. Each of these wire transfers were initiated from Progressive's bank accounts in Moundsville, West Virginia. A copy of the wire transfers are attached as Exhibit "H."

19)        In conjunction with Global's due diligence, Progressive was requested to provide numerous items over a six-moth period and  Progressive complied with every request it received.

20)        On July 21, 2005, Progressive and Global executed a Commitment Letter reiterating the terms in the Term Sheet, including the return of the Commitment Fee, and setting a closing date of August 15, 2005 (the "Commitment Letter").  A copy of the Commitment Letter is attached as Exhibit "I."

DALDMS/631792.3

21)	Progressive then sent the final wire transfer, in the amount of $500,000.00 on July 26, 2005. This wire transfer, like the two prior transfers, was likewise sent from bank accounts in Moundsville, West Virginia. A copy of the wire transfer is attached as Exhibit "J."

22)	In reliance upon the Term Sheet, Corporate Guaranty and Commitment Letter with Global Empire, Progressive expended an additional $516,219.18, to secure Progressive's right to purchase Justice's Red Fox Division from Justice Energy, LLC ("Justice Mine")—an acquisition the success of which was dependent upon the acquisition of the coal mine.

23)	Despite making all required payments, and responding several times to inquiries from Global Empire, and promptly and completely complying with all due diligence requests, Global Empire did not move forward with closing as scheduled on August 15, 2005.

24)	On September 6, 2005, I sent a letter to Global Empire referencing the lack of closing and Progressive's displeasure that no one from Global Empire advised me of same. Within that letter I specifically referenced the $750,000.00 commitment fee held by Global and the $516,219.18 paid by Progressive to Justice with regard to the Justice Mine. I further requested that Global comply with the agreements and acknowledged that settlement possibilities were available if Global decided it no longer wished to proceed. I further expressed therein my desire to complete the transaction and reiterated the tremendous respect I then had for Global Empire. A copy of that letter is attached as Exhibit "K" hereto.

25)	Due to the lack of closure on this issue I coordinated a meeting with

DALDMS/631792.3

representatives of Global Empire which I understood was for the purpose of closing the deal. On or about October 10, 2005, both myself and James C. Justice, II, his son, James Justice, III, Tom Lusk, Justice's Chief Operating Officer and another Justice representative flew down to Global's offices in Houston, Texas and met personally with Global's President and CEO, Dr. Rashid, and its Vice President of Finance and Legal Affairs David Bernstein.

26)     At that meeting both Dr. Rashid and Mr. Bernstein represented that Global was financially capable of financing the acquisition of the West Virginia Mine and was still interested in doing so. At no time did Mr. Bernstein state that he was not an officer of Global Empire.

27)     Instead of closing the financing and acquisition, however, Mr. Bernstein, in the presence of all the individuals from Justice, presented me that day with a letter written on Global Empire letterhead from him as V.P. Finance and Legal Affairs NOT as outside counsel (the "October Letter"). The October Letter contained a long list of due diligence items that he requested be delivered by November 15, 2005 and further advising that they would "be employing and sending our own due diligence experts in regards to quality and production of the coal mines and our auditing firm to examine the books and records of Progressive Mineral and Justice Energy." A copy of the Letter is attached as Exhibit "L."

28)     Within the October Letter Mr. Bernstein referenced that Global's "credit committee" would be meeting on November 17, 2005 to review this matter and to determine the viability of the loan application. He further stated that "in the event our credit committee regretfully declines we shall remit to you by cashier's check on

DALDMS/631792.3

November 18, 2005, $750,000, the amount of your advance."

29)       This letter surprised me because Global Empire had previously requested, and been provided answers to each and every one of these inquiries on multiple occasions over the preceding six months and the purpose of the meeting was to close the purchase. Mr. Bernstein never said that Global was not provided this information previously.

