# EXHIBIT "2"

# Affidavit of Fred Cooper

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, WHEELING
DIVISION

| | |
|---|---|
| PROGRESSIVE MINERALS LLC., | § |
| | § |
| Plaintiff, | § |
| V. | § |
| | § |
| MUHAMMAD HAROON RASHID, | § |
| GERALD D. HENDRIX, DAVID M. | § CASE NO. 5:07-CV-108 |
| BERNSTEIN, JOHN DOUGLAS | § |
| REYNOLDS, JOHN C. CROSBIE, and | § |
| JUDE O'NURKERA, | § |
| | § |
| Defendants. | § |

## AFFIDAVIT OF FRED COOPER

STATE OF PENNSYLVANIA    )
                         )
COUNTY OF ALLEGHENY      )

BEFORE ME, the undersigned Notary Public, did appear Fred Cooper, who is also personally known to me and who did state and testify as follows:

1)   My name is Fred Cooper. I am over the age of 18 and of sound mind. I have personal knowledge of the facts set forth herein and, if called upon, would testify as follows:

2)   In February or March of 2005, I was contacted by former West Virginia Governor Arch A. Moore, Jr. regarding potentially assisting the Governor and his company Progressive Minerals, LLC with the acquisition of coal mine in West Virginia from a subsidiary of James C. Justice, Companies, Inc. ("Justice").

3)   I had previously met the Governor for the first time about 18 months prior when I was looking to potentially invest in the renovation of certain buildings in Wheeling, West Virginia. While that venture was not ultimately pursued, the Governor

Page 1

DALDMS/631761.4

and I did speak and meet several times thereafter on both a professional and personal basis.

4) With regard to the coal mine the Governor was looking for a potential source of funding for the acquisition and he inquired into my ability to locate same. I made several inquiries among parties I thought might have an interest. One individual I contacted was Defendant Jude O'Nurkera, an individual whom I had never worked with before, but whom I had been introduced to several years earlier.

5) In March or early April of 2005 I had a telephone call with Mr. O'Nurkera regarding the proposed transaction and potential sources of capital infusion for Progressive. Mr. O'Nurkera indicated he had previously served as a broker on a coal deal of decent size and he thought he might know some people that might be interested in pursuing the transaction.

6) About a week later Mr. O'Nurkera advised me that he knew of a group based in Houston, Texas called Global Empire that was interested. Mr. O'Nurkera represented to me that the individuals comprising Global Empire were upstanding and honorable and that Global Empire was more than capable of making a deal of this size. Governor Moore requested that Global Empire provide us with information on their business and operations and forward biographies of their key officers and directors.

7) On April 26, 2005, I received three separate facsimiles from Global Empire regarding who they were and what they did. I immediately forwarded each of these facsimiles to Governor Moore's attention.

8) The first facsimile was a PowerPoint presentation of Global Empire. The PowerPoint presentation clearly showed that Global Empire was not a small operation but

actually consisted of companies comprising the "Global Empire Group Companies". The PowerPoint presentation conveyed that Global Empire was a global conglomeration of multiple business entities, and in particular, that it was an "asset based investment and holding corporation" that provided "venture capital." It further detailed that Global Empire had 10 areas with which they specialized. The PowerPoint likewise highlighted that Global Empire was comprised of "knowledgeable and experienced people" with "broad experience and in-depth industry knowledge." Global Empire represented itself as a self financed privately owned institution whose "principals, officers and advisers the composite disciplines of financial advisers, former bankers, security brokers, financial lawyers, accountants, CPA's and very highly respected and experienced auditors, tax planners, portfolio managers are molded into a strong effective financial expertise; totaling over 150 years."

9) The PowerPoint presentation further highlighted the various services purportedly offered by Global, the numerous industry sectors with which Global allegedly frequently conducted business, and a chart of their Organizational Structure. Defendants Reynolds and Crosbie were both listed as members of the Board of Directors and Defendant Bernstein was noted as an officer of the company.

10) Eliminating any doubt as to the identity of the individuals comprising the Global Empire team and containing the knowledge and experience described above, Global Empire supplemented the PowerPoint Presentation with two additional facsimiles containing detailed resumes and biographies of all the key members of Global—most notably Defendants Rashid, Hendrix, Bernstein, Reynolds and Crosbie.

11) The Curriculum Vitae of Mr. Reynolds highlighted his lengthy political

Page 3

career which spanned several decades, Mr. Reynolds portrayed himself as a leader in the business community that was actively involved in many pursuits. On the last page there was an entire paragraph devoted to Mr. Reynolds involvement with Global Empire.

12) The Curriculum Vitae of Mr. Crosbie highlighted his involvement with Global Empire under the "Professional Experience" tab of his Curriculum Vitae by expressly noting his election as Chairman of the Board of Directors in 2004.

13) After reviewing all of these facsimiles, I was extremely impressed with what they provided as well as the quality of the individuals comprising the Board of Directors.

14) On that same date Global Empire also provided me with additional information as to Defendants Crosbie and Reynolds. Shortly after receiving this information I called the offices for either Mr. Crosbie or Mr. Reynolds (I can't recall which) and spoke with a representative that confirmed that Mr. Crosbie or Mr. Reynolds were, or had been, in the Canadian government. This information further substantiated the Curriculum Vitae that they were most definitely high-ranking officials in Canadian government.

15) Global Empire subsequently provided me credit references and information on some of their holdings which I likewise forwarded to Governor Moore for review.

16) Sometime that summer, following the execution of the Agreement, but prior to the issuance of the Commitment Letter or payment of the remaining $500,000, O'Nurkera and Defendant Hendrix, Global's CFO, visited the Mine on behalf of Global (the "_Visit_"), ostensibly to do due diligence. I was there when they arrived at Justice's

offices in Beckley, West Virginia.

17) A representative of Justice then flew both Hendrix and O'Nurkera in a helicopter out to visit the Mine. They spent the rest of the day reviewing the Mine and then were flown back to Justice's offices. In conjunction with the Visit, Progressive was requested to provide numerous items to assist Global with their independent due diligence. Progressive complied with every request it received.

FURTHER AFFIANT SAYETH NOT.

Executed this __1-30-08__ under the laws of perjury of the United States of America.

_Fred E. Wyssen_ (signature)

SWORN AND SUBSCRIBED BEFORE ME
ON THIS __30TH__ DAY OF __JANUARY__, 2008.

_Deborah B. Moretti_ (signature)

Notary Public in and for the State of __PENNSYLVANIA__
My commission expires on: __12-02-2010__

**COMMONWEALTH OF PENNSYLVANIA**
Notarial Seal
Deborah B. Moretti, Notary Public
Carnegie Boro, Allegheny County
My Commission Expires Dec. 2, 2010

Member, Pennsylvania Association of Notaries