IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PROGRESSIVE MINERALS, LLC,

Plaintiff,

v. CIVIL ACTION NO. 5:07CV108

MUHAMMAD HAROON RASHID, GERALD D. HENDRIX, DAVID M. BERNSTEIN, and JUDE O'NURKERA,

Defendants.

TRANSCRIPT/MOTIONS TO COMPEL
June 11, 2009, at 2:07 p.m.
Wheeling, West Virginia

BEFORE: JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:
(Via Telephone)

DAVID W. PARHAM ESQ.
Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201

JACOB A. MANNING, ESQ.
Dinsmore & Shohl, LLP
Bennett Square, 2100 Market St.
Wheeling, WV 26003

(Continued)

Proceedings recorded by electronic sound recording, transcript produced by official court reporter.

---

SUE HATLEY, CCR
OFFICIAL U.S. COURT REPORTER
P. O. BOX 1518
ELKINS, WEST VIRGINIA 26241
(304) 614-3694

MARK A. CARTER, ESQ.
Dinsmore & Shohl, LLP
P. O. Box 11887
Charleston, WV 25339

Also: Arch A. Moore, Jr.

For the Defendants:

PATRICK S. CASEY, ESQ.
Burns, White & Hickton, LLC
32-20th Street
Wheeling, WV 26003

(Call to Order of the Court)

THE COURT: Good afternoon, this is Jim Seibert. Who is on the telephone, please?

MR. PARHAM: Your Honor, this is Dave Parham, with Baker & McKenzie in Dallas.

THE COURT: All right, thank you very much. This is Progressive Minerals v. Rashid, Hendrix, Bernstein and O'Nurkera, is my best guess on the pronunciations, 5:07CV108. This time was set for an Evidentiary Hearing and Argument on the Plaintiff's Motion to Compel Mediation and Motion to Compel Responses to Plaintiff's Request for Production of Documents and Answers to Plaintiff's Interrogatories to Defendant David M. Bernstein.

For the Plaintiff, we have here Mr. Manning and –

MR. CARTER: Your Honor, my name is Mark Carter. I am also at Dinsmore & Shohl in its Charleston offices.

THE COURT: Mr. Carter?

MR. CARTER: And also our – the representative of our client is here, Arch A. Moore, Jr.

THE COURT: Governor, nice to see you. And for the Defendant we have Mr. Casey, anyone else?

MR. CASEY: No, Your Honor.

THE COURT: Thank you. First, who is going to speak for the Plaintiff, please?

MR. CARTER: Your Honor, two motions have been called by the Court. One, a Argument regarding the Motion to Compel. Mr. Manning will be handling that argument. With regard to the Letters

Rogatory, I will be handling that argument, sir.

THE COURT: Thank you. Mr. Manning, do you have any testimony or other evidence to support – to offer in support of the Motion to Compel – I mean, it's Mr. Carter with respect to the Motion to Compel?

MR. CARTER: No, I'm sorry, Your Honor, it is Mr. Manning.

THE COURT: Okay, Mr. Manning, any testimony or other evidence?

MR. MANNING: Other than what was attached to the motion, Your Honor, no, we attached the Certificates of Service to the motion as well as the Notice of Deposition, I believe.

THE COURT: Mr. Carter, as to your motion.

MR. CARTER: Your Honor, we are prepared to present evidence as the Court desires. I would simply note for the Court, that the testimonial and documentary evidence that we would present through Governor Moore, has been submitted to the Court and is on the record in the form of – of declaration and affidavit by Governor Moore that attaches all the relevant documents, as well as, affidavits submitted by Mr.'s Crosbie and Reynolds, who are the subject of the Letters Rogatory. And we are happy to proceed as you wish, Your Honor.

THE COURT: Well, Judge Stamp would say to me that I am not smart enough to tell anybody how to practice law and it's up to you. I'd be pleased to accept it in the form it's already submitted or if you prefer another way, that's fine with me, too.

