**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA,**
**WHEELING DIVISION**

| | | |
|---|---|---|
| **PROGRESSIVE MINERALS LLC.,** | § | |
| | § | |
| **Plaintiff,** | § | **CASE NO. 5:07-CV-108** |
| **V.** | § | |
| | § | |
| **MUHAMMAD HAROON RASHID, GERALD** | § | |
| **D. HENDRIX, DAVID M. BERNSTEIN, and** | § | |
| **JUDE O'NURKERA,** | § | |
| | § | |
| **Defendants.** | § | |

**PROGRESSIVE MINERALS LLC'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR TRIAL**

**BAKER & McKENZIE LLP**
David W. Parham
Texas State Bar No. 15459500
Elliot D. Schuler
Texas State Bar No. 24033046
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile:  (214) 978-3099
(*Admitted pro hac vice*)

and

**DINSMORE & SHOHL LLP**

/s/ Jacob A. Manning
Jacob A. Manning
State Bar No. of West Virginia 9694
2100 Market Street
Wheeling, West Virginia 26003
Telephone: (304) 230-1700
Facsimile: (304) 230-1610

Mark A. Carter
State Bar No. of West Virginia 4316
900 Lee Street
Huntington Square, Suite #600
Charleston, West Virginia 25301
Telephone: (304) 357-0900
Facsimile: (304) 357-0919

**ATTORNEYS FOR PLAINTIFF**

Progressive Minerals LLC, Plaintiff ("<u>Progressive</u>") files the following *Proposed Findings of Fact and Conclusions of Law*:[1]

## I.   PROPOSED FINDINGS OF FACT

1)   In the Spring of 2005, Progressive, through its President, Arch A. Moore, Jr. "("<u>Governor Moore</u>") was negotiating with a subsidiary of James C. Justice, Companies, Inc. ("<u>Justice</u>") for the acquisition of the Red Fox Surface Mine located near Bishop, West Virginia (the "<u>West Virginia Mine</u>").[2]

2)   Justice had owned coal interests in Virginia, West Virginia, and Kentucky for decades and advised Governor Moore that he was looking to sell some of his interests, including all assets of the West Virginia Mine.[3]

3)   The West Virginia Mine was an operating mine that was loading coal every day and producing 80,000 tons of coal per month.[4]

4)   The Purchase Price of the West Virginia Mine was $168,000,000.00.[5]  Given the purchase price, Progressive needed a source of funding for the acquisition and requested that Fred Cooper ("<u>Cooper</u>"), whom Governor Moore had known well, help locate same.[6]

5)   Mr. Cooper was not a stranger to acquisition financing having been involved in the mergers and acquisitions business for about 30-35 years.[7]   His primary emphasis is on bringing together buyers and sellers, and working on financing for different companies.[8]

---

[1] All references to Progressive's Trial Exhibits admitted in this case shall be to "Exh."
[2] See Testimony of the Honorable Arch A. Moore, Jr. ("<u>Moore Testimony</u>") at p. 99:4-8
[3] Moore Testimony at pp.  127:17-128:4.
[4] Moore Testimony at pp.  128:22-129:7
[5] Moore Testimony at p. 127:5-16.
[6] Moore Testimony at p. 103:6-9. See also Testimony of Fred Cooper ("<u>Cooper Testimony</u>") at pp. 22:1-23:10.
[7] Cooper Testimony, at p. 21: 7-11.
[8] Cooper Testimony, at p. 21: 12-22.

6)      With regard to obtaining financing for the West Virginia Mine, Cooper initially contacted several large groups including Merrill Lynch and Prudential who had coal financing experience, however, they were not interested because the deal was not large enough.[9]   Cooper also reached out to several smaller banks, but they likewise were not interested in doing coal deals.[10]

7)      Cooper also reached to many of his industry contacts, including Defendant Jude O'Nurkera a/k/a Jude Onukwugha ("O'Nurkera"), an individual whom he had not done any business with before, but who had been previously recommended years prior by a reputable group in Atlanta.[11]

8)      O'Nurkera advised Cooper that he had experience doing coal deals, including one major deal, and was therefore familiar with that process.[12]  Mr. O'Nurkera further indicated that he might know some people that might be interested in pursuing the transaction.[13]

9)      After talking with Cooper, O'Nurkera made contact with Defendant David Bernstein ("Bernstein") regarding Progressive.[14]

10)     About a week later Mr. O'Nurkera advised Cooper of Global Empire and represented that the individuals comprising Global Empire were upstanding and honorable and that Global Empire was more than capable of making a deal of this size.[15]

11)     Neither Cooper nor Governor Moore had heard of Global Empire previously but were eager to gather more information on them and their business.[16]

---

[9] Cooper Testimony at p. 23:11-21 (noting that "most of those big companies up in New York are usually looking at 500 million on up for coal transactions.")
[10] Cooper Testimony at p. 23:22-24.
[11] Cooper Testimony at pp. 24:1-9 and 25:5-8
[12] Cooper Testimony at pp. 24:10-16 and 25:22-24.
[13] Cooper Testimony at pp 24:10-14 and 35:19-24.
[14] Exh. 27.
[15] Cooper Testimony at p 26:1-5, 15-18.
[16] Cooper Testimony at p. 26:9-11

12)     Governor Moore requested that Global Empire provide information on their business and operations and forward biographies of their key officers and directors.[17]  Cooper was subsequently provided with information by O'Nurkera and Defendants Hendrix and Rashid with information on Global Empire which he forwarded to Governor Moore for review.[18]  Specifically, on April 26, 2005 Defendants faxed copies of resumes of the individuals and a PowerPoint of the related companies and their experience (the "PowerPoint").[19]

13)     The PowerPoint contained a hierarchy of Global Empire's "Organisational Structure" which showed that Global's Board of Directors was comprised of Defendant Muhammad Haroon Rashid ("Rashid") and two prominent Canadian politicians John Douglas Reynolds ("Reynolds") and John C. Crosbie ("Crosbie").[20]  Defendant Gerald Hendrix ("Hendrix") and Defendant Bernstein were also noted as officers of Global Empire.

