IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


PROGRESSIVE MINERALS, LLC,

        Plaintiff,

v.                                   Civil Action No. 5:07CV108
                                        (STAMP)
MUHAMMAD HAROON RASHID,
GERALD D. HENDRIX,
DAVID M. BERNSTEIN,
JOHN DOUGLAS REYNOLDS,
JUDE O'NURKERA and
JOHN C. CROSBIE,

        Defendants.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  Procedural History

Progressive Minerals, LLC ("Progressive"), a limited liability company, filed this civil action against defendants Dr. Muhammad Haroon Rashid ("Rashid"), Gerald D. Hendrix ("Hendrix"), David M. Bernstein ("Bernstein"), John Douglas Reynolds ("Reynolds"), Jude O'Nurkera ("O'Nurkera") and John C. Crosbie ("Crosbie"), seeking damages arising out of plaintiff's claims against defendants for fraud, negligent misrepresentation, conspiracy to defraud and negligence dealing with plaintiff's efforts to obtain financing to acquire a coal mine in Bishop, McDowell County, West Virginia ("Bishop Mine"). Subsequently, this Court granted the motions of Reynolds and Crosbie to dismiss them for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) but found that it maintained personal jurisdiction over defendant

Bernstein and, therefore, denied his motion to dismiss for lack of personal jurisdiction.

This Court entered default against defendant Rashid pursuant to Federal Rule of Civil Procedure 55(a) for his failure to plead or otherwise respond to the summons and complaint. Also, this Court entered, pursuant to Federal Rule of Civil Procedure 55(a), a default against defendant Hendrix for his failure to plead or otherwise respond to the complaint.

Later, this Court entered a memorandum opinion and order granting plaintiff's motion for default against defendant Bernstein under Federal Rule of Civil Procedure 37 for his failure or refusal to comply with this Court's orders and with his discovery obligations under the Federal Rules of Civil Procedure. This Court, however, did permit defendant Bernstein to appear at a trial or hearing on damages but limited his right to appear and present only the very limited discovery that he had already provided to the parties. Notwithstanding this opportunity, defendant Bernstein did not further appear and take part in the non-jury trial or hearing in this case.

On October 14, 2009, the remaining defendant O'Nurkera, filed pro se, a pleading which he styled "Defendants' Affirmative Defenses of Jude O'Nurkera." With further respect to O'Nurkera, this Court denied plaintiff's motion in limine to prevent O'Nurkera from presenting any evidence at the trial or damages hearing. That

denial was conditioned upon the fact that O'Nurkera could appear at the trial or hearing and present the documentation that he said he had provided to Progressive at one time or another. Defendant O'Nurkera did not appear at the trial on October 14, 2009. However, at the trial on October 14, 2009, counsel for Progressive announced that Progressive had reached a settlement with O'Nurkera in which it was agreed that O'Nurkera would pay Progressive a certain sum of money on the first day of trial and then pay a remaining sum of money by the end of the year 2009. The terms of the settlement further provided that if O'Nurkera failed to make these payments then O'Nurkera agreed that he would be liable, jointly and severally, for whatever judgment this Court might enter against the other remaining defendants, Rashid, Hendrix and Bernstein. Counsel for Progressive indicated that following this Court's ruling at the conclusion of the trial, counsel for Progressive and O'Nurkera would be presenting "an agreed judgment" with respect to O'Nurkera.

Consequently, a non-jury trial in this civil action proceeded on October 14, 2009 against defendants Rashid, Hendrix, and Bernstein. On December 15, 2009, Progressive filed a Motion for Entry of Judgment Against Defendant Jude O'Nurkera a/k/a Jude Onukwugha. To date, this Court has received no further information regarding plaintiff's settlement with O'Nurkera, particularly as to

3

whether the final payment of the settlement amount was made on or before December 30, 2009.

Based upon this Court's review of the evidence, upon the resolution of any factual disputes after giving due consideration to the credibility of witnesses and the various documents produced as exhibits and based upon this Court's review of the applicable law, this Court, pursuant to Federal Rule of Civil Procedure 52(a), hereby makes the following findings of fact and conclusions of law and finds that plaintiff Progressive is entitled to judgment against defendants Rashid, Hendrix and Bernstein subject to any agreed judgment order to be presented regarding a judgment against defendant O'Nurkera.