30)       Despite Bernstein's present assertion to the contrary, there was never any question as to who owned the mine. Bernstein's version of what transpired is a complete fabrication. Justice had owned the mine for a considerable number of years prior to this point and his family is well-known in West Virginia in the mining of West Virginia coal. Any alleged concerns of ownership could have easily been addressed that day since four members of Justice were present at Global's offices in Houston at that exact moment. Furthermore, Justice still owns that mine today.

31)       Bernstein likewise spent a good portion of the meeting discussing Canadian politics and the role that Global's directors Crosbie and Reynolds served in same. Bernstein harped on their presence in Canadian government because he knew of my involvement in politics, in addition to that of my daughter, United States Congresswoman Shelley Moore Capito. Bernstein even commented how he had just recently read an article about leading women in politics and how my daughter was prominently mentioned.

32)       While I already knew that Crosbie and Reynolds were politicians and board members, Bernstein further advised me that one of them was running for President of Parliament. This information solidified my belief that Global Empire was legitimate and credible.

Page 10

DALDMS/631792.3

33)      Although we did not close the deal in Houston that day, my meeting with both Dr. Rashid and Mr. Bernstein ended on a pleasant note and I was left with the impression I had made two new friends in addition to business partners. Mr. Bernstein's characterization of the meeting as confrontational where he helped "avert a fraud" is totally inaccurate. I left Houston that day thinking that this matter would be resolved shortly and that Progressive would either receive the loan funding or a return of the Commitment Fee.

34)      Despite Mr. Bernstein's representations to the contrary, I did hear from him again after the meeting in Houston. Specifically, I can recall at least two occasions shortly after the meeting where Mr. Bernstein called me in West Virginia. Initially he gave me every assurance that the matter would be concluded either with a funding of the loan or a refund of the Commitment Fee. Bernstein specifically advised on the last call that he was preparing to send and return the Commitment Fee.

35)      Despite his statements on the telephone, and contained within the October Letter, I did not hear from Mr. Bernstein, one way or the other, on November 18, 2005. Mr. Bernstein never advised me of the alleged credit committee's determination as to whether Global Empire wanted to continue with the financing. Global Empire likewise did not refund the $750,000.00 on November 18, 2005 as promised by Mr. Bernstein.

36)      On January 4, 2006, I sent another letter to Global Empire referencing our agreement and Mr. Bernstein's direct promises with regard to the return of the $750,000.00 commitment fee. I further advised them that I did not understand the delay in refunding the money and notified them I had been forced to retain counsel. A copy of the Letter is attached as Exhibit "M."

Page 11

37)       On January 13, 2006, contrary to the statements made in Mr. Bernstein's Affidavit, I received a facsimile from Mr. Bernstein again written on Global Letterhead from him as V.P. Finance and Legal Affairs <u>NOT</u> as outside counsel (the "<u>January 2006 Letter</u>"). Mr. Bernstein apologized for the delay and referenced that it was due to the fact that he was intensely involved in the Canadian elections with Defendant Crosbie. Bernstein did advise that he would be in touch by the end of the following week "to settle this matter." A copy of the Letter is attached as Exhibit "N."

38)       I later found out that Global Empire had filed a petition for relief under Chapter 11 of the Bankruptcy Code on December 6, 2005, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Despite the fact that the bankruptcy filing pre-dated Mr. Bernstein's January 2006 Letter, Mr. Bernstein did not say a word about the bankruptcy filing nor did Progressive ever hear from him again as promised. Progressive likewise never received any portion of the Commitment Fee back.

FURTHER AFFIANT SAYETH NOT.

Executed this _1st day of February_ *2008* under the laws of perjury of the United States of America.

_Governor Arch A. Moore, Jr._

SWORN AND SUBSCRIBED BEFORE ME
ON THIS _1st_ DAY OF _February_, 2008.

_Mary Louise Lipsky_
Notary Public in and for the State of _West Virginia_
My commission expires on: _7/12/2013_

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
LOUISE LIPSKY
... Avenue
... Virginia 26038
... July 12, 2013

Page 13

DALDMS/651792.3