MR. CARTER: Your Honor, obviously, it is our desire to – and I recognize the Court's instruction about how to practice law. If the Court – I would simply move that the Court acknowledge the affidavit and the documentary evidence as evidentiary submissions in support of its Motions Rogatory. My hope is that it would be more convenient to the Court to simply take notice of what's in the record already as in the form of evidence, and permit legal argument regarding the entitlement of the Plaintiff to the Letters Rogatory.

THE COURT: All right. Mr. Casey, any objection to that?

MR. CASEY: No, objection, Your Honor.

THE COURT: All right, it will be so noted by me. And now Mr. Casey, do you have any testimony or other evidence to offer in opposition to either motion?

MR. CASEY: No, Your Honor. I – I am sure you have noticed from the file that I am in a bit of a quandary.

THE COURT: Yeah, the Judge kept you in the case.

MR. CASEY: Yes, sir. And – and there are and I have no evidence to offer. I, obviously, have comments and argument to offer but some of which I would ask the Court to take up *in camera* because of the attorney/client privilege. But so I – I have no evidence to offer, Your Honor, but I do – I would – if, Your Honor, has questions I would ask the opportunity to address you *in camera* about matters that might be confidential.

THE COURT: Thank you. Then I guess it's time to hear from Mr. Manning first. And Mr. Manning, would you come to the podium

for two reasons, so that Mr. Parham on the telephone as well as the record gets down everything you say, please, sir.

MR. MANNING: Sure, Your Honor. Your Honor, with regard to the Motion to Compel, it's relatively straightforward. With regard to the interrogatory portion of it, we served our Interrogatories and Request for Production on March 24th. That would have made responses due on April 26th or 27th because the 26th was a Monday – or a Sunday, and we have not received any responses to either the Interrogatories or the Request for Production of Documents. We did receive responses to Request for Admission with at least one of those Request for Admission having been changed since we submitted it.

We – I did confer with Mr. Casey during the course of – before the mediation and regarding his Motion to Withdraw the rescheduling of the mediation and those things. And Mr. Casey did ask me for time to response to the discovery requests. At the time, what he asked for was an extension. What I told him was, at the time we had a Notice of Deposition pending for his client which would have had the deposition occur on May 6th, and we wanted the documents and the responses to the interrogatories before that deposition so that we could use the deposition to inquire about them. Obviously, the deposition was cancelled but since May 6th, we have not had any responses whatsoever to either the Interrogatories or the Request for Production of Documents.

With regard to the deposition, as I said, we filed a Notice – or served a Notice of Deposition indicating that we intended to take Mr.

Bernstein's deposition on May 6th, that would have been the day after the mediation which was to occur by Judge Stamp's Order here in Wheeling. We scheduled the deposition for May 6th for the day after, so that we could save all of the parties and all of the attorneys costs by holding the deposition where the mediation was to be scheduled.

We – when we served the Notice of Deposition, Mr. Casey informed us that his client did not intend to attend the mediation and therefore, would not be in town to attend the deposition either. And there has been on Motion to Quash the deposition. There has been no Motion for a Protective Order seeking to move its location or anything like that. There is, in fact, been no response other than my conversation with Mr. Casey in which he told us verbally that his client did not intend to attend the deposition.

And finally, with regard to the mediation, there was never any Motion to Continue the Mediation or move the mediation, other than Mr. Casey's request to move the mediation because of his Motion to Withdraw, less than 24 hours before the mediation was to occur. That mediation was Ordered by Judge Stamp. We are in a position to proceed with the mediation and we are ready to proceed with it and we'd ask as we have in the motion, that the mediation be rescheduled for and a date that the Court would choose, in Wheeling, as it was to be scheduled originally. And that the deposition, as it was to be scheduled originally, be scheduled in Wheeling either on the day before the mediation or the day after the mediation. There has been no reason given to us other than a verbal reason why that couldn't occur.