14)     Both Governor Moore and Cooper deemed the presence of Crosbie and Reynolds on Global's board as a significant factor in their decision to push forward with Global Empire.[21]

15)     Global was further portrayed within the PowerPoint as being a global conglomeration of nine companies comprising the "Global Empire Group Companies"[22] and the resumes of Rashid and Hendrix provided detailed information about what facet of Global Empire each of these entities allegedly specialized.[23]  The other nine companies were Petroworld Services, LLC,[24] Primergy International, LLC,[25] Prime Stops, LLC,[26] Crown NRG Refinery,

---

[17] Cooper Testimony at p. 26:22-27:9
[18] Moore Testimony, at p. 103:12-26.
[19] Exhs. 17-22.
[20] Exhs. 17, 19 and 20.
[21] Cooper Testimony, at pp .28:17-29:17; 30:12-15; and 34:1-35:21.  Moore Testimony, at p. 107:1-7.
[22] Exh. 17.
[23] Exhs. 21 and 22.
[24] Petroworld allegedly provided project management construction management, facilities operations and maintenance services to the oil and gas and energy sectors both domestically and internationally.  Such services allegedly included offering complete turnkey projects from refurbishing to comprehensive installations. (see Exh. 22).

Mohawk Refining & Marketing, LLC, World Times Communications, LLC,[27] Prime Development & Construction, LLC,[28] First American Source Realty, LLC[29] and First American Source Mortgage, LLC.[30]

16)     Rashid later admitted under sworn testimony that all representations regarding Global's ownership and financial interests in the above-referenced companies as well as the stature and capabilities of all of these companies was completely false.[31]  In fact Global Empire was nothing more than a simple holding company.[32] It was not a regular entity that did business.[33]

17)     The PowerPoint further conveyed that Global Empire was an asset based investment and holding corporation that engaged in diversified investment, financial and related operations throughout the world and that had the wherewithal to finance, or arrange financing

---

[25] This corporation allegedly had several subsidiary corporations within the oil, gas and electrical energy sectors. Primergy allegedly held all of Global's oil and gas related companies which supposedly included two refineries in Texas and Louisiana (see Exh. 22).

[26] Prime Stops allegedly had formal Letters of Intent with several leading companies in the United States and Canada to purchase over 8,300 gas stations and truck stops throughout North America (see Exh. 22).

[27] World Times allegedly focused on prepaid domestic and international calling, internet service, wireless communication, WIFI and VOIP.  World Times allegedly was a pioneer in long distance and prepaid calling including establishing distribution channels within various communities in Southern California (Exh. 22).

[28] Prime Development allegedly focused on real estate investment and the construction and development of commercial and residential properties for affordable/low income housing, multi-family housing, commercial office, retail and industrial build outs and allegedly had $60 million under contract in affordable housing build-outs (Exh. 22).

[29] First American Source Reality, LLC allegedly had $75 million in properties under contract with expectations to expand operations in 2005 from Houston, Texas into Florida, New York and California (Exhs. 21 and 22).

[30] First American Source Mortgage allegedly originated residential and commercial loans for affordable housing, multi-family housing, commercial office, retail and industrial real estate. First Mortgage allegedly worked to coordinate loan origination through First Reality and Prime Development, both subsidiaries of Global Empire. It allegedly had over $60 million under contract.  (Exhs. 21 and 22).

[31] See, e.g. Exh. 23 at p. 17 (noting that Global never had any subsidiaries, or ownership percentage in any business); Exh. 23 at p. 50 (noting that Primergy was not a subsidiary of Global Empire); Exh. 23 at p. 51(noting that Petroworld did not have any employees and that Prime Stops did not own even one gas station. Exh. 23 at p. 52 (noting that neither World Times nor Crown was associated with Global Empire) . Exh. 23 at p. 53 (noting that First American Source Reality, LLC and First American Source Mortgage were independent companies that had no employees).

[32] Exh. 23 at p.51.

[33] Id.

for, the acquisition of the Mine.[34]   This representation was likewise false as demonstrated by Global's bankruptcy Schedules which showed that as of the date of the bankruptcy filing, Global Empire reflecting that upon filing for bankruptcy Global Empire only had $3,369.24 in its bank accounts.[35]

18)    The representations in the PowerPoint and related resumes, that Global's business interests allegedly encompassed a broad cross-section of industries, including all energy sectors, manufacturing companies, service industries, real estate companies as well as residential and commercial sectors,[36] were likewise false.[37]

19)    The PowerPoint clearly portrayed Global as a legitimate business with many subsidiaries.[38]   In reality, to quote Defendant Rashid months later, "Global Empire don't own interest in any one of them."[39]

20)    The misrepresentations did not end there though, as Cooper and Governor Moore attempted to conduct further due diligence to get more information on the company.[40]

21)    To accomplish this objective, Cooper requested further information on Global Empire including credit references.  References were subsequently provided by O'Nurkera or Hendrix, all of whom vouched for Global's creditworthiness.[41]

22)    Progressive likewise requested further information on financial wherewithal including bank references or other financial information.[42]   While Rashid, Hendrix and O'Nurkera did not provide direct bank information they quickly provided a letter from

---

[34] Exh. 17.
[35] Exh. 16, at Schedule B.
[36] Exh. 17.
[37] Exh. 23  at p.3-4 and 17.
[38] Cooper Testimony, at p. 42:1-19.
[39] Exh. 23 at p. 53.
[40] Cooper Testimony, at pp. 42:20-43-6.
[41] Cooper Testimony, at p. 43:7-23
[42] Cooper Testimony, at p. 43:24-44:4.