## II.  <u>Findings of Fact</u>

1.   In 2005, Progressive, through its president, Arch A. Moore, Jr. ("Moore"), began negotiating with a subsidiary of James C. Justice Companies, Inc. ("Justice") to acquire the Red Fox Surface Mine located near Bishop, West Virginia ("Bishop Mine").

2.   Justice owned coal properties in Virginia, West Virginia and Kentucky for a number of years.  Justice advised Moore that it was interested in selling some of its mine interests, including all assets of the Bishop Mine.

3.   The Bishop Mine was an operating coal mine loading coal each day and producing 80,000 tons of coal per month.

4.    The purchase price of the Bishop Mine was $168 million. For the amount of this purchase price, Progressive needed to obtain a source of financing and, therefore, Moore asked Fred Cooper ("Cooper") to assist Progressive in locating that financing.

5.    Cooper had had experience in acquiring financing of this type and with regard to financing for the Bishop Mine, he initially contacted several groups that had coal financing experience. However, these groups were at that time not interested because the transaction was not of sufficient size.    Cooper also contacted several smaller financial institutions, but they were also not interested in the financing.

6.    Accordingly, Bishop approached some of his other industry contacts including defendant O'Nurkera with whom Cooper had done business before and who had been previously recommended by Cooper's contacts in Atlanta, Georgia.

7.    O'Nurkera told Cooper that he had experience in coal financing and was familiar with the process.    O'Nurkera also indicated that he might know people who might be interested in pursuing the Bishop Mine transaction.

8.    O'Nurkera then made contact with defendant Bernstein regarding financing for Progressive.

9.    O'Nurkera told Cooper of an entity called Global Empire Investments & Holding, LLC ("Global Empire") and represented that the individuals comprising Global Empire were reputable and that

5

Global Empire was capable of putting together a transaction the size of the proposed Bishop Mine purchase.

10.  Neither Cooper nor Moore had ever heard of Global Empire but were interested in obtaining more information about Global Empire and its business.

11.  Moore asked Global Empire to provide certain information concerning their business operations and also to provide information concerning their key officers and directors.  Cooper was subsequently provided with information by O'Nurkera concerning defendants Hendrix and Rashid and with information dealing with Global Empire which Cooper forwarded to Moore for his review. Progressive was provided faxed copies of resumes of these individuals as well as a PowerPoint of related companies and their experience ("PowerPoint").

12.  This PowerPoint described Global Empire's organizational structure and showed that Global Empire's board of directors consisted of Rashid, Reynolds and Crosbie.  Reynolds and Crosbie were represented to be prominent Canadian politicians.  Hendrix and Bernstein were also listed as officers of Global Empire.

13.  Cooper and Moore considered the presence of Crosbie and Reynolds on Global Empire's board of directors to be a significant factor in their decision to have Progressive go forward with a transaction with Global Empire.

14. Global Empire also portrayed in its PowerPoint presentation that it consisted of nine companies described as "Global Empire Groups Companies." Further, the resumes of Rashid and Hendrix provided information about every facet of Global Empire in which these entities specialized. The other nine companies were Petroworld Services, LLC, Primergy International, LLC, Prime Stops, LLC, Crown NRG Refinery, Mohawk Refining & Marketing, LLC, World Times Communications, LLC, Prime Development & Construction, LLC, First American Source Realty, LLC and First American Source Mortgage, LLC. Significantly, defendant Rashid later admitted under sworn testimony that the representations regarding Global Empire's ownership and financial interest in these companies, as well as the stature and capabilities of these companies, was false. Actually, Global Empire was a simple holding company and was not even an entity that did any business.

15. The PowerPoint further portrayed Global Empire as being an asset-based investment and holding company engaged in diversified investment, financial and related operations throughout the world. It represented that Global Empire had the wherewithal to finance or arrange finances for the acquisition of the Bishop Mine. This representation also proved to be false as shown by Global Empire's bankruptcy schedules produced at the trial which showed that, as of the date of the bankruptcy filing, Global Empire had only $3,369.24 in its bank accounts. The PowerPoint also

7

represented that Global Empire's business interests encompassed a cross-section of different industries.  These representations were also false.  The PowerPoint portrayed Global Empire as a legitimate business with many subsidiaries which was not the case.