And therefore, we'd ask that those be – that those two, the mediation and the deposition occur back-to-back to save all of the parties and all of the attorneys costs.

TH4E COURT: Thank you very much.

MR. MANNING: Thank you, Your Honor.

THE COURT: Mr. Casey, would you share with me what you feel comfortable sharing on the record, please, sir, on Mr. Manning's motion.

MR. CASEY: Yes, Your Honor, it is – it is, obviously, we did not file responses to the – to the discovery. We filed responses to the Request for Admissions, it all revolves around the difficulty in getting the information. I informed counsel a few weeks before the mediation, that I would not be available for the deposition and that it needed to be rescheduled. I also, asked for the extension which was not granted. And I put – all I can say is, I put the other parties on notice as soon as I was aware that these matters were not going to go forward and I did not want to put any parties in – to the expense and inconvenience of having to go forward with it. As you know, I filed the motion to postpone the mediation and the mediation was postponed, and I have New York counsel that is not present today and he is in more contact with the client than I am. And I really have no further information than that, Your Honor.

THE COURT: And did – are you able to share with me why Mr. Kramer chose not to be with us today –

MR. CASEY: I was –

THE COURT: – including the fact that he had the opportunity to appear by telephone?

MR. CASEY: I learned yesterday, he was not going to appear. I think Mr. Manning knew before I did that he was not going to appear. Because, I asked Mr. Manning if he was included in the – the discussion about being on the telephone. Apparently, he had been contacted by Mr. Schuler sometime before and had informed him that he was going to St. Louis today. I did not know that until yesterday. So that's the – he's on an airplane as far as I know either going to St. Louis or in St. Louis and I didn't – I think Mr. Manning knew that before I did.

THE COURT: All right, thank you very much.

MR. CASEY: Yes, sir.

THE COURT: As far – I apologize, Mr. Casey, as far as you know, Mr. Kramer still intends to be counsel of record? As far as you know?

MR. CASEY: As far as I know, Your Honor, I have communicated with him several times about getting new responsible local attorney and as far as I know he continues to be involved. He is fully aware that I do not want to be involved for the reasons that I would like to discuss with, Your Honor. And as far as I know, he's going to be involved.

THE COURT: All right, thank you very much. We'll see if we can't bring the matter to Mr. Kramer's attention

Now, Mr. Carter –

MR. CARTER: Yes.

THE COURT: – would you come up and – and share with me your thoughts about the Letters Rogatory?

MR. CARTER: Yes, Your Honor, thank you for the opportunity.

Your Honor, I will be making frequent – frequent reference to the Affidavit of Governor Moore which appears in Progressive's Memorandum in Opposition of Motion to Dismiss Mr.'s Bernstein, Crosbie and Reynolds.

As, Your Honor, is likely – as, Your Honor, is certainly aware, Judge Stamp entered an Order that dismissed Mr. Crosbie and Mr. Reynolds from this litigation and retained jurisdiction over Mr. Bernstein, who remains a named defendant in this litigation.

Very briefly, the context of Governor Moore's affidavit and I will refer to certain documents by the letters to -- that they are identified by as attachments in that affidavit, if I may, Your Honor.

This case arises out of a business transaction which Progressive alleges in its complaint constitutes fraud among other torts. Governor Moore was the sole shareholder and is the sole shareholder of Progressive Minerals, a West Virginia corporation. And in that capacity, he was introduced to Dr. Rashid, the named defendant, who is also the principal of Global Empire Investments and Holdings which we call Global Empire to save words.

Your Honor, Governor Moore testified in his affidavit that he was introduced to Global Empire by a friend, who also submitted an

affidavit. And that gentleman was trying to assist Governor Moore in trying to find a financier for the purchase of coal operations and coal lands in southern West Virginia. Specifically, near the Town of Bishop in McDowell County, a mine known as Red Fox.