International Trust that showed the company had a large line of credit.[43]  While this was of use, attempts to reach the banker on the letter were unsuccessful.[44]

23)     Lastly, Hendrix provided a report from Hoover's website indicating that Global Empire had 25 employees and annual sales of $20 million.[45]  This report falsely represented Global Empire and was manipulated by Defendants as information from Hoover's is obtained from the company itself which is in charge of self-reporting.[46]

24)     After receiving all of this information, Cooper and Governor Moore discussed what had been provided.[47] While they each had some reservations, they were intrigued by the inclusion of  Crosbie and Reynolds being part of Global Empire and in Parliament and felt that Crosbie and Reynolds lent credibility to the organization.[48]  Specifically, Cooper stated "my particular point of credibility was the fact that they had two individuals affiliated with the company that were affiliated with the parliament in Canada.  And those particular directors, who were represented as directors, I felt gave the company credibility."[49]

25)     Both Cooper and Governor Moore emphatically agreed that the inclusion of Crosbie and Reynolds was the "hook" or the "key" to Progressive agreeing to enter into a term sheet with Global Empire.[50]

26)     On or about June 27, 2005, Progressive entered into a Term Sheet for acquisition financing (the "Term Sheet").[51] The Term Sheet detailed a $200,000,000.00 Loan (the "Loan") which contained a 5.5% interest rate payable on a quarterly basis and granted Global Empire a

---

[43] Cooper Testimony, at pp. 44:5-45:13. Exh. 28.
[44] Cooper Testimony, at p. 45:9-19.
[45] Cooper Testimony, at pp. 45:20-46:28.
[46] Cooper Testimony, at pp. 49:5-50:2. Exh. 29.
[47] Cooper Testimony, at pp.  47:15-48:1.
[48] Cooper Testimony, at p. 48:2-17.
[49] Cooper Testimony, at p. 48:8-13.
[50] Cooper Testimony, at p. 14-17. Moore Testimony, at p. 116:19-117:5.
[51] Exh. 2.

first lien on all assets, in particular the West Virginia Mine.[52]  Global Empire was also to receive a 45% ownership interest in the West Virginia Mine.[53]

27)    Pursuant to Paragraph 8 of the Term Sheet, Progressive was required to pay a Commitment Fee of $750,000.00 (the "Commitment Fee").[54]  The Commitment Fee was payable in parts: $250,000 upon execution of the Term Sheet; and $500,000.00 upon issuance of the Commitment Letter. [55]

28)    At the same time, Global likewise entered into a Corporate Guaranty, signed by Rashid, whereby they agreed to return the Commitment Fee if the loan did not close within 120 days of receipt of Funds (the "Corporate Guaranty").[56]

29)    Pursuant to these agreements, Progressive promptly forwarded the initial portion of the Commitment Fee to Global via two separate wire transfers.[57]  The first Wire Transfer, in the amount of $200,000.00 was sent on June 29, 2005.[58]  The following day Progressive made the second wire transfer of $50,000.00.[59]

30)    At that exact same time, Progressive made an additional $500,000.00 transfer to Justice to secure Progressive's right to purchase the West Virginia Mine.[60]  Governor Moore testified that but for the belief that what Defendants had stated about Global Empire, and their representations that they were going to do the deal, he would never have advanced the money to Justice.[61] Governor Moore emphatically confirmed at trial, "Not at all".[62]

---

[52] *Id*.
[53] *Id*.
[54] *Id*.
[55] *Id*. See also Moore Testimony, at p. 113:6-9.
[56] Exh. 1. See also Moore Testimony, at p. 108:1-22.
[57] Exhs. 3 and 4. See also Moore Testimony,  at p. 114: 7-21.
[58] Exh. 3. See also Moore Testimony, at p. 114:7-14.
[59] Exh. 4. See also Moore Testimony, at p. 114:15-21.
[60] Exh. 5. See also, Moore Testimony, at p. 115:2-15.
[61] Moore Testimony, at pp. 115:23-116:6.
[62] Moore Testimony, at p. 116:6.