In further pursuit of the financial transaction for Progressive with Global Empire, Cooper requested additional information on Global Empire including credit references, which reference were later provided by O'Nurkera or Hendrix.  These references vouched for Global Empire's creditworthiness.

16.  Progressive also requested additional information regarding Global Empire's finances.  Although Rashid, Hendrix and O'Nurkera did not provide requested bank information, they did provide a letter from an entity called International Trust that showed the company had a large line of credit.  Attempts to reach the banker who had issued this letter were unsuccessful.

Hendrix also provided a document called a "Hoover Report" in which Hoover, which appears to be a Dun & Bradstreet Company, indicated that Global Empire had 25 employees and annual sales of $20 million.  This report incorrectly represented Global Empire's true status.

Following receipt of all of the above information, Cooper and Moore discussed the information provided and, while having some reservations, were still interested in the fact that Crosbie and Reynolds were represented as being part of Global Empire's

operation as well as being members of the Canadian Parliament. Cooper felt that their inclusion as directors lent credibility to the project with regard to Global Empire. Cooper and Moore both felt that the inclusion of Crosbie and Reynolds was a "hook" or "key" to plaintiff Progressive's agreeing to enter into a financing arrangement with Global Empire.

17. Progressive then entered into a Term Sheet for the acquisition financing. This Term Sheet detailed a $2 million loan ("Loan") at a 5.5% interest rate payable quarterly. The loan would grant Global Empire a first lien on all assets, particularly the Bishop Mine. Global Empire was also to receive a 45% ownership interest in the Bishop Mine. As part of the Term Sheet, Progressive was required to pay a commitment fee of $750,000.00 ("Commitment Fee"). This Commitment Fee was payable as follows: $250,000.00 upon the execution of the Term Sheet and $500,000.00 upon the issuance of a Commitment Letter. Also, Global Empire entered into a Corporate Guaranty signed by Rashid in which Global Empire agreed to return the Commitment Fee if the Loan did not close within 120 days of receipt of the funds ("Corporate Guaranty").

18. In compliance with this agreement, Progressive forwarded the initial portion of the Commitment Fee to Global Empire by two wire transfers. The first wire transfer was made in the amount of $200,000.00. The second wire transfer was made in the amount of

$50,000.00.   At the same time, Progressive made an additional $500,000.00 transfer to Justice to secure Progressive's right to purchase the Bishop Mine.  Moore testified at trial that, but for the belief that what the defendants had stated about Global Empire was true and their representations that they were going to enter into the financial transaction, he would never have advanced the money to Justice.

19.  Following the execution of the agreement but prior to the issuance of the Commitment Letter or payment of the remaining $500,000.00, O'Nurkera and defendant Hendrix, represented to be Global Empire's Chief Financial Officer, visited the Bishop Mine on behalf of Global Empire, presumably to conduct some due diligence investigation.

20.  A representative of Justice flew both Hendrix and O'Nurkera in a helicopter to visit the Bishop Mine.  Individuals spent the day reviewing the Bishop Mine and were then flown to Justice's offices.  As a result of that visit, Progressive was requested to provide numerous items to assist Global Empire with their independent due diligence review.  Progressive and Cooper complied with each request made by these defendants.

21.  After O'Nurkera and Hendrix visited the Bishop Mine, Progressive and Global Empire executed a Commitment Letter which reiterated the terms in the Term Sheet, including the provision relating to the Commitment Fee and scheduling a closing date of

10

August 15, 2005.  Progressive then sent the final wire transfer in the amount of $500,000.00.

22.  Notably, no defendant dealing with Progressive raised any concern about the transaction prior to the payments made by Progressive.  In fact, separate from the Corporate Guaranty, Rashid affirmatively stated that Global Empire was prepared to complete the transaction and that if the transaction was not completed, the money would be refunded to Progressive.