Mr. – or Governor Moore testified in his affidavit that he was looking for financiers to assist Progressive in either purchasing the coal operations in McDowell County or, to arrange for the broker of that property to sell that property to an interested buyer. That upon learning of Global Empire, Governor Moore telephoned Dr. Rashid, the principal, and solicited information regarding Global Empire. Global Empire then sent three very important facsimiles to Progressive Minerals through – through the individual in Pittsburgh that detailed what Global Empire was and who is associated with that corporation.

The facsimiles are attached as Exhibit A, B and C to Governor Moore's affidavit. Of particular relevance to those facsimiles from Dr. Rashid to Governor Moore, is his identification of the organization structure of Global Empire. The Global – the organization structure of that corporation according to that power point and that facsimile was Dr. Rashid, as the principal and at the top of the organization chart. And then of the three directors who are identified in that organization chart, the two – two of those three directors appearing directly below Dr. Rashid are John Crosbie and John Reynolds, beneath that is Defendant David Bernstein, Defendant Gerald Hendrix and another individual.

Along with the facsimile of the power point presentation that

Governor Moore received April 26, 2005, were curriculum vitae of the primary agents of Global Empire as provided by Dr. Rashid. They include curriculum vitae for John Crosbie and John Reynolds, both Canadian citizens, both the subjects of this – of these Letters Rogatory. And the curriculum vitae prominently described their role in Global Empire in the documents transmitted by Dr. Rashid to Governor Moore.

Governor Moore testified in his affidavit that based upon these representations he was quite interested in Global Empire, both because of their financial representations but also significantly because of the reputation and statute of Mr. Crosbie and Mr. Reynolds, who Governor Moore immediately recognized to be prominent Canadian elected officials with sterling reputations in the Nation of Canada. And Governor Moore having had a history in the political field, was immediately impressed by their involvement with the corporation and assigned a great deal of credibility to the corporation because of their involvement, and was certainly induced to continue to deal with Global Empire towards trying to seek a financial arrangement with them for financing of the purchase of these coal lands and so it did continue.

On – in Exhibit F, Governor Moore attaches a term agreement between Global Empire and Progressive for the financing of $200,000,000.00 for the purchase of the coal lands in southern West Virginia.

In Exhibit G, there is a corporate guarantee that is attached to his affidavit which is an agreement between Dr. Rashid on behalf of

Global, and Governor Moore on behalf of Progressive, whereby Global Empire assured Progressive and Dr. Rashid assured Progressive and Governor Moore, that a $750,000.00 commitment fee that Progressive would be required to submit to Global Empire, would be returned if the financial transaction contemplated by the term agreement was not consummated.

Exhibit H, to Governor Moore's affidavit contains a contract or I'm sorry, Your Honor, it contains wire transfer records evidencing a $200,000.00 payment to Global Empire by Progressive on June 29th, and a $50,000.00 payment on June 30th, that immediately followed the execution of the term agreement and the corporate guarantee.

Exhibit I, contains a copy of the contract executed, signed by Dr. Rashid on behalf of Global, and Governor Moore on behalf of Progressive, for the consummation of the $200,000,000.00 financing upon certain due diligence being conducted. Governor Moore's affidavit – in his affidavit, he testifies that the due diligence took place and a meeting was scheduled eventually on October 12th for – or I'm sorry, on October 10th, for a closing meeting where – wherein the actual financial transaction would take place of the transfer of the $200,000,000.00, and the purchase of the coal lands would take place because the owners of the Red Fox mine were present at that meeting in Houston, Texas. He testified -- Governor Moore testified that at that meeting, Dr. Rashid and Mr. Bernstein, the Defendant, were present and that very significantly at that meeting, Mr. Bernstein made frequent reference in the presence of Dr. Rashid to the relationship of

Mr. Crosbie and Mr. Reynolds to Global Empire. The affidavit communicates that they both were active participants. Mr. Bernstein stated that there were active participants in Global Empire, that there was discussion concerning their interest in the accomplishments of Governor Moore's daughter, who is an elected member of the United States House of Representatives, and their continuing interest in this transaction and its accomplishment.