31)     Sometime that summer, following the execution of the Agreement, but prior to the issuance of the Commitment Letter or payment of the remaining $500,000.00, O'Nurkera and Defendant Hendrix, Global's Chief Financial Officer, visited the Mine on behalf of Global, ostensibly to do due diligence.[63]

32)     A representative of Justice then flew both Hendrix and O'Nurkera in a helicopter out to visit the Mine. They spent the rest of the day reviewing the Mine and then were flown back to Justice's offices.[64]   In conjunction with their Visit, Progressive was requested to provide numerous items to assist Global with their independent due diligence.[65] Progressive and Cooper complied with every request made by Defendants.[66]

33)     Following the O'Nurkera and Hendrix visit to the Mine, on July 21, 2005, Progressive and Global executed a Commitment Letter reiterating the terms in the Term Sheet, including the return of the Commitment Fee, and setting a closing date of August 15, 2005 (the "Commitment Letter").[67]   Progressive then sent the final wire transfer, in the amount of $500,000.00 on July 26, 2005. [68]

34)     None of the Defendants raised any concerns over the transaction prior to the payments made by Progressive.[69] In fact, separate from the Corporate Guaranty, Rashid had always affirmatively stated that Global Empire was prepared to do the deal and if things fell apart the money would be refunded.[70]

35)     After the $500,000.00 payment was made Global Empire became non-

---

[63] Cooper Testimony, at pp. 50:19-51:8. Moore Testimony, at p. 123:19-24.
[64] Cooper Testimony, at pp. 50:19-51:8.
[65] Cooper Testimony, at p. 51:9-19.
[66] Cooper Testimony, at p. 51:20-24.  Moore Testimony, at p. 126: 8-18.
[67] Exh. 10. See also Moore Testimony, at pp.117:18-118:11.
[68] Exh. 6. See also Moore Testimony, at p. 120:6-18.
[69] Cooper Testimony, at p. 53:4-19.
[70] Cooper Testimony, at p. 57:1-3, 58:4-21.

communicative.[71] While Hendrix and Rashid were both immediately available to talk and respond to inquiries prior to payment, they went radio silent after the money was paid.[72] In fact, no calls were returned for a period of two to three weeks.[73]

36)    Despite making all required payments, and responding to all inquiries from Global Empire and promptly and completely complying with all due diligence requests, Global Empire did not move forward with closing as scheduled on August 15, 2005.[74]

37)    After failing to get any answer from O'Nurkera and Hendrix as to why funding had not commenced, Cooper demanded to talk with Rashid, as it was clear he was the man that was calling the shots.[75] While Rashid avoided Cooper's calls for a period of time,[76] eventually Cooper reached Rashid on Rashid's cell phone, a number that had been provided to him by O'Nurkera.[77] During that call, Rashid reiterated that Global would fund the deal.[78]

38)    While Progressive was getting concerned about whether Global Empire would fund the money, at this point it was still a firm belief, based on the Corporate Guaranty and the Defendants' representations that Progressive would at least get their money back if the deal didn't close.[79] The primary basis for this belief was the presence of Crosbie and Reynolds on the board.[80] Their purported involvement lent considerable credibility to the organization. As Cooper noted at trial "the credibility with the company was Crosbie and Reynolds at the time that we thought about it; there must be credibility with this company."[81]

---

[71] Cooper Testimony, at p. 53:20-57:3.
[72] *Id.*
[73] Cooper Testimony, at p. 54:1-3.
[74] Cooper Testimony, at p. 54:21-23; Moore Testimony,  at p. 120:12-18.
[75] Cooper Testimony, at pp. 52:16-53:3, 56:1-8.
[76] Cooper Testimony, at p. 56:5-8
[77] Cooper Testimony, at p. 56:1-13.
[78] Cooper Testimony, at p. 56:15-24 and 58:14-16.
[79] Cooper Testimony, at p. 58:4-21.
[80] Cooper Testimony, at p. 69:4-8.
[81] *Id.*

39)     On September 6, 2005 Governor Moore sent a letter to Global Empire referencing the lack of closing and Progressive's displeasure that no one from Global Empire advised him of same.[82] Within that letter Governor Moore specifically referenced the $750,000.00 commitment fee held by Global and the $500,000.00 paid by Progressive to Justice with regard to the West Virginia Mine.[83]

40)     Due to the lack of closure on this issue Governor Moore coordinated a meeting with representatives of Global Empire which Progressive understood was for the purpose of closing the deal.[84]  On or about October 10, 2005, Governor Moore and James C. Justice, II, the owner of Justice, his son, James Justice, III, Tom Lusk, Justice's Chief Operating Officer and another Justice representative flew down to Global's offices in Houston, Texas and met personally with Rashid and Defendant Bernstein.[85]

41)     Bernstein began the meeting by discussing Canadian politics and stressing the role that Global's directors Crosbie and Reynolds served in the same.[86]  Rather than just using their names in a passing reference, Bernstein stressed that they sent their regards to Governor Moore and looked forward to meeting him personally.[87]

42)     While Governor Moore had hoped that the parties would close the deal that day, Defendants had other intentions. Instead of closing the financing and acquisition, however, Bernstein, in the presence of all the individuals from Justice, presented Progressive that day with a letter written on Global Empire letterhead which contained a long list of due diligence items that he requested be delivered by November 15, 2005.[88]

---

[82] Exh. 11. See also Moore Testimony, at p. 121-8-14.
[83] Exh. 11. See also Moore Testimony, at p. 122:5-9.
[84] Moore Testimony, at pp. 122:22-123:5.
[85] Moore Testimony, at pp. 122:22-123:5, 123:12-16.
[86] Moore Testimony, at p. 124:2-16.
[87] Moore Testimony, at p. 124:14-16.
[88] Exh. 12.

10

43)     Within the October Letter Bernstein referenced that Global's "credit committee" would be meeting on November 17, 2005 to review this matter and to determine the viability of the loan application. [89]  He further stated that "in the event our credit committee regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000, the amount of your advance."[90]   There is no evidence such a committee even existed, and, given the testimony provided by Rashid regarding Global Empire, in particular that he was the sole employee,[91] the Court concludes such a committee did not exist.