23.  After Progressive made the $500,000.00 payment to Global Empire, Global Empire made no further response.  Hendrix and Rashid made no responses after the payment even though they had been available to talk prior to the payment.  Indeed, no calls were returned by any defendant previously dealing with Progressive for a period of two or three weeks.

24.  Even though Progressive had made all required payments and responded to all questions raised by Global Empire and even though Progressive had promptly and completely complied with all due diligence requests by Global Empire, Global Empire did not take any action to move forward with the closing scheduled for August 15, 2005.

25.  After Progressive had failed to get any response from either O'Nurkera or Hendrix as to why the funding had not been commenced, Cooper demanded to talk with Rashid.  Rashid avoided Cooper's calls initially but eventually Cooper reached Rashid on

Rashid's cell phone, which cell phone number had been provided to Cooper by O'Nurkera.  During that telephone conversation, Rashid reiterated that Global Empire would fund the deal.

26.  At this point, Progressive, while somewhat concerned about whether Global Empire would be able or willing to fund the transaction, still believed, based upon the Corporate Guaranty and representations made by the defendants, that Progressive would be able to at least get its money back if the deal fell through. Progressive relied, in large part, upon the stated presence of Crosbie and Reynolds on Global Empire's board of directors which it felt lent credibility to Global Empire's organization.

27.  On September 6, 2005, Moore sent a letter to Global Empire referencing the fact that the closing had not taken place and noting Progressive's displeasure that no one from Global Empire was communicating with Progressive.   In that letter, Moore specifically referenced the $750,000.00 Commitment Fee still held by Global Empire and the $500,000.00 which Progressive had paid to Justice as a down payment on the acquisition of the Bishop Mine.

On October 10, 2005, Moore, James C. Justice, II (the owner of Justice), his son, and other Justice representatives flew with Moore to Global Empire's offices in Houston, Texas where they met personally with defendants Rashid and Bernstein.

28.  At that meeting, Bernstein stressed the role that Global Empire's directors, Crosbie and Reynolds, were playing.  In fact,

12

Bernstein specifically mentioned that these individuals sent their regards to Moore and looked forward to personally meeting him.

29.   While Moore believed that the transaction would close on that day, he learned that defendants felt otherwise.   Instead of closing the transaction, Bernstein, in the presence of all individuals from Justice, gave Progressive a letter written on Global Empire's letterhead which contained a lengthy list of more due diligence items which Global Empire required to be completed by November 15, 2005.

30.   Significantly, in that letter Bernstein mentioned that Global Empire's "credit committee" would meet on November 17, 2005 to review the matter and determine the viability of the loan application.   The letter stated that: "[i]n the event our credit committee regretfully declines we shall remit to you by cashier's check on November 18, 2005, $750,000.00 the amount of your advance."   Since there is no evidence, at trial or otherwise, that a "credit committee" even existed since Rashid had indicated that he was the sole employee of Global Empire, it is more likely than not that such a committee did not, in fact, even exist.   After reading Bernstein's letter and listening to Bernstein's comments at the meeting, Moore expressed his dissatisfaction with the fact that the loan was not closing on that date and that still further information was being required.   Indeed, there appears to not be any question as to the fact that Justice owned the Bishop Mine.

31.   The Bishop Mine loan did not close on the day of the meeting or on any day thereafter despite Bernstein's assurances that the matter would be concluded either by funding the loan or by refunding the Commitment Fee.  Bernstein never advised Progressive of the so-called credit committee's determination as to whether Global Empire wished to continue the financing, and defendants never refunded the $750,000.00 on November 18, 2005, as promised.

On January 4, 2006, Moore again wrote to Global Empire referring to the agreement as well as Bernstein's promises with regard to the return of the $750,000.00 Commitment Fee.  Moore indicated that he did not understand why there was a delay in returning the money that Global Empire was obligated to refund.

32.   On January 13, 2006, Progressive received a facsimile message from Bernstein in which he apologized for the delay and indicated that it was due to the fact that Bernstein was involved in the Canadian elections with Crosbie.  Bernstein called Moore about ten days later and again gave him some assurance that Bernstein was about to send Progressive the $750,000.00 as a refund.  However, despite these assurances, Moore never again heard from Bernstein.