On October 10th, the financial arrangement, however, was not consummated nor was the transfer of title to the land. Rather, Mr. Bernstein presented to Governor Moore and the document appears as – as an exhibit. And, Your Honor, I apologize, I have an exhibit number for it but I didn't have the letter number for it, but there is an October 10th correspondence from Mr. Bernstein to Governor Moore identifying other areas which he believed needed to be investigated as a matter of due diligence regarding the transaction. Governor Moore responded immediately, that all of that information had been provided but he was – he continued to be interested in consummating the financial transaction and the ultimate deal. The affidavit concludes by stating, that despite the efforts to continue to seek the transaction, it ultimately never was fulfilled.

And appearing as Exhibit N, is a letter from Mr. Bernstein and to Governor Moore on January 13, 2006, where Mr. Bernstein again makes reference to Mr. Crosbie and states that he is continuing to assist Mr. Crosbie in some political efforts and then has a one sentence explanation that he will be happy to conclude a settlement of the

outstanding issue in the next week. That, of course, would be the return of the commitment fee of $750,000.00 which Progressive had provided to Mr. – Dr. Rashid and Mr. Bernstein and the other principals of Global Empire.

At issue here immediately and I appreciate the Court's tolerance in that, perhaps, too long factual recitation but what is of particular relevance to the – to the motion, is the – whether or not Progressive is entitled to petition this Court for Letters Rogatory to seek discovery from Mr. Crosbie and Mr. Reynolds in – in the Nation of Canada.

Now Letters Rogatory, are – the issuance of Letters Rogatory is – is a matter that is within the sound discretion of every United States District Court to either grant or not grant. There is statutory authority regarding Letters Rogatory at 28 United States Coal – United States Code, Section 1781. Letters Rogatory are anticipated by the Federal Rules of Civil Procedure in 28(b)(1)(B) but ultimately there are – it is a matter within the discretion of the Court as to whether or not the Court desires to or feels that Letters Rogatory are appropriate.

Letters Rogatory are in essence a declaration by a United States Court, that it would be appropriate for a foreign nation to honor those Letters Rogatory and itself compel the participation in discovery of its own citizens. Essentially, after the Letters Rogatory issued from the United States District Court, it is then a matter that is incumbent upon the party to enforce through the foreign court system with or without the assistance of the United States Department of State. But it's within the Court's discretion as a matter of first instance, whether or

not those Letters Rogatory are called for under the circumstance of the case.

The courts generally focus on two primary issues with regard to issuing Letters Rogatory; that is unavailability of the witnesses without the issuance of the Letters Rogatory; and, what relevance or materiality the evidence is that is being sought from the individuals who are the subject of the Letters Rogatory.

With regard to the unavailability of the witnesses at issue here, Mr. Crosbie and Mr. Reynolds, it is important to note that Progressive is without authority to compel their participation in the discovery process or to submit to depositions absent the issuance of Letters Rogatory. They are foreign nationals. This Court has expressly held that it is not taking jurisdiction over those gentlemen. So absent the issuance of Letters Rogatory, Progressive would have no means to compel their participation.

Beyond that, both Mr. Crosbie and Mr. Reynolds have submitted affidavits to this Court in support of their Motion to Dismiss that was filed earlier this year, I believe, Your Honor. And in those affidavits which are part of the record before the Court, both of them evidenced tremendous hostility towards the pursuit of this litigation by the plaintiff corporation, indeed asked the Court to sanction Plaintiff's counsel, and – and testified, both witnesses testified that they had nothing to do with the matter despite acknowledging that both of them had met Dr. Rashid, one of the named defendants in this litigation within the United States.

Dr. Rashid presented a – an affidavit in support of that motion on behalf of those gentlemen where he echoed the same sentiments with regard to Progressive, but also testified acknowledging that he had met Mr. Crosbie and Mr. Reynolds at the introduction of David Bernstein, another named defendant, in the United States to discuss a business venture. The nature of that business venture was never discussed or the subject of description by Dr. Rashid in his affidavit. However, he testified himself that that was one of the topics that was discussed between himself, Mr. Bernstein, Mr. Crosbie and Mr. Reynolds.