44)     Upon reading the October Letter and listening to Bernstein's comments at the meeting, Governor Moore was dumbfounded commenting as follows:

" And I said, "Well, you've had that for two months yourself down here." And then he started asking for other questions all of which -- and I finally got to the point.  I  said, "Sir, I don't know -- we're here to sign and to put this proposition in the library."  And I said, "I don't know why you're asking these questions, because Mr. -- the superintendent of the mines has given you every answer that you want here." And he -- and I said, "Even you asked about the title to the property and Mr. Justice."  I said, "You've had that for almost a month and a half or two months.  And you've had that confirmed by your people when they went into" -- and he went on and he went on and he went on. I said, "Well, I think it's time for us to have somebody make a decision here.  Are we here to sell this mine?  You're not selling it to a company that's loaning the money.  You're loaning it to me."[92]

45)     Despite Bernstein's alleged concerns, there was never any question as to who owned the mine.[93]  Justice had owned the mine for a considerable number of years prior to this point and his family is well-known in West Virginia in the mining of West Virginia coal.[94]

46)     The deal did not close that day, or any day, despite Bernstein's continued assurances that the matter would be concluded either with a funding of the loan or a refund of the

---

[89] Id. See also Moore Testimony, at pp. 129:8-19.
[90] Exh. 12. See also Moore Testimony, at pp. 129:20-130:2.
[91] Exh. 23 at p. 17.
[92] Moore Testimony, at p. 126:4-22.
[93] Moore Testimony, at pp. 127:17-128:4, 129:4-7.
[94] Moore Testimony, at pp. 127:17-128:4.

Commitment Fee.[95]

47)     Despite Bernstein's statements to Governor Moore on the telephone following the meeting in Houston, and contained within the October Letter, Bernstein never advised Progressive of the alleged credit committee's determination as to whether Global Empire wanted to continue with the financing. Nor did they refund the $750,000.00 on November 18, 2005.[96]

48)     On January 4, 2006, Governor Moore sent another letter to Global Empire referencing the agreement and Bernstein's direct promises with regard to the return of the $750,000.00 commitment fee.[97] Governor Moore further advised them that he did not understand the delay in returning the money that they were obligated to refund.[98]

49)     On January 13, 2006, Progressive received a facsimile from Bernstein where he apologized for the delay and referenced that it was due to the fact that he was intensely involved in the Canadian elections with Crosbie.[99]  Bernstein called Governor Moore about ten days later and once again gave him "assurance that he was about to send us the $750,000."[100]

50)     Despite the assurances, Governor Moore never heard from Bernstein again.[101]

51)     Unknown to Progressive at the time, Global Empire had filed a petition for relief under Chapter 11 of the Bankruptcy Code on December 6, 2005, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.[102]

52)     As of the date of bankruptcy filing, Global's three bank accounts collectively contained   $3,369.24.[103] In addition to having virtually zero funds, Global's "biggest assets"

---

[95] Moore Testimony, at pp. 132:9-17, 132:23-133:11.
[96] Moore Testimony, at p. 130:13-17.
[97] Exh. 13. Moore Testimony, at p. 131:5-14.
[98] *Id*.
[99] Exh. 14. Moore Testimony, at p. 131:16-22.
[100] Moore Testimony, at p. 131:9-17
[101] Moore Testimony, at p. 131:18-22.
[102] Exh. 15.
[103] Exh. 16 at Schedule B.

were two office buildings in Houston, Texas (the "Office Park"), that were fully encumbered with secured debt against it.[104]   The date of the Promissory Note for the loan on the Office Park was June 27, 2005[105] --- approximately the same date as the initial wire transfers from Progressive.[106]

53)     Furthermore, the Schedules in Global's bankruptcy case and the sworn testimony from the 341 Creditors Meeting show that Global did not have the financial wherewithal to undertake any of the services the PowerPoint indicated it regularly offered.[107]

54)     Despite the PowerPoint's depiction of a worldwide network of affiliated entities, Global had no other subsidiaries at the time of the bankruptcy filing nor did these entities even have employees.[108]

55)     In addition to having no interest in any of the alleged subsidiaries and affiliates, Global never owned a percentage of any other business.[109]   Never in its history had Global made loans to any entity.[110]   Rashid testified under oath at the 341 Creditors Meeting in Global Empire's bankruptcy case that Global Empire was "not a regular entity that we done business through there. Is investment and holding company. That's all we do under Global Empire." [111]

56)     Despite the fact that the bankruptcy filing pre-dated Bernstein's January 2006 Letter, Bernstein did not say a word about the bankruptcy filing nor did Progressive ever hear from him again as promised.[112]   Progressive likewise never received any portion of the

---

[104] Exh. 25
[105] *Id*.
[106] Exhs. 3 and 4
[107] Exh. 16 at Schedule B. Exh. 23 at p. 20.
[108] Exh. 16 at Schedule B. Exh. 23 at pp.50-53.
[109] Exh. 23 at p.17.
[110] Exh. 23 at p.20.
[111] Exh. 23 at p. 51.
[112] Moore Testimony, at p. 131:18-22.