33.   Unknown to Progressive, at that time Global Empire had filed a petition for relief under Chapter 11 of the Bankruptcy Code on December 6, 2005 in the United States Bankruptcy Court for the Southern District of Texas.  As of the date of that bankruptcy

14

filing, Global Empire's three bank accounts collectively contained $3,369.24.   In addition to virtually having no funds, Global Empire's biggest assets were two office buildings in Houston, Texas that were fully encumbered with secured debt against them.   The date of the promissory note on the Houston, Texas buildings was June 27, 2005, which was approximately the same date as the initial wire transfers from Progressive.  Further, the schedules in Global Empire's bankruptcy proceeding and the sworn testimony from the 341 creditors' meeting illustrate that Global Empire did not have the financial wherewithal to undertake any of the services the PowerPoint had indicated Global Empire regularly offered.  Despite the PowerPoint's description of a worldwide network of affiliated entities, Global Empire had no other subsidiaries at the time of the bankruptcy filing.  Global Empire never owned a percentage of any other business.  Global Empire had never made any loans to any entity.  Indeed, Rashid testified under oath at the 341 creditors' meeting in the bankruptcy case that Global Empire was "only a simple holding company.  Investment company.  That's all."

34.  Bernstein never mentioned the bankruptcy filing even though that filing predated Bernstein's January 2006 letter to Moore.  Progressive never again heard from Bernstein as he had promised.  Progressive never received any portion of the Commitment Fee.  There is sufficient evidence from Rashid's testimony at the 341 creditors' meeting for this Court to conclude that the

15

Commitment Fee, which was never refunded to Progressive was used for purposes personal to at least some of the defendants. Monies were personally paid to O'Nurkera as well as to Bernstein or his law firm.

35. Defendants clearly never intended to perform their obligations under the agreements. In this case, the defendants responsible are Rashid, Hendrix, Bernstein and O'Nurkera. Even though Crosbie and Reynolds were initially listed as defendants, it is clear from their individual affidavits as well as other evidence that they were not involved in this transaction and that the other defendants merely used their names to induce Progressive to pay the Commitment Fee.

36. The due diligence requests contained in the October letter were only for purposes of delay. Progressive and Justice had supplied most if not all of this information previously, and these October requests were made after the loan was supposed to close. The testimony at trial, undisputed by defendants Rashid, Hendrix, Bernstein and O'Nurkera, is clear and convincing evidence that the representations of these defendants were fraudulent and that these defendants improperly obtained $750,000.00 from Progressive represented by the $250,000.00 paid upon execution of the agreement and the $500,000.00 paid after the Commitment Letter was issued.

16

37.   In reliance upon the Term Sheet, the PowerPoint and the various actions taken by defendants, the Corporate Guaranty and Commitment Letter with Global Empire, Progressive also spent an additional $500,000.00 to secure Progressive's right to purchase the Bishop Mine.

38.   There is also clear and convincing evidence presented by Progressive that in reliance upon the fraudulent misrepresentations of the defendants that Global Empire was a financially solid business entity with numerous holdings throughout the world that could provide the necessary $200,000.00 in financing and the false representations about Crosbie and Reynolds, Progressive entered into an agreement with Global Empire under which Global Empire was to fund Progressive's acquisition of the Bishop Mine.  There is clear and convincing evidence that Global Empire had virtually no unencumbered assets, had never made a loan and had virtually none of the many subsidiaries and holdings that had been represented to Progressive.  It is also clear that Crosbie and Reynolds, who were being advertised by the defendants as being key members of the board of directors of Global Empire, had no connection to Global Empire.  All of the above representations were made in order to defraud Progressive out of a $750,000.00 loan Commitment Fee.  In all, Progressive lost $1,250,000.00 as a result of defendants' fraudulent scheme.