Your Honor, that goes directly toward the issue of materiality or relevance. In the record before the Court is affidavit testament from the two subjects of this litigation, who acknowledge having met with one of the defendants personally. That defendant, Dr. Rashid, has testified before this Court and on the record of this Court, that the subject of the discussions in the United States of America was the pursuit of a business venture. This – Dr. Rashid also testified that he met them at the – at the introduction of Mr. Bernstein. And it’s important to note that the January 13, 2006 correspondence of Mr. Bernstein to Governor Moore, again, makes reference to Mr. – Mr. Crosbie as an individual with whom he was maintaining a relationship in assisting in political ventures.

And finally, there is the affidavit testimony of Governor Moore which is that Mr. Bernstein and – and the folks at Progress – at Global Empire made consistent references to Mr. Crosbie and Mr. Reynolds,

that they included their CV's in the initial communication between the corporation. That they identified both of those gentlemen as directors of the corporation and it is plain by all of their admission that some relationship exists. But the extent of that relationship, the scope, the nature of it, is not precisely clear and that is material to this case. For one of two factual scenarios almost certainly exist. One, is that Mr. Crosbie and Mr. Reynolds had nothing to do with the – with the transaction between Dr. Rashid and Governor Moore and that their images, their names, their reputations were being used wrongfully by Mr. Bernstein and Dr. Rashid, and that is material to the establishment of fraud on behalf of those defendants.

The other factual scenario that could exist, is that Mr. Crosbie and Mr. Reynolds were, in fact, complicit with – with Dr. Rashid and Mr. Bernstein, that, in fact, they did discuss business ventures as Dr. Rashid testified, consummated them and that they were involved in this transaction. However, absent the issuance of Letters Rogatory by this Court, we'll never know and that is the basis of our argument and our appeal to this Court to issue Letters Rogatory that would enable our discovery as to what the truth really is here.

THE COURT: Thank you very much. Mr. Casey?

MR. CASEY: Your Honor, I have no position on the request for the Letters Rogatory.

THE COURT: Thank you very much. Have you scheduled some depositions? Do I have a recollection from reading the pleadings?

MR. CARTER: Your Honor, if I might –

MR. PARHAM: We have – we are going to need to change them because we have not been able to get agreements on dates and whatnot. So we will need to provide new dates to the Court or have it open-ended and open-ended would be fine with us.

THE COURT: All right, thank you very much. All right, I think I understand everything. I did want to ask you Mr. Casey, do you – I understand that you have no position on this motion and that's fine. Was there any part of the factual recitation by Mr. Carter that you feel compelled to take issue with?

MR. CASEY: No, Your Honor.

THE COURT: All right. Then the last thing before we adjourn here today. Mr. Casey, if you have occasion to communicate with Mr. Kramer, would you tell him that: a) I am disappointed he wasn't able to join us today; and b) I am an old man and I can't remember anything but it seems to me maybe the time either has run or is close to running on his providing or his client providing local counsel and if you would share those thoughts with him, I would appreciate it.

MR. CASEY: Yes, sir, I sure will.

THE COURT: Thank you very much.

MR. CASEY: Thank you, sir.

(WHEREUPON, the proceeding was concluded at 2:34 p.m.)

REPORTER'S CERTIFICATE

I, Sue Hatley, Official Court Reporter for the United States District Court, Northern District of West Virginia, sitting at Elkins, West Virginia, do hereby certify that the foregoing transcript is, to the best of my skill and ability, a true and accurate transcript of the proceedings had or testimony adduced in the aforementioned case as set forth on the title page hereof.

Given under my hand this 19th day of June, 2009.

/S/ SUE HATLEY
SUE HATLEY
Official U.S. Court Reporter