Commitment Fee back.[113]

57)     Despite the fact that the Commitment Fee was supposed to be a refundable deposit, it was used almost, if not entirely, and nearly immediately, for purposes personal to the Defendants. O'Nurkera admitted that he personally received $200,000.00.[114]   Apparently,   no less than $200,000.00 also went to Bernstein himself.[115]

58)     Under the circumstances, it is clear that the Defendants never intended to perform. In fact, Global was a complete sham. While its marketing materials and board composition presented the picture of a veritable conglomerate spanning across the globe, nothing contained in these materials had even the slightest bit of truth behind them.  These materials were provided to Progressive to induce Progressive to pay the Commitment Fee.  Each of the Defendants knew that nothing existed behind the façade however, and that the Defendants had no intent to perform.

59)     It is clear that the due diligence items requested in the October letter served no purpose other than delay.[116] Progressive and Justice had supplied all of this information previously and the requests came in after the loan was supposed to fund.  Cooper stressed his issues with Bernstein's due diligence list at trial noting as follows

> "the list was -- to me was just a ridiculous statement. First of all, we had supplied them with all the information months prior to that with respect to all the financial information from Justice Coal Company. The tonnage -- the coal tonnage, the equipment lists, and everything. And I made a comment, and I remember making that comment to Governor Moore that this is -- this is not necessary and why all of a sudden is this coming --coming to a point in time. Because it just appeared to me that it was just a stall tactic at that time."[117]

---

[113] Moore Testimony, at p. 130:13-16.
[114] Cooper Testimony, at pp. 70:10-71:12.
[115] Exh. 23 at p. 19 (referring to $200,00 paid to Jerome Choquette law firm). See also Exh. 17 and 18 linking Bernstein to the Choquette Beuapre Rheaume law firm.
[116] Cooper Testimony, at 64:16-20.
[117] Cooper Testimony, at p. 64:7-20.

60)     Moreover, Bernstein further perpetuated the fraud by continually bringing up Global's relationships with Crosbie and Reynolds, two prominent Canadian politicians.[118] However, Reynolds and Crosbie both deny, in a pleading sponsored by Bernstein, ever being a director, an employee of, agent of, advisor to or consultant to Global.[119] They further deny ever having a connection with Global, either directly or indirectly.[120]

61)     Bernstein has likewise backtracked and testified that neither Reynolds nor Crosbie had any connection with Global other than one meeting with Rashid in Houston.[121]  Since Reynolds, Crosbie (and Bernstein) have since filed sworn statements vehemently denying Reynolds and Crosbie's involvement with Global Empire, Bernstein's representations about them in 2005 and 2006 could only have been for the purpose of furthering the fraud and making Global appear to be something it was not.

62)     In hindsight, it is clear the intent all along was fraud. The following exchange at trial from Cooper summarizes the Defendants' conspiracy:

> Mr. Schuler:    Okay.  To your knowledge, did Global Empire ever fund the loan?
>
> Mr. Cooper:    They never funded the deal, no.
>
> Mr. Schuler:    Did they ever re-pay the amounts that were paid by Progressive?
>
> Mr. Cooper:    No, they did not.
>
> Mr. Schuler:     Okay.   Looking back, what are your thoughts on this whole arrangement from start to finish?
>
> Mr. Cooper:    My thoughts are simply, it was a scam from the very get-go.
>
> Mr. Schuler:   What makes you think that?

---

[118] Moore Testimony, at pp. 124:10-16, 131:22-132:18. See also Exh. 14.
[119] Exh 24 (Crosbie Affidavit at ¶9, Reynolds at ¶9).
[120] *Id.*
[121] Exh. 24 (Bernstein Affidavit at ¶12).

Mr. Cooper:   Well, the signal went up after the fund- --after the Governor sent the money to them.  I mean, after the $500,000 was sent, the second payment, as I had said earlier, things slowed down tremendously. Phone calls were not being returned the way they should have been returned.  Funding did not take place thee way it should have been.  So when you look back on this, and the Governor and I have talked about this several times, they set this up beautifully with respect to certain credit references.  Lines of credit, whether they were there or not there, we never verified that. Again, my opinion, and I think the Governor felt the same at the time -- I'm not speaking for him, but the credibility with the company was Crosbie and Reynolds at the time that we thought about it; there must be credibility with this company. And once this whole process slowed down, and it kept slowing down, answers were not being given, phone calls were not being returned, and I looked to Jude O'Nurkera and I said -- I'll tell you, basically, a conversation we had probably would have been somewhere in late September, early October -- my conversation with O'Nurkera was this, "I represent this man up here, and you have got $750,000 of his money, and it better be returned."

Mr. Schuler:   What did he say to that?

Mr. Cooper:   His response to me was, "Don't worry, we will fund this transaction.  I'm getting involved with this transaction now." I said, "What do you mean you're getting involved with this transaction?" "Dr. Rashid wants me to help with the funding on this." I said, "Well, why would he have to help – you have to help with the funding on this transaction, when you represented all along that Dr. Rashid has the wherewithal to fund this and the financial contacts to fund this?" And that's when we started getting in several arguments on the phone with respect to this whole transaction. And then about mid October -- mid October -- I'm going to say mid October, in the middle of October, O'Nurkera finally told me that he had taken -- that he had

gotten some money -- he had received money from Dr. Rashid.

Mr. Schuler:  He got paid out of this?

Mr. Cooper:   He got paid out of some of the deposit money.

Mr. Schuler:  Out of the deposit money?

Mr. Cooper:   Yes, $200,000.

Mr. Schuler:  Did that surprise you?