17

39.  Even though defendant Bernstein originally filed an answer, he subsequently showed a complete indifference to this civil action and ignored several of this Court's orders.  Bernstein violated this Court's April 1, 2009 order scheduling mediation in which this Court initially ordered the parties to appear for mediation and required the parties to submit mediation statements. Defendant Bernstein's local counsel was permitted to withdraw from representation in this case in part because counsel was unable to convince defendant Bernstein to comply with his obligations under this Court's order.  In addition, defendant Bernstein violated this Court's May 21, 2009 order setting an evidentiary hearing and argument on plaintiff's motion to compel mediation and motion to compel responses to plaintiff's request for production of documents and answers to plaintiff's interrogatories to defendant David M. Bernstein.  Bernstein failed to appear at the scheduled evidentiary hearing on plaintiff's motion to compel to explain why he had failed to answer these discovery requests.

40.  Finally, defendant Bernstein violated this Court's June 23, 2009 order granting plaintiff's motion to compel mediation and motion to compel responses to plaintiff's request for production of documents and answers to plaintiff's interrogatories to defendant Bernstein, in three respects, when he failed again to answer discovery requests, failed to appear for his deposition, and failed to appear for mediation.

41.   After a motion filed by Progressive, with due notice and an opportunity to be heard, defendant Bernstein was sanctioned for his conduct under Rule 37 of the Federal Rules of Civil Procedure because of his failure to comply with the Court's orders.   This Court ultimately rendered a default against Bernstein in the manner provided above.

42. Defendants Rashid and Hendrix were timely served but never filed any response to the complaint.   This Court has previously entered defaults against defendants Rashid and Hendrix, given their failure to plead or otherwise respond to the complaint in this civil action.

43. Defendant O'Nurkera, even though he might be described as the most cooperative of defendants, has done little to participate in this case even failing, like defendant Bernstein, to appear at the court-ordered mediation, the pretrial conference and the non-jury trial.

44. The contents of each exhibit admitted at trial are also adopted as part of these findings of fact.

45. Any finding made by this Court which is not a finding of fact shall be deemed a conclusion of law.

### III.   Conclusions of Law

1.   This Court has previously entered default against defendants Rashid and Hendrix given their failure to plead or otherwise defend this civil action.   (Docs. 82 and 83).

2.   Also on September 30, 2009, this Court entered a memorandum opinion and order granting Progressive's motion for default under Rule 37 of the Federal Rules of Civil Procedure as against defendant Bernstein.   This Court directed the clerk to enter default against defendant Bernstein pursuant to Federal Rule of Civil Procedure 37 because of his egregious and flagrant refusal to comply with several court orders, as well as general discovery rules.   Nevertheless, this Court held that it would permit defendant Bernstein to appear at trial, but limit his evidence to only that revealed through discovery that he has already provided to the parties, which is limited.   However, defendant Bernstein did not attend the trial of this case or in any other way submit evidence.

3.   Therefore, the primary purpose of this non-jury trial was to determine the amount of damages to be awarded to Progressive and to be paid by defendants Rashid, Hendrix and Bernstein.

4.   Further, counsel for the plaintiff represented at trial that defendant O'Nurkera has agreed to the entry by this Court of judgment against him jointly and severally with the other defendants, Rashid, Hendrix and Bernstein.   In view of O'Nurkera's failure to attend trial, this Court must acknowledge plaintiff's counsel's representations and enter judgment against him as well. Progressive on December 15, 2009 filed a motion for entry of judgment against defendant Jude O'Nurkera a/k/a Jude Onukwugha

setting forth the terms of its settlement with O'Nurkera and attaching a copy of the settlement release and compromise agreement with O'Nurkera.  Progressive represents that defendant O'Nurkera has satisfied the first term of the settlement, namely the payment of $5,000.00.  It appears that under the settlement $30,000.00 was to be paid on or before December 30, 2009.  Plaintiff represents that according to the terms of the settlement agreement, defendant O'Nurkera has agreed to entry of judgment against him pending the second payment.  O'Nurkera has also agreed that the amount of that judgment will be the amount that this Court decides was proven against defendants Bernstein, Hendrix and Rashid at the trial of this action.  Progressive has agreed to release that judgment if the $30,000.00 payment is made on or before December 30, 2009, but otherwise it may proceed to collect on the judgment.  As of this date, this Court has not been advised as to whether O'Nurkera has paid the $30,000.00.  Accordingly, this Court will include O'Nurkera in the judgment of this case subject to his release from that judgment hereafter upon proper notification to this Court by Progressive.