Mr. Cooper:   Yes, I was in shock to be honest with you. I said "What?" -- "What?" -- "Tell me exactly where you get off deserving any money on this transaction when it hasn't been funded, number one." "Well, I'm gonna" -- and his answer was, "I'm going to be working on this, so Dr. Rashid thought I should have some of the deposit money." And my response was, "Jude, this looks to me right now.  It looks like to me that you guys have cooked up a good scheme here." And that's how I feel today, and that's how I felt then.  And it was not funded yet; it never was funded.

Mr. Schuler:  And they never got their money back?

Mr. Cooper:   They never got their money back. I believe that Jude was involved in this tran- -- in this whole scheme.

Mr. Schuler:  And in your opinion what was the role of Crosbie and Reynolds?

Mr. Cooper:   Pardon me?

Mr. Schuler:  What was the role of Crosbie and Reynolds?

Mr. Cooper:   Well, they never came -- they never were involved in anything.  I mean, there was no involvement with me or the Governor, with Crosbie and Reynolds.

Mr. Schuler:   So -- and I guess you believe that O'Nurkera, Hendrix, Rashid, Bernstein, they basically pulled in Crosbie and Reynolds's names to perpetuate the fraud and

legitimize the transaction?

        Mr. Cooper:   I don't know to this day whether they were on that board or not, but they were represented to be on that board of directors. So Crosbie and Reynolds, I don't think, played any part of this, in my opinion.  I believe it was Rashid and Hendrix for sure; I believe O'Nurkera was involved as well.

        Mr. Schuler:  And Bernstein played the role --

        Mr. Cooper:   And Bernstein was involved as well.  Yes, that's my belief.[122]

63)     In total, the Defendants improperly obtained $750,000 from the Plaintiff. This represents the $250,000.00 paid upon execution of the Agreement and the $500,000.00 after the commitment letter was issued.

64)     In reliance upon the Term Sheet, the PowerPoint, the various actions taken by Defendants, the Corporate Guaranty and Commitment Letter with Global Empire, Progressive also expended an additional $500,000.00, to secure Progressive's right to purchase the West Virginia Mine.[123]

65)     The evidence presented by Plaintiff establishes that in reliance upon the fraudulent misrepresentations of Defendants that Global Empire was a financially solid business entity, with numerous holdings throughout the world, and could provide the necessary $200,000,000 in financing, and the reputation of alleged Board of Director members Crosbie and Reynolds, Progressive entered into an agreement with Global Empire pursuant to which Global Empire was to fund Progressive's acquisition of the West Virginia Mine.  There is no question but that Global Empire was a façade.

66)     According to its subsequent bankruptcy filing and Rashid's testimony therein,

---

[122] Cooper Testimony, at pp. 68:5-72:10.
[123] Moore Testimony, at pp. 115:2-116:6.

Global Empire had virtually no unencumbered assets, had never made a loan, and had virtually none of the many subsidiaries and holdings that had been represented to Progressive. In addition, Messrs. Crosbie and Reynolds, who were advertised as being key members of the Board of Directors, appear to have had no connection with the enterprise whatsoever.  In essence, Global Empire was the Defendants who through various lies and misrepresentations created the illusion of a mythical business enterprise in order to defraud  Progressive out of a $750,000.00 loan commitment fee.  In all, Progressive lost $1,250,000.00 as a result of the Defendants fraudulent scheme.

67)     The Court would be remiss if it did not note the complete indifference of each of the Defendants to this lawsuit. Defendant Bernstein in particular, has ignored several of this Court's orders, and the discovery rules in general.

68)     First, Defendant Bernstein violated this Court's April 1, 2009 Order Scheduling Mediation (the "April 1st Order"),[124] in which the Court initially ordered the parties to appear for mediation and requiring the parties to submit mediation statements.[125]   Indeed, Defendant Bernstein's local counsel was permitted to withdraw from representation in this case, in part, because he was unable to convince Defendant Bernstein to comply with his obligations under that order.[126]

69)     Second, Defendant Bernstein violated this Court's May 21, 2009 Order Setting Evidentiary Hearing and Argument on Plaintiff's Motion to Compel Mediation and Motion to Compel Responses to Plaintiff's Request for Production of Documents and Answers to Plaintiff's Interrogatories to Defendant David M. Bernstein (the "May 21st Order"),[127] when he

---

[124] Docket No. 45.
[125] Id.
[126] Docket No. 64.
[127] Docket No. 59.

failed to appear at the scheduled Evidentiary Hearing on Plaintiff's Motion to Compel to explain why he had failed to answer discovery requests.

70)     Finally, he violated this Court's June 23, 2009 Order Granting Plaintiff's Motion to Compel Mediation and Motion to Compel Responses to Plaintiff's Request for Production of Documents and Answers to Plaintiff's Interrogatories to Defendant David M. Bernstein (the "June 23rd Order"),[128] in three respects when he failed yet again to answer discovery requests, failed to appear for his deposition, and failed to appear for mediation.

71)     After motion by the Plaintiff,[129] with due notice and an opportunity to be heard, Defendant Bernstein was sanctioned for his conduct under Rule 37 of the Federal Rules of Civil Procedure for his failure to comply with the April 1st Order, the May 21st Order, and lastly the June 23rd Order which required him to submit to a deposition and answer interrogatories and requests for production of documents.  The Court ultimately rendered a default judgment against him.[130]

72)     While Defendant Bernstein's conduct is the most egregious, it is not unique among the Defendants.  Defendants Rashid and Hendrix were timely served but never filed any response to the Complaint. The Court has previously entered default judgments against Defendants Rashid and Hendrix, given their failure to file Answers to the Complaint or otherwise participate in this case.[131]

73)     Defendant O'Nurkera, the most cooperative of all Defendants, has done little to participate in this case--even failing, like Defendant Bernstein, to appear at the Court-ordered mediation and at trial.

---

[128] Docket No. 67.
[129] Docket No. 78.
[130] Docket No. 98.
[131] Docket Nos. 82 and 83.

## II.      PROPOSED CONCLUSIONS OF LAW

74)      Any finding of fact that may also constitute a conclusion of law shall be deemed to be a conclusion of law.  Any and all evidence or prior finding or conclusion of this Court referenced in support of a finding of fact is incorporated by reference.

75)      The Court has previously entered default judgments against Defendants Rashid and Hendrix, given their failure to file Answers to the Complaint or otherwise participate in this case.

76)      Likewise, the Court has previously entered default judgment under Rule 37 against Defendant David M. Bernstein, given his complete disregard of this Court's orders and his failure to participate in discovery, his deposition, or mediation.

77)      Counsel for the Plaintiff represented at trial that Defendant O'Nurkera has agreed to the entry by this Court of judgment against him jointly and severally with the other Defendants.  Given O'Nurkera's failure to attend trial this Court is inclined to acknowledge Plaintiff's counsel representations and enter judgment against him as well.

78)      Progressive Minerals has therefore established liability against Defendants Bernstein, Rashid, Hendrix, and O'Nurkera for fraud and conspiracy to defraud.

79)      With regard to damages, Progressive Minerals has established that it paid $750,000.00 to the Defendants as a Commitment Fee; and also expended $500,000.00 in reliance on Defendants' misrepresentations that financing would be arranged.

80)      Plaintiff further seeks an award of punitive or exemplary damages against all Defendants in an amount that will punish and deter future similar conduct by the Defendants. Given the nature of these allegations, and given the amount sought in this case, if Defendants in fact had anything really truthful to say -- any defense to these actions, they would have shown up

to present that defense.  The Court finds the fact that they have chosen to ignore this lawsuit as significant and offensive.

81)     The Supreme Court of the United States has held that punitive damages awards may exceed compensatory damages awards by "single-digit multipliers." *Etchison v. Westfield Ins. Co.,* 2006 U.S. Dist. LEXIS 70574 (N.D. W. Va. Sept. 26, 2006)(citing *State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003)). Given the level of misconduct, and indifference displayed by the Defendants, the Court believes that a high single-digit multiplier is necessary to punish and deter future similar conduct by the Defendants.

82)     It is without question that Defendants knew that the representations made to Progressive were false at the time they were made, the representations were fraudulent and malicious and constitute conduct that warrants the imposition of punitive or exemplary damages. *Cooke & Moses, LLC v. QSS-Engineered Sys. Group, LLC,* 2007 U.S. Dist. LEXIS 63650 (N.D. W. Va. Aug. 28, 2007); *Ashworth v. Albers Med., Inc.,* 410 F. Supp. 2d 471, 477 (S.D.W.Va. 2005) (citing *Lengyel v. Lint,* 167 W. Va. 272, 280 S.E.2d 66, 67 (W.Va. 1981)).

83)     Furthermore, the acts complained of were wrongful and done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations. *Peters v. Rivers Edge Mining, Inc.,* 2009 W. Va. LEXIS 22 (W. Va. Mar. 27, 2009)

84)     The Court therefore awards Plaintiff $8,750,000.00 in punitive damages representing a multiplier of seven times the compensatory damages awarded..

85)     The amount of punitive damages awarded in this case is not so excessive as to "raise a suspicious judicial eyebrow." *Peters v. Rivers Edge Mining, Inc.,* 680 S.E.2d 791, 826 (W. Va. 2009)(quoting *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 481, 113 S. Ct.

2711, 2732, 125 L. Ed. 2d 366 (1993) (O'Connor, J., dissenting)). The Supreme Court of Appeals of West Virginia has held that "[t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional." *Peters v. Rivers Edge Mining, Inc.*, 680 S.E.2d 791, 826 (W. Va. 2009)(quoting *TXO Prod. Corp. v. Alliance Resources Corp.*, 187 W. Va. 457 (W. Va. 1992). The Defendants in this case acted with evil intention and complete disregard for the judicial process. The levels of punitive damages in this case are therefore within the described boundaries.

86)      Plaintiff is therefore entitled to a total judgment in the amount of $10,000,000.00, plus pre- and post-judgment interest from the date of judicial demand.  Pre-judgment interest shall be calculated in accordance with applicable state law.  Post-judgment interest shall be calculated at the prevailing federal rate on the date of judgment.

Dated: December 15, 2009

Respectfully submitted by:

**BAKER & McKENZIE LLP**

David W. Parham
Texas State Bar No. 15459500
(Admitted pro hac vice)
Elliot D. Schuler
Texas State Bar No. 24033046
(Admitted pro hac vice)
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone:   (214) 978-3000
Facsimile:    (214) 978-3099

and

**DINSMORE & SHOHL LLP**

/s/ Jacob A. Manning
Jacob A. Manning
State Bar No. of West Virginia 9694
2100 Market Street
Wheeling, West Virginia 26003
Telephone:   (304) 230-1700
Facsimile:    (304) 230-1610

and

Mark A. Carter
State Bar No. of West Virginia 4316
900 Lee Street
Huntington Square, Suite #600
Charleston, West Virginia 25301
Telephone:   (304) 357-0900
Facsimile:    (304) 357-0919

**ATTORNEYS FOR PLAINTIFF**