5.   Based upon all of the evidence in this case, Progressive has established liability against defendants Bernstein, Rashid, Hendrix and O'Nurkera for fraud and conspiracy to defraud.

6.   Under West Virginia law, the elements of fraud are: (1) that the act claimed to be fraudulent was the act of the defendant

or induced by the defendant; (2) that it was material and false; (3) that the party relied upon it; and (4) that the party was damaged because that party relied upon it.  <u>Folio v. City of Clarksburg</u>, 655 S.E.2d 143, 221 W. Va. 397 (2007).  Progressive has established by clear and convincing evidence that it paid $750,000.00 to the defendants as a Commitment Fee and also spent $500,000.00 in reliance upon defendants' misrepresentations that financing would be arranged.  Accordingly, Progressive is entitled to an award of compensatory damages in the amount of $1,250,000.00.

7.    Progressive further seeks an award of punitive or exemplary damages against defendants Rashid, Hendrix, Bernstein and O'Nurkera in an amount sufficient to punish and deter future similar conduct by these defendants.

8.    The Supreme Court of the United States has held that punitive damages awards should exceed compensatory damage award by "single-digit multipliers."  <u>State Farm Mutual Auto Ins. Co. v. Campbell</u>, 538 U.S. 408, 425, 123 S. Ct. 1530, 15 L.Ed.2d 585 (2003).

9.    This Court finds that defendants knew that the representations made to Progressive were false at the time they were made, that the representations were fraudulent and malicious and constituted conduct that warrants the imposition of punitive or exemplary damages.

10.   Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as the harm that actually has occurred.   The court may consider the reprehensibility of the defendant's conduct, how long the defendant continued his actions, whether he was aware that his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether or how often the defendant engaged in similar conduct in the past and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.   If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit so that the award discourages future bad acts by the defendant. <u>Boyd v. Goffoli</u>, 608 S.E.2d 169, 216 W. Va. 552 (2004).

11.   This Court finds that the actions of the defendants were indeed reprehensible and certainly caused harm to Progressive. Further, defendants on multiple occasions wilfully attempted to conceal or cover up their actions and the harm caused by repeatedly promising to complete the financial transaction when in fact they had no intention of doing so but rather intended only to keep the monies paid by Progressive.   This harm also consisted of the amount that Progressive paid to Justice which it was unable to recover. Defendants never made any effort to make amends by refunding the

amounts paid or by concluding the transaction.  Without question,
the defendants profited from their wilful, intentional and
malicious wrongful conduct.  Therefore, this Court awards plaintiff
Progressive $3,750,000.00 in punitive damages representing a
multiplier of three times the compensatory damages awarded.

12.  Plaintiff Progressive is therefore entitled to a total
judgment in the amount of $5 million plus pre-judgment and post-
judgment interest from the date of this judgment.  Post-judgment
interest shall be in the amount of 0.41%.  Plaintiff has requested
pre-judgment interest but has offered no calculation as to the
amount of said pre-judgment interest.  This Court, therefore,
defers entering judgment on the issue of pre-judgment interest in
order that plaintiff Progressive may consider and then offer a
written calculation as to the proper computation of pre-judgment
interest as well as the amount upon which the pre-judgment interest
is calculated.[1]  Accordingly, plaintiff is DIRECTED to prepare a
computation of pre-judgment interest and file a report with this
Court setting forth in detail plaintiff's recommendation regarding
how pre-judgment interest in this matter should be calculated which
filing shall be no later than **April 5, 2010**.  Once the Court has

---

[1]Pre-judgment interest shall be computed pursuant to West
Virginia Code § 56-6-31 and the interest rate shall be 7.00% as
determined by the Administrative Order of the Supreme Court of
Appeals of West Virginia entered January 4, 2010.

determined the amount of pre-judgment interest, it will enter an amended judgment order.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of these findings of fact and conclusions of law to counsel of record herein and to the pro se defendants by certified mail.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:   March 25, 2010

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE